**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

_____
                                                    :
RARITAN BAYKEEPER, INC., d/b/a              :
NY/NJ BAYKEEPER, EDISON WETLANDS  :
ASSOCIATION, INC.,                               :     Civil Action No. 3:09-cv-04117 (JAP)
                                                    :
              Plaintiffs,                            :
                                                    :
       vs.                                            :
                                                    :
NL INDUSTRIES, INC., et al.,                   :
                                                    :
              Defendants.                          :
_____:

---

**BRIEF ON BEHALF OF DEFENDANTS NEW JERSEY TURNPIKE AUTHORITY AND DIANE GUTIERREZ-SCACCETTI IN SUPPORT OF MOTION TO DISMISS PURSUANT TO FED.R.CIV.P. 12(b)(1) and (6)**

---

**DECOTIIS, FITZPATRICK, COLE
 & WISLER, LLP**
Glenpointe Center West
500 Frank W. Burr Boulevard, Suite 31
Teaneck, New Jersey 07666
(201) 928-1100

Attorneys for Defendants,
 New Jersey Turnpike Authority and
 Diane Gutierrez-Scaccetti

Of Counsel and On the Brief:
 Thomas A. Abbate

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................................................ii

PRELIMINARY STATEMENT ................................................................................................ 1

STATEMENT OF FACTS ......................................................................................................... 3

      A.  General Nature of the Lawsuit .................................................................................. 3

      B.  Allegations Against the Primary Defendants ............................................................. 4

         1.  Alleged Sediment Contamination Attributable to the NL Site ................................ 4

         2.  Alleged Sediment Contamination Attributable to NJDOT ..................................... 6

      C.  Allegations Against the New Jersey Turnpike Authority and
         Diane Gutierrez-Scaccetti ........................................................................................ 7

LEGAL ARGUMENT................................................................................................................ 9

    I.  THIS COURT LACKS JURISDICTION OVER THE NJTA DEFENDANTS
      BECAUSE THEY ARE ENTITLED TO ELEVENTH AMENDMENT
      IMMUNITY.................................................................................................................. 9

    II.  PLAINTIFFS HAVE FAILED TO PLEAD THEIR CLAIMS AS AGAINST
       THE NJTA DEFENDANTS WITH SUFFICIENT PARTICULARITY ........................ 16

    III.  THE COMPLAINT FAILS TO STATE A RCRA VIOLATION AGAINST
        THE NJTA DEFENDANTS AS A MATTER OF LAW .................................................. 22

CONCLUSION........................................................................................................................ 28

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

<u>Federal Cases</u>

<u>Ashcroft v. Iqbal</u>,
   129 S.Ct. 1937 (2009) ............................................................................................... 18, 21

<u>Bell Atlantic v. Twombly</u>,
   127 S.Ct. 1955 (2007) ....................................................................................................... 17

<u>Bell Atlantic v. Twombly</u>,
   550 U.S. 544 (2007) ......................................................................................................... 17

<u>Benn v. First Judicial District of Pennsylvania</u>,
   426 F.3d 233 (3d Cir. 2005) ............................................................................................ 11

<u>Carson Harbor Village, Ltd. v. Unocal Corporation</u>,
   287 F.Supp.2d 1118 (C.D.Ca. 2003), <u>aff'd</u>,
   433 F.3d 1260 (9th Cir. 2006) ........................................................................................ 27

<u>Conley v. Gibson</u>,
   355 U.S. 41 (1957) ........................................................................................................... 17

<u>Coon v. Willet Dairy, LP</u>,
   536 F.3d 171 (2d Cir. 2008) ............................................................................................ 26

<u>Dasrath v. Continental Airlines, Inc.</u>,
   228 F.Supp.2d 531 (D.N.J. 2002) ..................................................................................... 9

<u>Ex parte Young</u>,
   209 U.S. 123 (1908) ......................................................................................................... 15

<u>Federal Maritime Commission v. S.C. State Ports Authority</u>,
   535 U.S. 743 (2002) ......................................................................................................... 11

<u>Fitchik v. New Jersey Transit Rail Operations, Inc.</u>,
   873 F.2d 655 n. 1 (3d Cir.) (en banc), <u>cert.</u> <u>denied</u>,
   493 U.S. 850 (1989) ...................................................................................................... 9, 10

<u>Hackensack Riverkeeper, Inc. v. Delaware Ostego Corp.</u>,
   450 F.Supp.2d 467 (D.N.J. 2006) ................................................................................... 19

<u>Hafer v. Melo</u>,
   502 U.S. 21 (1991) ........................................................................................................... 10

Hallstrom v. Tillamook County,
  493 U.S. 20 (1989)...................................................................................... 18

In re Burlington Coat Factory Sec. Litigation,
  114 F.3d 1410 (3d Cir. 1997)..................................................................... 17

Interfaith Community Organization v. Honeywell International, Inc.,
  399 F.3d 248 (3d Cir.), cert. denied,
  545 U.S. 1129 (2005)................................................................................. 21

Jones v. E.R. Snell Contractor, Inc.,
  333 F.Supp.2d. 1344 (N.D.Ga.), aff'd mem.,
  120 Fed.Appx. 786 (11th Cir. 2004), cert. denied,
  544 U.S. 962 (2005).................................................................................. 24

Medical Society of New Jersey v. Herr,
  191 F.Supp.2d 574 (D.N.J. 2002) ................................................................ 9

Morse v. Lower Merion School Dist.,
  132 F.3d 902 n.8 (3d Cir. 1997).................................................................. 17

Mortensen v. First Fed. Savings & Loan Association,
  549 F.2d 884 (3d Cir. 1977).......................................................................... 9

No Spray Coalition, Inc. v. City of New York,
  2000 U.S. Dist. LEXIS 13919 (S.D.N.Y. 2000),
  aff'd, 252 F.3d 148 (2d Cir. 2001) ............................................................. 28

Pennhurst State School & Hospital v. Halderman,
  465 U.S. 89 (1984)................................................................................... 9, 14

Phillips v. County of Allegheny,
  515 F.3d 224 (3d Cir. 2008)........................................................................ 17

Pinker v. Roche Holdings Ltd.,
  292 F.3d 361 n.7 (3d Cir. 2002).................................................................. 17

Public Interest Research Group of New Jersey, Inc. v. Hercules, Inc.,
  50 F.3d 1239 (3d Cir. 1995)........................................................................ 19

Regents of the University of California v. Doe,
  519 U.S. 425 (1997).................................................................................... 11

S.J. Groves & Sons Company,
  268 F.Supp. 568 (1967) .............................................................................. 11

Seminole Tribe of Florida v. Florida,
 517 U.S. 44 (1996) ........................................................................................... 10, 15

United States v. Burns,
 512 F.Supp. 916 (W.D.Pa. 1981) ................................................................................ 28

Urbano v. Board of Managers,
 415 F.2d 247 (3d Cir. 1969), cert. denied,
 397 U.S. 948 (1970) ........................................................................................... 10, 11

Will v. Michigan Dept. of State Police,
 491 U.S. 58 (1989) ...................................................................................................... 14

## State Cases

S.E.W. Friel Co. v. New Jersey Turnpike Authority,
 73 N.J. 107 (1977) ...................................................................................................... 12

## Federal Constitutional Provisions

U.S. Const. Amend. XI ............................................................... 1, 9, 10, 11, 14, 15, 16

## Federal Statutes

P.L. 100-4 ...................................................................................................................... 23
101 Stat. 65 ................................................................................................................... 23
33 U.S.C. §1342(b) ....................................................................................................... 23
33 U.S.C. §1342(k) .................................................................................................. 26, 27
33 U.S.C. §1342(p) ....................................................................................................... 23
33 U.S.C. §1342(p)(3)(B) ............................................................................................. 23
33 U.S.C. §1365(a)(1) ..................................................................................................... 3
42 U.S.C. §§6901 .......................................................................................................... 22
42 U.S.C. §1342(p) ....................................................................................................... 23
42 U.S.C. §6901 ............................................................................................................ 22
42 U.S.C. §6903(5) ....................................................................................................... 22
42 U.S.C. §6903(27) ........................................................................................... 22, 25, 27
42 U.S.C. §6905 ............................................................................................................ 26
42 U.S.C. §6905(a) ................................................................................................... 26, 27
42 U.S.C. §6972 ............................................................................................................ 16
42 U.S.C. §6972(a)(1)(A) ................................................................................. 15, 20, 21, 22
42 U.S.C. §6972(a)(1)(B) ............................................................................................ 3, 18

## State Statutes

N.J.S.A. 27:1B-22 .................................................................................................................. 12

N.J.S.A. 27:23-2 .................................................................................................................... 12

N.J.S.A. 27:23-3(a) ............................................................................................................... 11

N.J.S.A. 27:23-17 .................................................................................................................. 13

N.J.S.A. 27:23-23.7 ............................................................................................................... 13

N.J.S.A. 27:23-3(b) ............................................................................................................... 12

N.J.S.A. 27:23-3(f) ................................................................................................................ 12

N.J.S.A. 27:23-3.2 ................................................................................................................. 12

N.J.S.A. 27:23-5(j) ................................................................................................................ 12

N.J.S.A. 27:23-5(l) ................................................................................................................ 13

N.J.S.A. 40A:12A-1 ............................................................................................................ 4, 7

N.J.S.A. 52:14B-1, et. seq. .................................................................................................... 12

N.J.S.A. 59:1-1, et. seq. ........................................................................................................ 12

## Federal Rules

Fed.R.Civ.P. 8 ....................................................................................................................... 17

Fed.R.Civ.P. 8(a)(2) .............................................................................................................. 17

Fed.R.Civ.P. 12(b)(1) ................................................................................................... 1, 9, 18

Fed.R.Civ.P. 12(b)(6) ..................................................................................................... 16, 17

## Federal Regulations

40 C.F.R. §122.26 ................................................................................................................. 25

40 C.F.R. §122.26(a)(9) .................................................................................................. 24, 25

40 C.F.R. §122.26(b)(14) ...................................................................................................... 25

40 C.F.R. §122.26(b)(16) ...................................................................................................... 24

40 C.F.R. §122.30(c) ............................................................................................................. 27

40 C.F.R. §254.3(a) ............................................................................................................... 19

40 C.F.R. §261.4(a) ............................................................................................................... 22

40 C.F.R. §261.4(a)(2) ........................................................................................................... 25

## State Regulations

N.J.A.C. 7:14A-1.1, et. seq. .................................................................................................. 23

N.J.A.C. 7:14A-25.1, et. seq. ................................................................................................ 24

## State Administrative Materials

Executive Order #41 (Codey June 15, 2005) ........................................................................ 14

Executive Order #37 (Corzine September 26, 2006) ............................................................. 14

Executive Order #155 (Corzine October 6, 2009) ................................................................ 14

NJTA Resolution #192-08 (October 10, 2008) ..................................................................... 13

## PRELIMINARY STATEMENT

For a substantial portion of the twentieth century, defendant NL Industries and others engaged in the heavy industrial use of a parcel of property located in Sayreville, New Jersey, which included the manufacture of titanium dioxide pigments and sulfuric acid.  Those activities have now ceased, but the property was left in a heavily contaminated condition, and with the ignoble distinction as one of the most polluted sites in the region.  Although a clean-up of the land is in progress, plaintiff environmental groups contend that hazardous wastes have migrated into the nearby Raritan River.  Consequently, they now seek to use the citizen suit provisions of the Clean Water Act and Resource Conservation and Recovery Act ("RCRA") to compel a host of allegedly responsible parties to engage in a far flung remedial effort to remove hazardous wastes from the sediments of the Raritan River.

As a government entity, defendant New Jersey Turnpike Authority ("NJTA") and its Executive Director, defendant Diane Gutierrez-Scaccetti, can voice no objection to the laudable principle of environmental conservation, but bring this motion to dismiss the complaint because they have been miscast in this litigation.  There are three principal reasons why the motion should be granted.  First, NJTA is a state agency, and is the alter ego of the State of New Jersey.  RCRA expressly makes citizen suits subject to the Eleventh Amendment, and the State has not waived its entitlement to immunity from suit.  Consequently, the court lacks jurisdiction and the complaint should be dismissed for this reason.

Second, NJTA's presence in this lawsuit appears to be either an afterthought, or an ill-considered attempt at overreaching.  As the operator of the Garden State Parkway and the New Jersey Turnpike, NJTA is not alleged to have had any role whatsoever in the contamination of the property.  Nevertheless, in the barest and most conclusory terms, plaintiffs allege both that

NJTA discharges stormwater into the Raritan River – pursuant to a duly issued permit under Section 402 of the Clean Water Act – and that NL Industries, in an attempt at blame shifting, had previously told the New Jersey Department of Environmental Protection that it believed NJTA's stormwater discharges were a source of contamination.  On this sole basis, plaintiffs seek to hold NJTA liable for the remedial efforts.  The Supreme Court has recently heightened civil pleading standards, and a complaint which contains mere labels and conclusions, or which does not state plausible grounds for relief, is subject to dismissal.  Here, the complaint does not sufficiently plead a factual basis for a claim under RCRA as against NJTA, and it fails for this reason.

Finally, and as noted, NJTA possesses a duly issued permit under Section 402 of the Clean Water Act that lawfully permits the discharge of stormwater into the Raritan River.  NJTA is in full compliance with the terms and conditions of that permit, and for this reason plaintiffs have brought no action under the Clean Water Act as against NJTA.  Nevertheless, plaintiffs now seek relief, under RCRA, because they allege that heavy metals suspended in NJTA's stormwater stream – an activity which is lawfully within NJTA's Section 402 permit – constitutes the unlawful disposal of hazardous waste.  The complaint is subject to dismissal in this regard because RCRA expressly exempts from liability a point source discharge that is lawfully conducted pursuant to a validly issued Section 402 permit.  Moreover, RCRA requires that its terms be interpreted in a manner that is not inconsistent with the Clean Water Act.  Here, plaintiffs seek to perform an end run around the clear provisions of the Clean Water Act, and, in essence, wish to hold NJTA liable for complying with its permit.  Such a result cannot stand, and the complaint should be dismissed.

## STATEMENT OF FACTS

### A.      General Nature of the Lawsuit

This citizens' suit was filed on August 11, 2009 by Raritan Baykeeper, Inc., and Edison Wetlands Association, Inc., (collectively, "Plaintiffs"), under enabling provisions of the Resource Recovery and Conservation Act ("RCRA"), 42 U.S.C. §6972(a)(1)(B), and the Federal Water Pollution Control Act (the "Clean Water Act" or "CWA"), 33 U.S.C. §1365(a)(1), against a host of parties for alleged contamination of sediments in the Raritan River.  (Complaint ¶¶1-2). In their three-count complaint, Plaintiffs seek a declaratory judgment, injunctive relief associated with remedial action in and around the Raritan River, together with civil penalties, costs and fees.  (Complaint ¶2).

Plaintiff Raritan Baykeeper, Inc. ("Raritan Baykeeper") is a non-profit corporation that purports to advance the ecological integrity of certain navigable waters in and around the region, including the Raritan River.  (Complaint ¶11).  In this regard, Raritan Baykeeper states that it conducts boat patrols of the Raritan River to identify sources of pollution, conduct environmental surveillance, and increase public awareness of its regulatory agenda.  (Complaint ¶¶12-14). Raritan Baykeeper alleges that it has 400 individual members, many of whom live in and around the Raritan River.  (Complaint ¶22).  This membership includes William Schultz, who holds the title of "Raritan Riverkeeper" and alleges that as a result of sediment contamination he is unable to catch and consume fish and crabs caught from the Raritan River.  (Complaint ¶¶26-28). Plaintiff Edison Wetlands Association, Inc. ("EWA"), is also a non-profit corporation seeking to advance environmental interests in the region, in a manner that is quite similar to that of Raritan Baykeeper.  (Complaint ¶¶29-36).

**B.**     <u>**Allegations Against the Primary Defendants**</u>

1.     <u>Alleged Sediment Contamination Attributable to the NL Site</u>

From the 1930's until around 2005, Defendants NL Industries Inc., and NL Environmental Management Services, Inc. (collectively, "NL Industries") owned approximately 440 acres of property in the Borough of Sayreville that is surrounded by the Raritan River on three sides (the "NL Site").  (Complaint ¶¶37-39, 49-50).  For a substantial portion of that period of time, NL Industries, and related parties, engaged in heavy industrial use of the property, including the manufacture of titanium dioxide pigments and sulfuric acid, that left the NL Site in a heavily contaminated condition, and with the ignoble distinction as one of the most heavily polluted parcels of land in the region.  (Complaint ¶50).

In  1988, NL Industries began an environmental assessment of the NL Site in order to comply with its obligations under New Jersey law, including the Environmental Cleanup Responsibility Act, and the Industrial Site Recovery Act.  As a result of this investigation, NL Industries entered into an administrative consent order with the New Jersey Department of Environmental Protection ("NJDEP") that required certain remediation and monitoring of the NL Site, which remains in progress.  (Complaint ¶51).

Notwithstanding the existence of ongoing remediation efforts, in or around 2005 defendant Sayreville Economic and Redevelopment Agency ("SERA"), a public entity created by the Borough of Sayreville pursuant to the Local Redevelopment and Housing Law, N.J.S.A. 40A:12A-1 <u>et seq.</u>, acquired the NL Site by eminent domain.  (Complaint ¶40).  SERA thereafter entered into various agreements pursuant to which it was to convey the NL Site to defendants O'Neill Properties Group, L.P., and Sayreville Seaport Associates, L.P. ("SSA"), for purposes of redevelopment and conversion of the property to a new use.  (Complaint ¶¶40-42, 52-54).  SSA

also assumed responsibility for environmental liabilities with respect to the NL Site, but NL Industries retained liability for any contamination of Raritan River sediments. (Complaint ¶55). Finally, as part of the transaction, defendant County of Middlesex obtained an access easement to the NL Site. (Complaint ¶43).

The NL Site contains two drainage structures. The first, the "North Ditch," collects surface water runoff from the site and discharges it into the Raritan River. (Complaint ¶57). The second, the "Tertiary Lagoon System," consists of a three-part lagoon system that was used for the containment and settling of process plant effluent and stormwater prior to discharge into the Raritan River. (Complaint ¶58).

As part of the remediation process, NJDEP required NL Industries to collect and analyze sediment samples from the Raritan River in and around the NL Site. (Complaint ¶60). These studies evidenced adverse levels of heavy metals, including arsenic, copper, lead, nickel and zinc, in the sediments of the Raritan River in and around the North Ditch, Tertiary Lagoon System, and generally adjacent to the NL Site. (Complaint ¶¶61-67). Consequently, plaintiffs allege that contamination of the North Ditch, Tertiary Lagoon System and ground water in, and around the NL Site has migrated to, and contaminated the sediments of the Raritan River. (Complaint ¶¶64, 67). An existing permit issued by NJDEP allows the discharge of stormwater from the North Ditch into the Raritan River through a specified stormwater outfall, however, the terms of the permit do not allow the discharge of the specified heavy metals. (Complaint ¶¶78-80).

In June 2004, NJDEP concluded that NL Industries had contributed to sediment contamination in the Raritan River, but eschewed requiring additional remediation in favor of a "regional approach" to the problem. (Complaint ¶¶69-70). NJDEP has not presently required

additional remediation of the Raritan River adjacent to the NL Site, however, the United States Environmental Protection Agency ("USEPA") has required dredging of contaminated sediments in an upstream location.  (Complaint ¶¶71-73).

Dissatisfied with the pace of governmental efforts to effectuate the remediation of the Raritan River, plaintiffs have asserted two claims against NL Industries.  In the First Count, alleging a violation of RCRA, plaintiffs allege that NL Industries has unlawfully disposed of solid or hazardous waste into the Raritan River, and have thus caused an imminent and substantial endangerment to health or the environment.  (Complaint ¶¶87-89).  In the Second Count, alleging a violation of the Clean Water Act, plaintiffs allege that NL Industries has discharged pollutants from a point source into navigable waters of the United States, and contrary to the limits defined by its existing NJDEP permit.  (Complaint ¶90-92).

2.    <u>Alleged Sediment Contamination Attributable to NJDOT</u>

The New Jersey Department of Transportation ("NJDOT"), a state agency, operates U.S. Route 9 and State Route 35, two highways that traverse the Raritan River near the NL Site.  (Complaint ¶44).  Stephen Dilts is the Commissioner of NJDOT and Bernard James is the Regional Director of Operations for NJDOT's Central Region, which includes the relevant portions of U.S. Route 9 and State Route 35 (collectively, the "NJDOT Defendants").  (Complaint ¶¶45-46).

Consistent with its delegated authority under the Clean Water Act, on August 1, 2005, NJDEP issued a Highway Agency Stormwater General Permit (the "Stormwater Permit"), that allows NJDOT to discharge stormwater into the Raritan River.  (Complaint ¶2).  Specifically, the Stormwater Permit allows NJDOT to discharge stormwater from its roadways through a "small MS4," or small municipal storm sewer system.  (Complaint ¶¶46, 82).

The Stormwater Permit does not contain numerical effluent limits, however, highway agencies discharging stormwater through a small MS4 system are required to implement a stormwater management program designed to reduce the discharge of pollutants into navigable waters to the maximum extent practicable, and in compliance with the "Statewide Basic Requirements" that have been promulgated by NJDEP. (Complaint ¶83). Highway agencies are required to annually self-certify their compliance with the terms and conditions of the Stormwater Permit. (Id.).

Since the issuance of the Stormwater Permit in 2005, NJDOT has been unable to certify its compliance with its terms, in any year, due to various violations of its substantive standards. (Complaint ¶¶85-86). For this reason, plaintiffs allege, in the Third Count of the complaint, that the NJDOT Defendants have violated the terms of the Stormwater Permit and are therefore in violation of the Clean Water Act. (Complaint ¶¶93-96). The NJDOT Defendants are also named in the First Count of the complaint, asserting a violation of RCRA for the unlawful disposal of solid or hazardous waste into the Raritan River. (Complaint ¶¶87-89).

C.   **Allegations Against the New Jersey Turnpike Authority and Diane Gutierrez-Scaccetti**

Defendant New Jersey Turnpike Authority ("NJTA") is a state agency responsible for the operation of the Garden State Parkway. (Complaint ¶47). Diane Gutierrez-Scaccetti is the Executive Director of NJTA (collectively, the "NJTA Defendants"). The complaint makes scant mention of the relationship between the NJTA Defendants and the subject of this litigation other than the fact that the Garden State Parkway traverses the NL Site. (Complaint ¶49). Also, as a highway agency, NJTA is authorized to discharge stormwater through its own small MS4 municipal storm sewer system into the Raritan River under the same Stormwater Permit as NJDOT, under the same general terms and conditions. (Complaint ¶47).

In its negotiations with NJDEP over the scope of remedial action that would be required in and around the admittedly contaminated NL Site, plaintiffs allege that NL Industries made the self-serving suggestion to NJDEP that the distribution of heavy metal contamination in the Raritan River "suggested inputs" from both the NL Site and storm sewers operated by NJDOT and NJTA.   (Complaint ¶63).   On the sole basis of this statement, Plaintiffs allege, upon information and belief, that NJTA's small MS4 system is a source of sediment contamination within the Raritan River.  (Complaint ¶68).

Plaintiffs do not allege that NJTA has ever violated the Stormwater Permit, and consequently do not assert a violation of the Clean Water Act against the agency.   Nor do Plaintiffs seek any particularized relief as against the NJTA Defendants.  (Complaint at pp. 27-28).   Rather, the NJTA Defendants are named only collectively with all of the "Defendants" in a single count, the First Count, for allegedly violating RCRA.   (Complaint ¶89).   The NJTA Defendants now bring this motion to dismiss the complaint.

**LEGAL ARGUMENT**

I.     **THIS COURT LACKS JURISDICTION OVER THE NJTA DEFENDANTS BECAUSE THEY ARE ENTITLED TO ELEVENTH AMENDMENT IMMUNITY**

The complaint should be dismissed because the court lacks subject matter jurisdiction over the NJTA Defendants pursuant to the Eleventh Amendment.  See Fed.R.Civ.P. 12(b)(1); Fitchik v. New Jersey Transit Rail Operations, Inc., 873 F.2d 655, 658 n. 1 (3d Cir.) (en banc), cert. denied 493 U.S. 850 (1989) (invocation of the Eleventh Amendment implicates the court's jurisdiction over the action).  In a facial jurisdictional challenge, the court must assume the veracity of plaintiff's allegations, however, a factual challenge does not require the court to afford a presumption of truthfulness to the allegations of the complaint.  See Mortensen v. First Fed. Savings & Loan Association, 549 F.2d 884, 891 (3d Cir. 1977); Dasrath v. Continental Airlines, Inc., 228 F.Supp.2d 531, 534 (D.N.J. 2002); Medical Society of New Jersey v. Herr, 191 F.Supp.2d 574, 578 (D.N.J. 2002) ("A facial attack on jurisdiction is directed to the sufficiency of the pleading as a basis for subject matter jurisdiction," while a factual challenge "calls into question the essential facts underlying a claim of subject matter jurisdiction.").

The Eleventh Amendment to the Constitution of the United States provides:

> The judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by citizens of another state, or by citizens or subjects of any foreign state.

The Supreme Court has consistently interpreted this Amendment to immunize an unconsenting State "from suits brought in federal courts by her own citizens as well as by citizens of another state."  Pennhurst State School & Hospital v. Halderman, 465 U.S. 89, 100 (1984).  Even when the State itself is not named as a party, the suit may nevertheless be barred if the State is the "real party in interest."  Fitchik, supra, 873 F.2d at 658 (citing Edelman v. Jordan, 415 U.S. 651, 663

(1974)); see also Seminole Tribe of Florida v. Florida, 517 U.S. 44, 54 (1996).  In this regard, "an official capacity suit against a state officer is not a suit against the official but rather is a suit against the official's office," and as such "is no different from a suit against the State itself."  See Hafer v. Melo, 502 U.S. 21, 26 (1991).

Here, there is no disputing that NJTA is an extension of the State, and, since defendant Scaccetti is sued solely in her official capacity, she is equally entitled to Eleventh Amendment immunity.  State agencies and employees that are sued in their official capacity are entitled to avail themselves of Eleventh Amendment immunity if they are the alter ego of the State.  The NJTA Defendants' existence as arms of the State is beyond material dispute, but nonetheless it bears noting that the Third Circuit has established a multi-factor test governing the issue.  See Urbano v. Board of Managers, 415 F.2d 247 (3d Cir. 1969), cert. denied 397 U.S. 948 (1970) (establishing nine-part test governing Eleventh Amendment immunity).  In Fitchik, supra the Third Circuit condensed the Urbano factors into the following three-pronged test: (1) "whether the money that would pay the judgment would come from the state;" (2) "the status of the agency under state law;" and (3) "what degree of autonomy the agency has."

In Fitchik, the ultimate issue before the court was whether New Jersey Transit – also an independent authority organized within the NJDOT and a sister agency of NJTA – was the alter ego of the state.  The court there answered the question in the negative and rejected that agency's Eleventh Amendment defense.  There are several reasons why application of the Fitchik factors to NJTA compels a contrary result.  Initially, Fitchik held that the multi-prong analysis does not require an equal weighting of the factors, but, rather, that the first factor – whether the funds to satisfy any judgment would come from the state – was the most important.  Id. at 659-60.  Thus, in a case that an en banc panel of the court admitted was a close call, New Jersey Transit was

found not to be entitled to Eleventh Amendment immunity because any judgment would not be paid directly out of the State Treasury.  Id. at 664.

While the Fitchik factors still apply, the Third Circuit has since repudiated this "unweighted" analysis.  In Benn v. First Judicial District of Pennsylvania, 426 F.3d 233 (3d Cir. 2005), the court held that "we can no longer ascribe primacy to the first factor" and relegated it "to the status of one factor co-equal with others in the immunity analysis."  Id. at 239-40.  This is consistent with recent Supreme Court precedent that has distanced the source of a judgment debtor's funds as the primary factor in analyzing Eleventh Amendment immunity.  See Regents of the University of California v. Doe, 519 U.S. 425, 431 (1997) (the analysis of whether an agency is the alter ego of the state is not merely a "formalistic question of ultimately financial liability"); Federal Maritime Commission v. S.C. State Ports Authority, 535 U.S. 743, 765 (2002) ("while state sovereign immunity serves the important function of shielding state treasuries…the doctrine's central purpose is to accord the States the respect owed them as joint sovereigns.").  Thus, Fitchik would no doubt have been differently decided were it before the court today[1].

An analysis of NJTA's status must start from the proposition that it shares many of the same governance attributes of New Jersey Transit that were discussed in Fitchik.  That is, NJTA is an independent authority organized within NJDOT, a principal executive branch department, with an independent corporate identity and capacity to sue and be sued in its own name.  N.J.S.A. 27:23-3(a) and (d).  NJTA is governed by an eight-member Board of Commissioners appointed by the Governor, and which includes the Commissioner of NJDOT.  N.J.S.A. 27:23-

---

[1] For the same reason, the District Court's decision, in S.J. Groves & Sons Company, 268 F.Supp. 568 (1967), in which it was held that NJTA is not entitled to Eleventh Amendment immunity, is contrary to the weight of modern authority and should be disapproved.

3(b).  In fact, the current chairman of the NJTA's Board of Commissioners is the Commissioner of NJDOT, a cabinet-level official.  Any action of NJTA is subject to approval of the Governor through the exercise of the executive's veto power, and, in the case of any action authorizing the incurring of indebtedness or the fixing of tolls, express pre-approval is required from *both* the Governor and the Treasurer.  N.J.S.A. 27:23-3(f).  NJTA also possesses eminent domain authority as against any other political subdivision other than the State, and is exempt from property taxation.  N.J.S.A. 27:23-5(j) and -12.  Also, NJTA's primary source of revenue is through the collection of tolls and the issuance of debt instruments, and in this regard the credit of the State is not pledged to NJTA creditors.  N.J.S.A. 27:23-2.  Finally, NJTA is subject to both the Administrative Procedures Act, N.J.S.A. 52:14B-1 et seq. and the New Jersey Tort Claims Act, N.J.S.A. 59:1-1 et seq.  See S.E.W. Friel Co. v. New Jersey Turnpike Authority, 73 N.J. 107, 118 (1977) (holding the New Jersey Tort Claims Act applicable to NJTA).

However, there are several additional factors, not considered in Fitchik, which closely align NJTA with the Executive Branch and implicate the public fisc.  First, NJTA is subject to State oversight, and is required to coordinate its transportation and planning priorities with the Executive Branch.  It is required to submit to the NJDOT Commissioner, the Governor, Treasurer and the Legislature an annual report of its operations and finances, operating and capital improvement budget, and "a plan that details proposed transportation projects and proposed work on existing transportation projects that further the goals of attaining coordinated and integrated Statewide and regional transportation systems."  N.J.S.A. 27:23-3.2.  NJTA is also required to coordinate with NJDOT with respect to its capital investment strategy.  See N.J.S.A. 27:1B-22 (requiring NJTA and NJDOT to jointly prepare a long-term Statewide Capital

Investment Strategy with respect to transportation goals); N.J.S.A. 27:23-17 (authorizing NJDOT to expend monies for the study and design of NJTA transportation projects).

Second, despite the existence of an independent corporate identity, and the statutory disclaimer of the State's obligation to make good on NJTA's debts, in reality NJTA's finances are closely intertwined with that of the State.  That is, NJTA is authorized to enter into agreements with the State to allocate the financing, administration, operation, management and construction of transportation projects, and may, in fact, cede control over such projects to NJDOT.  N.J.S.A. 27:23-5(l); -5.6a; -5.8; -23a.  Pursuant to these powers, NJTA and NJDOT have traditionally shared responsibility for the operation of many projects, and hundreds of millions of dollars of monies have flowed between the agencies.  See, e.g., NJTA Resolution #192-08 (October 10, 2008) (authorizing Executive Director to execute inter-agency agreement with, inter alia, State Treasurer, for the provision of $1.25 billion in NJTA monies for the construction of a trans-Hudson River commuter rail tunnel)[2]; N.J.S.A. 27:23-23.7 (authorizing NJTA to remit the sum of $400 million to the State General Fund for the purposes of acquiring a 4.4-mile stretch of I-95).  Thus, while the State General Fund is not responsible for guaranteeing NJTA's debts, the converse is not necessarily true.  Were NJTA's finances to be adversely impacted by a judgment, the consequences to the Treasury are clear and definite.

Third, the Governor has asserted direct control over NJTA's operations, and has gone so far as to establish the Governor's Authorities Unit, an administrative subdivision within the Office of the Governor that is responsible for overseeing the operations of independent authorities.  As noted above, the Governor has appointed a cabinet-level official, the Commissioner of NJDOT, as the Chairman of NJTA.  Also, it is beyond dispute, at this point,

---

[2] Available at: http://www.state.nj.us/turnpike/MINUTES-10-10-08.pdf.

that agencies like NJTA are subject to the Governor's authority by way of Executive Order. See, e.g., Executive Order #37 (Corzine September 26, 2006) (requiring independent authorities to report and coordinate their actions through the Governor's Office, and subjecting such agencies to direct gubernatorial oversight); Executive Order #155 (Corzine October 6, 2009) (subjecting NJTA to the oversight of the State Comptroller with respect to expenditures associated with the trans-Hudson River commuter rail tunnel); Executive Order #41 (Codey June 15, 2005) (subjecting independent authorities to the oversight of the Inspector General and requiring ethics training of certain key individuals)[3].

Contrary to the analysis of New Jersey Transit's statutory structure in Fitchik, NJTA's operations are closely related to the State and subject to direct control through the Governor, the Governor's Authorities unit, and a host of other administration officials.  Consequently, NJTA is the alter ego of the State and is entitled to avail itself of Eleventh Amendment immunity.

Having established NJTA's facial entitlement to immunity, there are only two potential exceptions to the Eleventh Amendment bar that might be applicable here: (1) waiver and/or consent by the State, see Edelman, supra, 415 U.S. at 673 (holding that a waiver can be found only "by the most express language or by such overwhelming implications from the text as [will] leave no room for any other reasonable construction"); and (2) exercise by Congress of its power under the Fourteenth Amendment to override the State's immunity.  See, e.g., Will v. Michigan Dept. of State Police, 491 U.S. 58, 66 (1989); Pennhurst, supra, 465 U.S. at 100.

As to the former, plaintiffs can point to no provision within New Jersey law standing for the proposition that Eleventh Amendment immunity has been waived for the instant purposes.

---

[3] Each of the cited Executive Orders are available at the following URLs:
http://www.state.nj.us/infobank/circular/eojsc37.htm;
http://www.state.nj.us/infobank/circular/eojsc155.htm; and
http://www.state.nj.us/infobank/circular/eoc41.htm

Thus, the inquiry must necessarily shift to the latter prong. Fortunately, Congress has answered this question squarely in the negative, for the relevant statutory provision within RCRA that gives rise to a private right of action made such suits expressly subject to the Eleventh Amendment:

> …[A]ny person may commence a civil action on his own behalf…against any person, including…any governmental instrumentality or agency, <u>to the extent permitted by the eleventh amendment to the Constitution</u>, and including any past or present generator, past or present transporter, or past or present owner or operator of a treatment, storage, or disposal facility, who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment.

42 U.S.C. §6972(a)(1)(A) (emphasis added). Accordingly, the complaint should be dismissed as against the NJTA Defendants.

Finally, the rule of <u>Ex parte Young</u>, 209 U.S. 123 (1908) (Eleventh Amendment does not preclude suit against a state official, in her official capacity, for prospective injunctive relief to remedy an ongoing violation of federal law), to the extent plaintiffs might argue that they are still entitled to seek injunctive relief as against defendant Scaccetti, is inapplicable here. <u>See Seminole Tribe of Florida</u>, <u>supra</u>, 517 U.S. at 73 ("where Congress has prescribed a detailed remedial scheme for the enforcement against a State of a statutorily created right, a court should hesitate before casting aside those limitations and permitting an action against a state officer based upon <u>Ex parte Young</u>."). In <u>Seminole Tribe</u>, the Court held that the existence of a detailed statutory remedial scheme within the Indian Gaming Regulatory Act precluded the availability of prospective injunctive relief (and by extension contempt sanctions) against state officials, in their official capacities, under <u>Young</u>. In so doing, the Court observed that the legislative provision for statutory remedies against the states evidenced an intent to limit the judiciary's authority to invoke its inherent remedial powers through the mechanism of an injunction. <u>Id.</u> at 75.

Here, RCRA provides a detailed and precise regulatory scheme as against parties, including the states, that are subject to its provisions.  In this regard, the primary mechanism by which RCRA is enforced is through oversight by USEPA.  The availability of the citizen's suit provision, 42 U.S.C. §6972, is intended to supplement USEPA's authority in certain instances.  In <u>Seminole Tribe</u>, the Court inferred that the legislative provision for a specific statutory remedy as against the states precluded the availability of prospective injunctive relief under <u>Young</u>.  In this case, no such inference is required because Congressional intent is strikingly clear – on its face, Section 6972 is expressly subject to the Eleventh Amendment.  It necessarily follows that no cause of action against defendant Scaccetti is available under <u>Young</u>[4].  Accordingly, the court lacks jurisdiction over the NJTA Defendants and the complaint should be dismissed.

## II.  PLAINTIFFS HAVE FAILED TO PLEAD THEIR CLAIMS AS AGAINST THE NJTA DEFENDANTS WITH SUFFICIENT PARTICULARITY

Settled principles of notice pleading compel that plaintiffs' vague and non-specific allegations against the NJTA Defendants, uniformly collectivized with allegations against its co-defendants, fail to state a viable claim upon which relief may be granted and should be dismissed under Fed.R.Civ.P. 12(b)(6).  The standard of review on a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) requires that the court accept as true all of the well-pled allegations of the complaint, viewing them in the light most favorable to the non-moving party.  <u>Pinker v. Roche</u>

---

[4] Even if the court were to recognize the availability of an action for purely injunctive relief against defendant Scaccetti, in her official capacity, we note that defendant NJTA must still be dismissed from the suit, and the limit of the relief as against defendant Scaccetti would be an injunction directing her to prospectively cease the disposal of allegedly contaminated stormwater in the Raritan River.  Plaintiffs' claims for costs, fees, declaratory relief and remedial action as against past violations must still be dismissed.  <u>Edelman</u>, <u>supra</u>.

Holdings Ltd., 292 F.3d 361, 374 n.7 (3d Cir. 2002); see also Fed.R.Civ.P. 8(a)(2) ("a pleading that states a claim for relief must … contain a short and plain statement of the claim showing that the pleader is entitled to relief."). Though this standard is deferential, it is not without clear limits. The court need not credit the complaint's bald assertions or legal conclusions. In re Burlington Coat Factory Sec. Litigation, 114 F.3d 1410, 1426 (3d Cir. 1997). Neither is the court required to accept unwarranted inferences, or sweeping legal conclusions cast in the form of a factual allegation. Morse v. Lower Merion School Dist., 132 F.3d 902, 906 n.8 (3d Cir. 1997).

In recent years, the Supreme Court has substantially tightened pleading standards under Fed.R.Civ.P. 8. Initially, in Bell Atlantic v. Twombly, 550 U.S. 544 (2007), the Court abrogated the long applied rule of Conley v. Gibson, 355 U.S. 41, 45-46 (1957), in which was announced the widely held notion that a motion to dismiss must be denied unless it appears "beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Twombly, supra, 550 U.S. at 555 ("after puzzling the profession for 50 years, this famous observation has earned its retirement. The phrase is best forgotten as an incomplete, negative gloss on an accepted pleading standard…").

As a result of Twombly, the modern rule is that in order to survive a motion to dismiss, the plaintiff must state plausible grounds for relief. Id. An entitlement to relief requires "more than labels and conclusions, and a formulaic recitation of a cause of action's elements." Id. at 1965. In other words, the complaint must contain sufficient factual allegations to raise a right to relief above a speculative level. Id. at 1965-66. The Third Circuit has since confirmed that Twombly is of general application, and is not limited to its specific context as an antitrust case. Phillips v. County of Allegheny, 515 F.3d 224, 234 (3d Cir. 2008) (Twombly "can be summed

up thus: stating a claim requires a complaint with enough factual matter (taken as true) to suggest the required element.  This does not impose a probability requirement at the pleading stage, but instead simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element.").

More recently, the Supreme Court again revisited the issue of civil pleading standards in Ashcroft v. Iqbal, 129 S.Ct. 1937 (2009) (dismissing Bivens claims brought by September 11 detainee against federal officers as implausible).  There, the Court announced a new approach for reviewing civil complaints on a motion to dismiss, holding that conclusory allegations of fact are no longer entitled to a presumption of validity, and even if allegations are entitled to the presumption, they must still provide plausible grounds for relief:

> A court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth.  While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations.  When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.  Id. at 1950.

The sufficiency of plaintiffs' complaint can be considered together with their jurisdictional compliance with RCRA's pre-suit notice requirements.  See Fed.R.Civ.P. 12(b)(1). As a jurisdictional prerequisite, plaintiffs were required pursuant to the citizens suit provision of RCRA, 42 U.S.C. §6972(a)(1)(B), to provide NJTA with a sufficiently detailed advance notice of the alleged violation.  42 U.S.C. §6972(b)(2)(A)(iii).  This advance notice is a mandatory prerequisite, and will be strictly construed.  Hallstrom v. Tillamook County, 493 U.S. 20, 31 (1989) ("experience teaches that strict adherence to the procedural requirements specified by the legislature is the best guarantee of evenhanded administration of the law.").  Pursuant to USEPA implementing regulations, the pre-suit notice must be sufficiently detailed to provide meaningful notice to an alleged violator:

Notice regarding an alleged violation of a permit, standard, regulation, condition, requirement, or order which has become effective under this Act shall include sufficient information to permit the recipient to identify the specific permit, standard, regulation, condition, requirement, or order which has allegedly been violated, the activity alleged to constitute a violation, the person or persons responsible for the alleged violation, the date or dates of the violation, and the full name, address, and telephone number of the person giving notice.

40 C.F.R. §254.3(a). While the regulatory content requirements are not construed quite as strictly as the statutory requirement that the notice be given, a reasonably descriptive notice that allows the recipient to identify the kind of RCRA violations being charged is necessary. See Hackensack Riverkeeper, Inc. v. Delaware Ostego Corp., 450 F.Supp.2d 467, 480 (D.N.J. 2006); Public Interest Research Group of New Jersey, Inc. v. Hercules, Inc., 50 F.3d 1239, 1248 (3d Cir. 1995) ("a general notice letter that fails sufficiently to inform its recipients of the violations upon which a citizen intends to bring suit will not conform to" the parallel notice provisions of the Clean Water Act; however, "the citizen is not required to list every specific aspect or detail of every alleged violation").

Here, the inclusion of the NJTA Defendants in this suit appears to be something of an afterthought, and the pre-suit notice and complaint are defective for the same reasons. Beyond stating NJTA's existence, and describing its strict compliance with the terms of the Stormwater Permit, the entire complaint contains essentially two relevant accusations, and then only in a collectivized manner. In paragraph 63, plaintiffs describe, but do not endorse, NL Industries' efforts to shift blame in its remediation negotiations with NJDEP:

63.     NL Industries concluded that the spatial distribution of the metals found in the sediments suggested inputs to the Raritan River from the North Ditch, the Garden State Parkway, State Route 35, and other overland sources, rather than from groundwater. (Complaint ¶63).

In sole reliance upon this statement, plaintiffs contend:

> 68.     Upon information and belief, the Garden State Parkway, U.S. Route 9, and State Route 35 are sources that contribute to the contamination of sediments in the Raritan River in the vicinity of the NL site. Stormwater runoff from these roadways discharges into the Raritan River. In the sediments of the Raritan River near these roadways, concentrations of arsenic, copper, lead, nickel, and zinc are elevated and generally higher than concentrations of these metals found in sediments upstream of the roadways. (Complaint ¶68).

Likewise, the pre-suit letter contains a similar statement that "plaintiffs also believe that the Garden State Parkway…are sources of the sediment contamination." (Complaint, Exh. A at 3). No claim within the complaint specifically refers to the NJTA Defendants. Rather, the First Count, asserting a RCRA violation, only includes the following general allegation: "Defendants have contributed to the past or present handling, storage, treatment, transportation, or disposal of the contaminants in the Raritan River sediments." (Complaint ¶89).

It is telling that the NJTA Defendants' connection to this case is so tenuous that plaintiffs can do no more than conditionally allege the allegation of another defendant. In other words, without affirmatively stating that the NJTA Defendants have discharged heavy metals into the Raritan River, plaintiffs simply re-state NL Industries' allegation of this conduct to NJDEP, which took no action in consequence. Furthermore, plaintiffs can make no specific allegation against the NJTA Defendants, who are in full compliance with the Stormwater Permit, and instead groups their conduct in with allegations against the NJDOT Defendants, which *did* violate the Stormwater Permit, and simply parrots the statutory provision, 42 U.S.C. §6972(a)(1)(A), governing this action. Finally, Plaintiffs plead no specific basis upon which the NJTA Defendants have violated RCRA, and have instead made a single collectivized allegation of wrongdoing against all "Defendants."

These conclusory allegations provide scant detail of any wrongdoing on the part of the NJTA Defendants and do not state a plausible basis for relief. In a word, the NJTA Defendants

do not know what they have done wrong, and have been deprived of a meaningful opportunity to respond to the allegations.  Specifically, as required by 42 U.S.C. §6972(a)(1)(A), plaintiffs do not plead facts to support the elements of a RCRA claim, namely, that:

> (1) that the defendant is a person, including, but not limited to, one who was or is a generator or transporter of solid or hazardous waste or one who was or is an owner or operator of a solid or hazardous waste treatment, storage, or disposal facility; (2) that the defendant has contributed to or is contributing to the handling, storage,  treatment, transportation, or disposal of solid or hazardous waste; and (3) that the solid or hazardous waste may present an imminent and substantial endangerment to health or the environment.

See Interfaith Community Organization v. Honeywell International, Inc., 399 F.3d 248, 258 (3d Cir.), cert. denied, 545 U.S. 1129 (2005).

Under Twombly and Iqbal, the mere recital of the required elements of a cause of action, absent meaningful factual detail, ultimately proves insufficient for a complaint to survive the pleading stage.  See Iqbal, supra, 129 S.Ct. at 1950 ("Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").  For the same reason, the pre-suit notice letter is defective.  The NJTA Defendants should not be embroiled in what will likely prove to be prolonged, and expensive discovery in a dispute over the remediation of one of the more notoriously contaminated toxic waste sites in our State.  The complaint should accordingly be dismissed on jurisdictional grounds, or, alternatively, for failure to sufficiently state a claim.

### III.   THE COMPLAINT FAILS TO STATE A RCRA VIOLATION AGAINST THE NJTA DEFENDANTS AS A MATTER OF LAW

The Resource Conservation and Recovery Act, 42 U.S.C. §6901 et seq., establishes a comprehensive regulatory scheme for the generation, management, transportation and disposal of hazardous and solid wastes.  See 42 U.S.C. §§6901 and 6902.   Although the primary enforcement mechanism under RCRA lies with federal and state regulatory agencies, as noted above, a private right of action is available in specific instances.  42 U.S.C. §6972(a)(1)(A).

Plaintiffs' complaint fails to state a claim against the NJTA Defendants for several reasons.  Initially, NJTA is not a generator, transporter, or owner of "solid or hazardous waste" within the meaning of RCRA, and therefore no cause of action exists under 42 U.S.C. §6972(a)(1)(A).   RCRA defines the term "hazardous waste" as a subset of the term "solid waste," as follows:

> [H]azardous waste means a solid waste, or combination or solid wastes, which because of its quantity, concentration, or physical, chemical, or infectious characteristics may (A) cause, or significantly contribute to an increase in mortality or any increase in serious irreversible, or incapacitation reversible, illness; or (B) pose a substantial present or potential hazard to human health or the environment when improperly treated, stored, transported, or disposed of, or otherwise managed.  42 U.S.C. §6903(5).

"Solid waste," is defined, in turn, as follows:

> [A]ny garbage, refuse, sludge from a waste treatment plant, water supply treatment plant, or air pollution control facility and other discarded material, including solid, liquid, semisolid, or contained gaseous material resulting from industrial, commercial, mining, and agricultural operations, and from community activities, but does not include solid or dissolved material in domestic sewage, or solid or dissolved materials in irrigation return flows or industrial discharges which are point sources subject to permits under section 402 of the Federal Water Pollution Control Act…

42 U.S.C. §6903(27) (emphasis added); see also 40 C.F.R. §261.4(a) (excluding from the definition of "solid waste," the terms "domestic sewage," "any mixture of domestic sewage and

other wastes that passes through a sewer system to a publicly-owned treatment works," "untreated sanitary wastes that pass through a sewer system," and "industrial wastewater discharges that are point source discharges subject to regulation under section 402 of the Clean Water Act, as amended.").

The small MS4 separate municipal storm sewer system operated by the NJTA Defendants is exempt from regulation under RCRA because it is a point source that provides an industrial discharge into the Raritan River, and which is regulated by a permit issued pursuant to Section 402 of the Clean Water Act, 33 U.S.C. §1342(p).   In general, Section 402 establishes the National Pollutant Discharge Elimination System, or "NPDES," which provides a uniform system for the regulation and control of pollutant discharges into navigable waters of the United States.   Section 402 also allows USEPA to delegate its permit administration authority to the states.   33 U.S.C. §1342(b).   NJDEP has availed itself of this authority and by agreement with USEPA administers a permitting system in New Jersey known as the New Jersey Pollutant Discharge Elimination System, or "NJPDES."   See N.J.A.C. 7:14A-1.1 et seq.

In 1987, Congress mandated, for the first time, that USEPA promulgate regulations requiring permits for municipal stormwater discharges.   See P.L. 100-4, §405, 101 Stat. 65, 69 (1987), codified at 33 U.S.C. §1342(p).   Such permits may be issued on a system or jurisdiction-wide basis, and, while they require "controls to reduce the discharge of pollutants to the maximum extent practicable," do not necessarily contain numeric effluent discharge limits.   33 U.S.C. §1342(p)(3)(B).   It was not until late 1999 that USEPA fully implemented the legislation and promulgated regulations governing small MS4 municipal stormwater systems.   See 64 Fed.Reg. 68722 (Dec. 8, 1999).   Presently, public entities, including state governments that operate small MS4 systems in urbanized areas, are required to obtain a Section 402 permit for

the discharge of stormwater into navigable waters of the United States.  See 40 C.F.R. §§122.26(a)(9) and 122.32(a)(1); see also 40 C.F.R. §122.26(b)(16) (defining a small MS4 system).  In 2004, NJDEP, as the enforcing agency under the NJPDES program, promulgated its own regulations governing small MS4 systems.  See N.J.A.C. 7:14A-25.1 et seq.

Plaintiffs' effort to embroil NJTA in the far-reaching remediation of the NL Site is an attempt at an end-run around the Clean Water Act.  Liberally construed, their basic allegation is that particles of heavy metals suspended in a stormwater stream that is lawfully discharged by NJTA pursuant to a Section 402 permit – and which necessarily contemplates the discharge of pollutants – nevertheless may violate RCRA.  The absurd result advocated by plaintiffs would effectively nullify the Clean Water Act's permitting scheme, and leave permittees like NJTA that are strictly complying with their Section 402 permits subject to liability.

Thus, the existence of, and the requirement that NJTA obtain a permit under Section 402 of the Clean Water Act precludes its liability for the very same conduct under RCRA.  See Jones v. E.R. Snell Contractor, Inc., 333 F.Supp.2d. 1344 (N.D.Ga.), aff'd mem., 120 Fed.Appx. 786 (11th Cir. 2004), cert. denied, 544 U.S. 962 (2005).  In Jones, plaintiff owned a parcel of property that included a navigable waterway, a lake.  After the Georgia Department of Transportation and a local government widened a state highway adjacent to her property, it resulted in increased stormwater and other pollutant discharges that negatively affected the water quality in plaintiff's lake.  Consequently, she filed a citizen's suit against the government entities under RCRA and the Clean Water Act.  The District Court granted summary judgment in favor of the government entity on the RCRA claim on grounds that the Clean Water Act provided her with the exclusive remedy for the unlawful discharge of pollutants from a point source into navigable waters of the United States.  Jones, 333 F.Supp.2d at 1350.

In granting summary judgment, the District Court rendered two alternative holdings that are of equal force here.  First, and as previously noted, the District Court held that stormwater discharges from state highways are not "solid waste" under RCRA, as defined by 42 U.S.C. §6903(27), because they are "industrial discharges which are point sources subject to permits under Section 402 of" the Clean Water Act, a category of substances that are expressly exempted from regulation under RCRA.  Id. at 1350.

Interestingly, RCRA does not separately define the term "industrial discharge," although the applicable RCRA implementing regulation, 40 C.F.R. §261.4(a)(2), adopts an exemption for "industrial wastewater discharges" without further elaboration.  Neither does the Clean Water Act specifically define either term, however, the applicable regulation that contains the stormwater management guidelines, 40 C.F.R. §122.26, creates further subclasses for stormwater discharged through small MS4 systems, which are operated by municipalities and transportation agencies, and "stormwater discharge associated with industrial activity." Both subclasses require a Section 402 permit.  See 40 C.F.R. §122.26(b)(14) and (17).  Regardless of the Clean Water Act's nomenclature, a common sense reading of the terms leads to the inexorable conclusion that stormwater emitted from a highway network and its associated maintenance and operational facilities is a form of industrial wastewater that is generally within the broader umbrella terms of "industrial discharge" or "industrial wastewater."   40 C.F.R. §122.26(a)(9) and (c)[5].  Thus, RCRA's statutory exemption from the definition of "solid waste," pursuant to 42 U.S.C. §6903(27), is fully applicable.

---

[5] The District Court in Jones also noted the requirement for a Section 402 permit for stormwater discharges associated with construction activity.  See 40 C.F.R. §122.26(b)(14)(x).  This holding was not inconsistent with the District Court's earlier reliance upon the more general proposition that stormwater discharge from a state highway is exempt from RCRA as an "industrial discharge."   The District Court referred to construction activity because the dispute dealt with both the initial construction of the highway, and its continued operation.

Second, the <u>Jones</u> court relied upon RCRA's anti-duplication provision, 42 U.S.C. §6905.

That section provides:

> (a)    Nothing in this Act shall be construed to apply to…any activity or substance which is subject to the Federal Water Pollution Control Act…except to the extent that such application (or regulation) is not inconsistent with the requirements of such acts.

> (b)    Integration with other Acts.  (1) The Administrator shall integrate all provisions of this Act for purposes of administration and enforcement and shall avoid duplication, to the maximum extent practicable, with the appropriate provisions of…the Federal Water Pollution Control Act…Such integration shall be effected only to the extent that it can be done in a manner consistent with the goals and policies expressed in this Act and in the other acts referred to in this subsection.

42 U.S.C. §6905(a) and (b); <u>see</u> <u>also</u> 46 Fed.Reg. 47048 (1981) (announcing USEPA policy against double liability under both RCRA and the Clean Water Act).

To like effect, the Second Circuit has joined the Eleventh Circuit in holding that the Clean Water Act provides the exclusive remedy for activities regulated under that statute, and has taken the analysis a step further.  In <u>Coon v. Willet Dairy, LP</u>, 536 F.3d 171 (2d Cir. 2008), the Second Circuit affirmed the dismissal of a citizen's suit against a dairy farm that was accused of discharging animal waste into a navigable waterway.  The plaintiff alleged that the activity violated both the dairy's Clean Water Act permit, and was a discharge of hazardous waste under RCRA.  In dismissing the RCRA claim, the Second Circuit relied upon both the RCRA anti-duplication provision, 42 U.S.C. §6905(a), and the so-called "permit shield" provision of the Clean Water Act, 33 U.S.C. §1342(k).  <u>See</u> <u>Coon</u>, <u>supra</u>, 536 F.3d at 174 ("Appellants' RCRA claims are based on the same activities and substances that the CWA covers.  Therefore, pursuant to Section 6905(a), the RCRA cannot apply to these activities and substances in this instance because any such application would be inconsistent with the CWA's 'permit shield.'").

Under the "permit shield" provision of the Clean Water Act, compliance with the terms of a duly issued Section 402 permit shall be deemed a defense to a citizen's suit or other agency enforcement action under that statute.  33 U.S.C. §1342(k).  Interestingly, the Second Circuit held the permit shield applicable to a RCRA claim, in principle, even though the express terms of Section 1342(k) do not refer to a citizen's suit under RCRA.

The reasoning of Jones and Coon apply with equal force to this lawsuit.  Here, NJTA is doing precisely what it is permitted to do pursuant to its Clean Water Act permit, and for this reason plaintiffs do not allege that NJTA has violated any provision of that statute.  Nevertheless, they now seek to hold NJTA liable, by virtue of RCRA, for the very same activity that it lawfully engages in under the Clean Water Act.  Permitting this claim to proceed, as against NJTA, is contrary to both the express exemption afforded from the definition of solid waste under 42 U.S.C. §6903(27), and the anti-duplication provision of 42 U.S.C. §6905(a), and would clearly set up an inconsistent result.  See 40 C.F.R. §122.30(c) (purpose of Clean Water Act stormwater management regulations is to regulate the discharge of "sediment, suspended solids, nutrients, heavy metals, pathogens, toxins, oxygen-demanding substances, and floatables.").

In other circumstances, courts have not hesitated to read environmental remedial legislation in a common sense way, and to harmonize the statutes in a manner that is protective of the environment, but does not place parties at undue risk of complying with contradictory obligations.  See, e.g., Carson Harbor Village, Ltd. v. Unocal Corporation, 287 F.Supp.2d 1118, 1183 (C.D.Ca. 2003), aff'd, 433 F.3d 1260 (9th Cir. 2006) (granting summary judgment motions of government entity defendants against a claim that the discharge of lead suspended in roadway stormwater flows violated CERCLA because the activity was lawfully permitted pursuant to a Section 402 permit under the Clean Water Act); No Spray Coalition, Inc. v. City of New York,

2000 U.S. Dist. LEXIS 13919 (S.D.N.Y. 2000), <u>aff'd</u>, 252 F.3d 148 (2d Cir. 2001) (incidental contamination resulting from aerial pesticide spraying was not actionable under RCRA, because such activities were permitted under the Clean Water Act, and consistent with approved usage instructions); <u>United States v. Burns</u>, 512 F.Supp. 916 (W.D.Pa. 1981) (dismissing RCRA claim arising out of alleged disposal of PCB contaminated materials because such substances were already comprehensively regulated under the Toxic Substances Control Act and the Clean Water Act).  This situation is no different, and the complaint should accordingly be dismissed.

## <u>CONCLUSION</u>

For the foregoing reasons, the complaint should be dismissed with prejudice as against defendants New Jersey Turnpike Authority and Diane Gutierrez-Scaccetti.

Respectfully submitted,

**DECOTIIS, FITZPATRICK,**
**COLE & WISLER, LLP**

By:____/s Thomas A. Abbate___

Dated: October 8, 2009