EDWARD LLOYD
Columbia Law School
435 West 116th Street, Room 831
New York, NY 10027
(212) 854-4376/4291
Elloyd@tpmlaw.com

BRUCE J. TERRIS
CAROLYN SMITH PRAVLIK
Terris, Pravlik & Millian, LLP
1121 12th Street, N.W.
Washington, DC 20005-4632
(202) 682-2100
TPMInfo@tpmlaw.com

Counsel for Plaintiffs

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| RARITAN BAYKEEPER, INC., d/b/a NY/NJ Baykeeper<br>52 West Front Street<br>Keyport, NJ 07735 | )<br>)<br>)  Case No.<br>)  3:09-cv-04117-JAP-DEA |
| EDISON WETLANDS ASSOCIATION, INC.<br>206 Tyler Road<br>Edison, NJ 08820 | )<br>)<br>) |
| Plaintiffs, | )<br>) |
| v. | )<br>) |
| NL INDUSTRIES, INC.<br>5430 LBJ Freeway, Suite 1700<br>Dallas, TX 75240 | )<br>)<br>)<br>) |
| NL ENVIRONMENTAL MANAGEMENT SERVICES, INC.<br>5430 LBJ Freeway, Suite 1700<br>Dallas, TX 75240 | )<br>)<br>)<br>) |
| SAYREVILLE ECONOMIC AND REDEVELOPMENT<br>AGENCY<br>167 Main Street<br>Sayreville, NJ 08872 | )<br>)<br>)<br>)<br>) |
| O'NEILL PROPERTIES GROUP, L.P. | ) |

2701 Renaissance Boulevard, Fourth Floor )
King of Prussia, PA 19406 )
  )
SAYREVILLE SEAPORT ASSOCIATES, L.P. )
2701 Renaissance Boulevard, Fourth Floor )
King of Prussia, PA 19406 )
  )
COUNTY OF MIDDLESEX )
Middlesex County Administration Building )
John F. Kennedy Square, Post Office Box 871 )
New Brunswick, NJ 08901 )
  )
STEPHEN DILTS, in his official capacity as Commissioner of )
STATE OF NEW JERSEY DEPARTMENT OF )
TRANSPORTATION )
David J. Goldberg Transportation Complex )
1035 Parkway Avenue )
Post Office Box 600 )
Trenton, NJ 08625 )
  )
BERNARD JAMES, in his official capacity as Regional Director )
of Operations for the Central Region of STATE OF NEW )
JERSEY DEPARTMENT OF TRANSPORTATION )
100 Daniels Way )
Freehold, NJ 07728 )
  )
NEW JERSEY TURNPIKE AUTHORITY )
581 Main Street )
Post Office Box 5042 )
Woodbridge, NJ 07095 )
  )
DIANE GUTIERREZ-SCACCETTI, in her official capacity as )
Executive Director of NEW JERSEY TURNPIKE AUTHORITY )
581 Main Street )
Post Office Box 5042 )
Woodbridge, NJ 07095 )
  )
NEW JERSEY DEPARTMENT OF ENVIRONMENTAL )
PROTECTION )
401 East State Street )
Trenton, NJ 08625 )
  )
MARK MAURIELLO, in his official capacity as Commissioner )
of NEW JERSEY DEPARTMENT OF ENVIRONMENTAL )

2

```
PROTECTION                                      )
401 East State Street                           )
Seventh Floor, East Wing                        )
Post Office Box 402                             )
Trenton, NJ 08625-0402                         )
                                                )
                                                )
                        Defendants.             )
_____)
```

## AMENDED COMPLAINT

### INTRODUCTION

1.      This is a citizens' suit brought to remediate contaminated sediments in the Raritan River in the vicinity of a site in Sayreville, New Jersey, formerly owned by NL Industries, Inc. (hereafter the "NL site"), and to control sources that may continue to contribute to the sediment contamination.

2.      Suit is brought under Section 7002(a)(1)(B) of the Resource Conservation and Recovery Act (hereafter "RCRA"), 42 U.S.C. 6972(a)(1)(B), to remedy the imminent and substantial endangerment to health and the environment presented by the sediment contamination and contributing sources.  Suit is also brought under Section 505(a)(1) of the Federal Water Pollution Control Act (hereafter the "Clean Water Act"), 33 U.S.C. 1365(a)(1), for unauthorized discharges of pollutants from the North Ditch on the NL site into the Raritan River and for violations of New Jersey's Highway Agency Stormwater General Permit, New Jersey Pollutant Discharge Elimination System (hereafter "NJPDES") Permit # NJ0141887 (hereafter the "Highway Permit"), that result in contamination of sediments in the Raritan River.  Plaintiffs seek a declaratory judgment, injunctive relief, imposition of civil penalties, and an award of costs, including attorneys' fees and expert witnesses' fees.

3

## JURISDICTION AND VENUE

3.     This Court has subject matter jurisdiction over the claims set forth in this complaint pursuant to Section 7002(a)(1)(B) of RCRA, 42 U.S.C. 6972(a)(1)(B), and Section 505(a)(1) of the Clean Water Act, 33 U.S.C. 1365(a)(1).

4.     On April 14, 2009, plaintiffs Raritan Baykeeper, Inc., d/b/a NY/NJ Baykeeper, and Edison Wetlands Association, Inc., gave notice of their intent to file suit under RCRA and the Clean Water Act to the Administrator of the Environmental Protection Agency (hereafter "USEPA"), the New Jersey Department of Environmental Protection (hereafter "NJDEP"), and defendants, as required by Section 7002(b)(2)(A) of RCRA, 42 U.S.C. 6972(b)(2)(A), and Section 505(b)(1)(A) of the Clean Water Act, 33 U.S.C. 1365(b)(1)(A).  A copy of this notice is attached to the complaint as Exhibit A.

5.     On June 18, 2009, plaintiffs sent a second notice letter indicating their intent to file suit under RCRA and the Clean Water Act to the Administrator of USEPA, NJDEP, and defendants, as required by Section 7002(b)(2)(A) of RCRA, 42 U.S.C. 6972(b)(2)(A), and Section 505(b)(1)(A) of the Clean Water Act, 33 U.S.C. 1365(b)(1)(A).  A copy of the second notice letter is attached to the complaint as Exhibit B.

6.     On July 9, 2009, plaintiffs sent a third notice letter indicating their intent to bring additional claims under RCRA and the Clean Water Act to the Administrator of  USEPA, NJDEP, and defendants, as required by Section 7002(b)(2)(A) of RCRA, 42 U.S.C. 6972(b)(2)(A), and Section 505(b)(1)(A) of the Clean Water Act, 33 U.S.C. 1365(b)(1)(A).  A copy of the third notice letter is attached to the complaint as Exhibit C.

7.     More than 90 days have passed since notice was served.

8.     To the best of plaintiffs' knowledge, USEPA has not commenced and is not diligently prosecuting an action under Section 7003 of RCRA, 42 U.S.C. 6973, or under Section 106 of the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (hereafter "CERCLA"), 42 U.S.C. 9606; is not actually engaging in a removal action under Section 104 of CERCLA, 42 U.S.C. 9604; has not incurred costs to initiate a Remedial Investigation and Feasibility Study under Section 104 of CERCLA, 42 U.S.C. 9604, and is not diligently proceeding with a remedial action under CERCLA; and has not obtained a court order or issued an administrative order under Section 106 of CERCLA, 42 U.S.C. 9606, or Section 7003 of RCRA, 42 U.S.C. 6973, pursuant to which a responsible party is diligently conducting a removal action, Remedial Investigation and Feasibility Study, or proceeding with a remedial action.

9.     To the best of plaintiffs' knowledge, the State has not commenced and is not diligently prosecuting an action under Section 7002(a)(1)(B) of RCRA, 42 U.S.C. 6972(a)(1)(B); is not actually engaging in a removal action under Section 104 of CERCLA, 42 U.S.C. 9604; has not incurred costs to initiate a Remedial Investigation and Feasibility Study under Section 104 of CERCLA, 42 U.S.C. 9604, and is not diligently proceeding with a remedial action under CERCLA.

10.     To the best of plaintiffs' knowledge, neither USEPA nor the State has commenced and is diligently prosecuting a civil or criminal action in a court to redress the alleged violations of the Clean Water Act.

11.     This action is not barred by any prior administrative penalty under Section 309(g) of the Clean Water Act, 33 U.S.C. 1319(g).

12.     Venue is appropriate in the District of New Jersey, pursuant to Section 7002(a) of

5

RCRA, 42 U.S.C. 6972(a), because the endangerment alleged under RCRA is located within this District, and pursuant to Section 505(c)(1) of the Clean Water Act, 33 U.S.C. 1365(c)(1), because the sources of the Clean Water Act violations are located within this District.

## PARTIES

### Plaintiffs

13.     Plaintiff Raritan Baykeeper, Inc., d/b/a NJ/NJ Baykeeper (hereafter "NJ/NY Baykeeper"),  is a not-for-profit corporation organized under the laws of the State of New Jersey, with its principal place of business in Keyport, New Jersey.  Founded in 1989, NY/NJ Baykeeper is a member of the Waterkeeper Alliance, an international organization of watershed advocates that work together to guarantee attainment of the "fishable and swimmable" goals of the Clean Water Act.  NY/NJ Baykeeper's purpose is to protect, preserve, and restore the ecological integrity and productivity of the Hudson-Raritan Estuary, which includes the Raritan River and Raritan Bay.  Through its programs, NY/NJ Baykeeper seeks to stop pollution, improve public access, restore aquatic habitats, and increase public awareness of the Hudson-Raritan Estuary as a vital natural and recreational resource.

14.     The Raritan Riverkeeper is a program of the NY/NJ Baykeeper.  Its mission is to protect, preserve, and restore the ecological integrity of the Raritan River, its tributaries, bay, and watershed.

15.     NY/NJ Baykeeper patrols the Raritan River and Raritan Bay by boat to monitor for signs of pollution in the waters and changes to the shoreline.  From June through October, it patrols the Raritan River, including the part of the river adjacent to the NL site, about once per month and the Raritan Bay about five times per month.  NY/NJ Baykeeper sometimes hosts elected officials,

6

media personnel, and members of the public on the boat patrols and seeks to educate them on water quality issues and the value of the water resources being patrolled.  NY/NJ Baykeeper spends a significant amount of resources on these boat patrols.  If there were not ongoing sources of pollution into the Raritan River and contamination of the sediments in the river, NY/NJ Baykeeper would not need to patrol as often to monitor the health of the Raritan River and Raritan Bay and educate officials, the media, and the public about threats to the waters and could use resources it spends on these patrols for other purposes.

16.    The Raritan Riverkeeper separately performs environmental surveillance of the Raritan River and Raritan Bay by boat, kayak, personal watercraft, and motor vehicle.  The Raritan Riverkeeper's patrol area includes the part of the Raritan River adjacent to the NL site.  The Raritan Riverkeeper previously performed its patrols twice per week, but, because of a reduction in resources, it now patrols once every two weeks.  If there were not ongoing sources of pollution into the Raritan River and contamination of the river sediments, the Raritan Riverkeeper would not need to patrol as often to monitor the health of the Raritan River and Raritan Bay and could use resources it spends on these patrols for other purposes.

17.    NY/NJ Baykeeper offers members of the public guided boat tours called "Eco-Cruises" to different parts of the Hudson-Raritan Estuary, including the Raritan Bay, and obtains income from tickets sold for these tours.  Members of the public are more interested in going on these boat tours when they are able to see clean waters and a variety of fish, birds, and other species on these tours.  Pollution and sediment contamination in the Raritan River lessen the public's interest in taking boat tours of the Raritan Bay.  This reduces the moneys obtained by NY/NJ Baykeeper  from these activities.

18.     The Raritan Riverkeeper is currently working with the U.S. National Oceanic and Atmospheric Administration, the U.S. Fish and Wildlife Service, and counties with jurisdictions along the Raritan River to restore fish migrations to the Raritan River through removal of dams and other actions.  The Raritan Riverkeeper is concerned that contaminated sediments in the Raritan River near the NL site will undermine this effort because fish migrating past the site will feed on food sources from the bottom of the river and become contaminated.

19.     NY/NJ Baykeeper and the Raritan Riverkeeper work to educate the public on the value of the Raritan River as an environmental resource, champion public access to the river, and encourage the public to make use of the river.  Employees of NY/NJ Baykeeper have found that there is a stigma attached to the Raritan River because of its high level of pollution and sediment contamination and, as a result, they often have a difficult time convincing the public to recreate in and around the river.  The public's perception of the Raritan River as highly polluted undermines the efforts of NY/NJ Baykeeper and the Raritan Riverkeeper to increase the public's use of, and appreciation for, the river.

20.     NY/NJ Baykeeper and the Raritan Riverkeeper conduct educational programs on the Raritan River focusing on wildlife, pollution and sediment contamination, and the need for recovery and restoration.  The goal of such public outreach is to raise awareness of the threats from pollution and sediment contamination in the Raritan River and involve the public in efforts to clean up and restore the river so that it is fishable and swimmable.  If there were not pollution and sediment contamination in the Raritan River, NY/NJ Baykeeper and the Raritan Riverkeeper could use resources they spend on these educational programs for other purposes.

21.     NY/NJ Baykeeper and the Raritan Riverkeeper alert the public to threats to public

health and the environment in the Raritan River and Raritan Bay.  Fish and crabs in the Raritan River and Raritan Bay are unsafe for human consumption as a result of water pollution and sediment contamination.  They absorb contaminants into their systems directly and by eating species lower in the food chain that have already absorbed contaminants.  NY/NJ Baykeeper and the Raritan Riverkeeper call attention to advisories issued by NJDEP that fish and crabs in the Raritan River and Raritan Bay are unsafe for consumption.  If fish and crabs in the Raritan River and Raritan Bay were not contaminated, NY/NJ Baykeeper and the Raritan Riverkeeper would not need to spend their limited resources on alerting the public to such advisories.

22.    Pollution and sediment contamination in the Raritan River makes it more difficult for NY/NJ Baykeeper and the Raritan Riverkeeper to obtain participation in, and support for, their programs, including educational and recreational activities, and expand the variety of their programs.  Because of concerns that direct contact with the water and sediments in the Raritan River may be harmful to human health, municipalities are reluctant to provide access to the river, and members of the public are reluctant to engage in recreational activities, such as swimming and kayaking, that bring them in contact with the water and sediments in the river.  NY/NJ Baykeeper has announced its intention to start a program that will include guided kayak tours on the Raritan River, but it will likely be able to attract fewer customers for these tours due to the public's concerns about pollution in the river.  Moreover, because pollution and sediment contamination have reduced the aesthetic quality of the Raritan River and the variety of species in and around the river, members of the public are less interested in participating in activities, such as boat tours offered by the Raritan Riverkeeper,  that allow them to recreate in the river and observe and learn about the river and its

9

e      c      o      s      y      s      t      e      m      .

23.     NY/NJ Baykeeper has promoted oyster restoration throughout the Hudson-Raritan

Estuary.  The Raritan River was historically prime oyster habitat, but the presence of toxic metals

in the river has made it more difficult for NY/NJ Baykeeper to restore oysters to the river.

Pollutants in the river harm the oysters by lowering their growth rates, thinning their shells, and

increasing their susceptibility to disease.  Moreover, it is more difficult for NY/NJ Baykeeper to

obtain support and necessary regulatory approvals for oyster restoration in the Raritan River because

of concerns that humans will consume oysters contaminated with toxins from the river.

24.     NY/NJ Baykeeper sues on behalf of itself and its officers, board members,

employees, and members.  NY/NJ Baykeeper has approximately 400 members, many of whom live

in the vicinity of the Raritan River and Raritan Bay.  NY/NJ Baykeeper's officers, board members,

employees, and members engage in recreational activities, including fishing, boating, bird watching,

and use of beaches, in these waters and on their shores.

25.     NY/NJ Baykeeper's officers, board members, employees, and members are

adversely affected by pollution and sediment contamination in the Raritan River.  They would like

to observe clean waters and a variety of species in the ecosystem in and around the Raritan River

and Raritan Bay, but they are less likely to do so because of impacts from pollution of the river and

contamination of the river sediments.  They are concerned about the health of the fish, birds, and

other species that they are able to observe in and around the Raritan River and Raritan Bay.  They

would recreate in and around the Raritan River and Raritan Bay more frequently and derive greater

enjoyment from such recreation if they could observe cleaner waters and a healthier ecosystem.

They would like to swim and engage in other activities in the Raritan River and Raritan Bay that

require them to have direct contact with the water and sediments, but they refrain from doing so out of out of concern that the water and sediments in the Raritan River and Raritan Bay are not safe for direct contact.

26.     NY/NJ Baykeeper's officers, board members, employees, and members fish and crab in the Raritan River and Raritan Bay for both subsistence and recreational purposes.  Despite NY/NJ Baykeeper's efforts to alert the public to health advisories, some of them eat fish and crabs from the Raritan River and Raritan Bay that are harmful to their health because they remain unaware of the advisories or are forced by poverty to rely on the fish and crabs as sources of food.  They may suffer health consequences as a result of eating fish and crabs that are not safe for human consumption. Others would like to fish and crab in the Raritan River and Raritan Bay and eat what they catch, but they refrain from doing so out of concern that this would be harmful to their health.

27.     The NJ/NJ Baykeeper's Boat Auxiliary Program is a group of members of NY/NJ

Baykeeper who use their own boats to patrol and observe the waterways of the Hudson-Raritan Estuary, including the Raritan River.  These members observe and report on pollution and adverse environmental impacts.  If there were not ongoing sources of pollution discharging into the Raritan River and contamination of the sediments in the river, there would be less need for these members to donate time and expenses for this purpose.

28.     William Schultz holds the post of Raritan Riverkeeper.  Mr. Schultz lives in Perth Amboy**,** which is located on the Raritan River, downstream of the NL site.

29.     Mr. Schultz enjoyed fishing and crabbing in the Raritan River throughout his youth and in later years.  As his awareness of pollution sources discharging to the river and contamination

of fish in the river increased, he became concerned that consuming fish and crabs from the river would be harmful to his health.  Consequently, he reduced his fishing and crabbing in the Raritan River, eventually ceasing these activities entirely 15-20 years ago.  If he knew that fish and crabs in the Raritan River were safe for consumption, he would enjoy fishing and crabbing in the river and eating what he catches.

30.     Mr. Schultz used to enjoy swimming and scuba diving in the Raritan River but ceased these activities 15-20 years ago out of safety concerns   He fears that by swimming or diving in the river, he would stir up the bottom of the river, putting contaminated sediments in suspension and in contact with his skin.  If he knew that the water and sediments in the Raritan River were safe for human contact, Mr. Schultz would enjoy swimming and diving in the river.  He knows that ships from the American Revolution were lost in the river, and he would prize the opportunity to search for historical artifacts on scuba dives into the river.

31.     Plaintiff Edison Wetlands Association, Inc. (hereafter "EWA") is a not-for-profit corporation organized under the laws of the State of New Jersey, with its principal place of business in Edison, New Jersey.  Founded in 1989, EWA is dedicated to protecting human health and the environment through conservation and cleanup of hazardous waste sites throughout New Jersey, with a focus on sites in the Raritan Watershed of central New Jersey.

32.     EWA's employees, board members, and members patrol the Raritan River and Raritan Bay to monitor sources of pollution to the waters.  They patrol the Raritan River and Raritan Bay by boat approximately three to six times per year and have canoed the Raritan River approximately a dozen times.  In addition, they have joined NY/NJ Baykeeper on boat patrols to educate regulators and members of the public about pollution in the Raritan River and Raritan Bay.

12

EWA's employees, board members, and members spend a significant amount of time and resources on these boat patrols.  If there were not ongoing sources of pollution discharging into the Raritan River and contamination of sediments in the river, EWA would not need to patrol the Raritan River and Raritan Bay as often and could use resources it spends on patrols for other purposes.

33.     Along with NY/NJ Baykeeper, EWA plans to begin a Raritan River Kayak and Canoe Club to offer members of the public guided tours of the Hudson-Raritan Estuary, including the Raritan River and Raritan Bay.  EWA will obtain income from tickets sold for these tours. Members of the public are more interested in going on these tours when they are able to see clean waters and a variety of fish and other wildlife species on the tours.  Pollution and sediment contamination lessen the public's interest in taking these tours.  This will reduce the moneys obtained by EWA from these activities.

34.     EWA has sponsored surveys and counts of birds that are found near the Raritan River, including the area near the NL site.  Pollution and sediment contamination in the Raritan River may harm bird species that use the river as habitat, making it more difficult to locate and observe birds during bird counts and surveys.

35.     EWA works to educate the public on the value of the Raritan River as an environmental resource, champions public access to the river, and encourages the public to make use of the river.  Pollution and sediment contamination in the Raritan River prevents EWA from encouraging greater recreational use of the river and undermines its efforts to increase the public's use of, and appreciation for, the river.

36.     Employees of EWA have fished and recreated on the Raritan River.  Employees have fished in parts of the Raritan River near the NL site and Garden State Parkway, but they do not

eat the fish they catch because of advisories from NJDEP that eating fish from the river is harmful to human health.  If the fish they catch were not contaminated, they would enjoy eating the fish. Employees would also enjoy swimming, diving, and water skiing in the Raritan River, but they refrain from these activities out of concern that the water and sediments in the river are not safe for direct contact.

37.     EWA sues on behalf of itself and its officers, board members, employees, and members.  EWA has approximately 500 members, most of whom live in the vicinity of Raritan River and Raritan Bay.  EWA's officers, board members, employees, and members engage in recreational activities, including fishing, crabbing, boating, bird watching, and use of beaches, in these waters and on their shores.

38.     EWA's officers, board members, employees, and members are adversely affected by pollution and sediment contamination in the Raritan River.  They would like to fish and crab in the Raritan River and Raritan Bay and eat what they catch, but they refrain from doing so out of concern that this would be harmful to their health.  They would like to observe clean waters and a variety of species in the ecosystem in and around the Raritan River and Raritan Bay, but they are less likely to do so because of impacts from pollution into the river and contamination of the river sediments.  They are concerned about the health of the fish, birds, and other species they are able to observe in and around the Raritan River and Raritan Bay.  They would recreate in and around the Raritan River and Raritan Bay more frequently and derive greater enjoyment from such recreation if they could observe cleaner waters and a healthier ecosystem.  They would like to swim and engage in other activities in the Raritan River and Raritan Bay that require them to have direct contact with the water and sediments, but they refrain from doing so out of out of concern that the

water and sediments in the Raritan River and Raritan Bay are not safe for direct contact.

### Defendants

39.     Defendant NL Industries, Inc., formerly known as National Lead Company, is a corporation organized under the laws of the State of New Jersey, with its principal place of business in Dallas, Texas.

40.     Defendant NL Environmental Management Services, Inc., is a corporation organized under the laws of the State of New Jersey, with its principal place of business in Dallas, Texas.

41.     NL Industries, Inc. and/or NL Environmental Management Services, Inc. (hereafter "NL Industries") owned the NL site from the early 1930's to 2005 and operated on the site from approximately 1935 to 1982.  While NL Industries leased a part of the site called the "Marsulex Tract" to other companies from approximately 1982 to 1997, NL Industries assumed responsibility for environmental issues associated with the Marsulex Tract under a settlement agreement with Marsulex Incorporated (hereafter "Marsulex") in 1997.

42.     Defendant Sayreville Economic and Redevelopment Agency (hereafter "SERA") is a municipal redevelopment agency.  By the Borough of Sayreville's Ordinance #589-98, codified at Section 2-53 of the Borough's Municipal Code, the Borough created SERA as a "body corporate and politic" pursuant to N.J.S. 40A:12A-11(a).  As such, SERA has the authority to sue and be sued. *See* N.J.S. 40A:12A-11(a), 40A:5A-3(a)(2).  SERA acquired the NL site by eminent domain in 2005 for the purpose of redevelopment of the site.  A "Settlement Agreement and Release" reached in 2008 ("2008 Agreement") provides for the purchase of the site from SERA by other parties, but, upon information and belief, ownership of the site has not yet been fully transferred from SERA under the terms of the 2008 Agreement.

43.     Defendant O'Neill Properties Group, L.P. (hereafter "O'Neill") is a limited partnership organized under the laws of Pennsylvania, with its principal place of business in King of Prussia, Pennsylvania.  By a 2007 resolution, SERA selected O'Neill as the redeveloper for the NL site.

44.     Defendant Sayreville Seaport Associates, L.P. (hereafter "SSA") is a limited partnership organized under the laws of Delaware, with its principal place of business in King of Prussia, Pennsylvania.  O'Neill created SSA for the purpose of purchasing and redeveloping the NL site.  In the 2008 Agreement, portions of the site are referred to as "Parcel A," "Parcel B," and the "C Parcels," respectively.  According to the terms of the 2008 Agreement, SSA owns or will own the C Parcels; an easement on Parcel A for construction of a road and turnaround; the development rights to Parcel A, which were or shall be transferred by SSA to Parcel C and/or Parcel B or otherwise preserved for the benefit of SSA for use in the redevelopment of the C Parcels and/or Parcel B; and Parcel B.

45.     Defendant County of Middlesex (hereafter "Middlesex") is a New Jersey county.  Its jurisdiction includes the Borough of Sayreville.  According to the terms of the 2008 Agreement, Middlesex owns or will own an easement across a portion of the C Parcels along the entire waterfront; an easement across Parcel B along the entire waterfront; and Parcel A, the title to which shall be held by Middlesex in its Open Space Inventory and subject to conservation easements as required by governmental entities assisting in the funding of the purchase of Parcel A.

46.     Defendant Stephen Dilts is the Commissioner of New Jersey Department of Transportation (hereafter"NJDOT").  NJDOT is responsible for the operation of U.S. Route 9 and State Route 35 in the State of New Jersey. Mr. Dilts is sued in his official capacity.

16

47.     Defendant Bernard James is the Regional Director of Operations for NJDOT's Central Region, which includes the portions of U.S. Route 9 and State Route 35 that cross the Raritan River.  Discharges by "NJDOT Region Central" through small municipal separate storm sewer systems (MS4's) are authorized under the Highway Permit and subject to the requirements of that permit.  Mr. James is sued in his official capacity.

48.     Defendant New Jersey Turnpike Authority (hereafter "NJTA") is responsible for the operation of the Garden State Parkway.  Discharges from Garden State Parkway through small MS4's are authorized under the Highway Permit and subject to the requirements of that permit.

49.     Defendant Diane Gutierrez-Scaccetti is the Executive Director of NJTA.  Ms. Gutierrez-Scaccetti is sued in her official capacity.

50.     Defendant NJDEP may provide a grant or grants to fund the purchase of Parcel A, entitling it to hold a conservation easement on Parcel A under the terms of the 2008 Agreement. NJDEP is named as a party defendant pursuant to Rule 19(a) of the Federal Rules of Civil Procedure, because, in its absence, complete relief cannot be accorded among the parties and it has an interest in the subject of this action.

51.     Defendant Mark Mauriello is Commissioner of NJDEP.  Mr. Mauriello is sued in his official capacity.  Mr. Mauriello is named as a party defendant pursuant to Rule 19(a) of the Federal Rules of Civil Procedure, because, in his absence, complete relief cannot be accorded among the parties and he has an interest in the subject of this action.

## FACTS

### THE FORMER NL INDUSTRIES SITE

52.     The NL site is a land site of approximately 440 acres located at 1000 Chevalier

Avenue in the Borough of Sayreville, Middlesex County, New Jersey.  The NL site is surrounded by the Raritan River on three sides.  The Garden State Parkway, U.S. Route 9, and State Highway Route 35 traverse the NL site.

53.     The NL Companies owned the NL site beginning in the early 1930's.  Between 1935 and 1982, the NL Companies manufactured titanium dioxide pigments on the NL site for use in paints, paper, cosmetics, and other products.  In approximately 1982, the NL Companies leased a portion of the site now referred to as the "Marsulex Tract" and sold two sulfuric acid plants on the Marsulex Tract to C-I-L Corporation of America (hereafter "C-I-L").  In approximately 1989, Marsulex took assignment of C-I-L's lease and purchased the two plants.  Both C-I-L and Marsulex manufactured sulfuric acid on the Marsulex Tract.  In 1997, Marsulex and the NL Companies entered into a settlement agreement under which the NL Companies assumed responsibility for environmental issues associated with the Marsulex Tract.

54.     To comply with New Jersey's Environmental Cleanup Responsibility Act (hereafter "ECRA"), currently known as the Industrial Site Recovery Act (hereafter "ISRA"), NL Industries began an environmental investigation of the site in 1988.  Under ECRA/ISRA and an administrative consent order, NJDEP has required investigation of contamination at the site and remediation of some areas of concern.  The investigation and remediation process remains ongoing at the time of the filing of this complaint.

55.     In 2005, SERA acquired the site by eminent domain for the purpose of redevelopment of the site.  SERA selected O'Neill as the redeveloper for the site.

56.     On April 1, 2008, NL Industries, SERA, SSA, and the County entered into the 2008 Agreement.

57.     The 2008 Agreement provides for ownership of the property to be transferred from SERA through a series of three closings.  Under the Agreement, at the initial closing, SSA will purchase the C Parcels, and the County will purchase an easement across a portion of the C Parcels along the entire waterfront and an easement across Parcel B along the entire waterfront.  Upon information and belief, the initial closing took place in October 2008.  The Agreement provides that, at the second closing, the County will purchase Parcel A, the title to which will be held by the County in its Open Space Inventory and subject to conservation easements to other governmental entities assisting in the funding of the purchase of Parcel A as required by those entities.  SERA shall apply to NJDEP and the Borough of Sayreville for grants to fund the purchase of Parcel A, which would entitle these entities to hold conservation easements on Parcel A.  The Borough provided financial support for the funding of Parcel A, but it did not condition its support upon receipt of easement rights.  SSA will purchase an easement on Parcel A for the construction of an access road and turnaround and the development rights to Parcel A (which shall be transferred by SSA to Parcel C and/or Parcel B or otherwise preserved so as to accrue to the benefit of SSA for use in the redevelopment of the C Parcels and/or Parcel B).  The Agreement provides that, at the third closing, SSA will purchase Parcel B.

58.     The 2008 Agreement settled among the parties to the Agreement responsibility for environmental liabilities associated with the site.  The Agreement provides that, at the initial closing, SSA will assume responsibility for all environmental investigation and remediation obligations, with certain exceptions.  One of these exceptions is that SSA does not assume responsibility under the Agreement for any environmental investigation and remediation related to the Raritan River sediments.  Under  the Agreement, NL Industries retains responsibility for liabilities related to the

19

sediments.

59.     The Agreement does not include any requirement or plan for remediation of contaminated Raritan River sediments.

60.     The North Ditch is a drainage ditch on the site.  It collects surface water runoff from off-site and on-site areas and discharges into the Raritan River.

61.     The Tertiary Lagoon System consists of three lagoons on the site along the Raritan River.  The lagoon system was used for containment and settling of plant process effluent and stormwater runoff prior to discharge into the Raritan River.  Discharge of certain pollutants from the lagoon system through a stormwater outfall has been subject to NJPDES Permit # NJ0000931.

## CONTAMINATION OF RARITAN RIVER SEDIMENTS

62.     The Raritan River, the largest river located entirely within the State of New Jersey, flows into the Raritan Bay of the Atlantic Ocean.

63.     NJDEP required NL Industries to collect and analyze samples of sediments in the Raritan River in the vicinity of the NL site as part of the site-wide investigation under ECRA/ISRA.  Sediment samples were collected in June 2000 and July and August 2002. The samples were taken from locations adjacent to and downstream of the NL site, as well as upstream of and across the river from the NL site for comparison purposes.  NL Industries submitted reports with the results of the sediment sampling and analysis to NJDEP in October 2000, April 2001, November 2002, and July 2003.

64.     NJDEP has adopted Marine/Estuarine Screening Guidelines – screening levels for sediment contamination in marine/estuarine waters.   The Effects Range-Low (ER-L) value

represents a concentration at which adverse benthic impacts are found in approximately 10% of studies.  Contamination greater than the Effects-Range Median (ER-M) value indicates adverse benthic impacts in more than 50% of cases studied.

65.     The sampling results revealed that sediments in the Raritan River adjacent to and downstream of the NL site are contaminated with arsenic, copper, lead, nickel, and zinc.  With respect to each of these metals, nearly all of the samples from locations adjacent to the site exceeded the ER-L standard and many of the samples also exceeded the ER-M standard.  The ER-L standard for arsenic, copper, lead, and nickel was also exceeded downstream of the site.

66.     NL Industries concluded that the spatial distribution of the metals found in the sediments in the Raritan River resulted, at least in part, from the North Ditch, the Garden State Parkway, State Route 35, and other overland sources, rather than from groundwater.  NL Industries concluded that the Tertiary Lagoon System is not a significant source of the sediment contamination.

67.     Upon information and belief, sources located on the NL site, including the North Ditch, groundwater at the site, and the Tertiary Lagoon System, contribute to the contamination of sediments in the Raritan River in the vicinity of the NL site.

68.     The North Ditch discharges stormwater into the Raritan River.  According to sampling of sediments in the North Ditch by NL Industries, the North Ditch contains levels of arsenic, copper, lead, and zinc that exceed NJDEP standards.  A Remedial Action Selection Report for the North Ditch was submitted to NJDEP in July 2007.  In the Raritan River sediments, at the point where the North Ditch discharges into the river, concentrations of arsenic, copper, lead, nickel, and zinc are elevated and higher than concentrations of these metals in sediments immediately upstream of that point.

21

69.     Groundwater discharges into the Raritan River at numerous points from the NL site. The groundwater discharging to the river contains elevated levels of arsenic, copper, lead, nickel, and zinc.  Concentrations of these metals are elevated in the river sediments at the locations where groundwater discharges into the river.

70.     The Tertiary Lagoon System discharges stormwater into the Raritan River. Sampling by NL Industries of the sediments and soils in the lagoons revealed elevated levels of arsenic, copper, lead, nickel, and zinc in the lagoons.  Concentrations of arsenic, copper, lead, nickel, and zinc in the Raritan River sediments are elevated near the point of discharge from the lagoons. Discharge of certain pollutants from the lagoons has been subject to NJPDES Permit # NJ0000931, but this permit does not authorize the discharge of arsenic, copper, lead, nickel, or zinc.

71.     Upon information and belief, the Garden State Parkway, U.S. Route 9, and State Route 35 are sources that contribute to the contamination of sediments in the Raritan River in the vicinity of the NL site.  Stormwater runoff from these roadways discharges into the Raritan River. In the sediments in the Raritan River near these roadways, concentrations of arsenic, copper, lead, nickel, and zinc are elevated and generally higher than concentrations of these metals found in sediments upstream of the roadways.

**THE FAILURE TO REMEDIATE CONTAMINATED RARITAN RIVER SEDIMENTS**

72.     In a letter dated June 24, 2004, NJDEP provided its comments on the results of the sampling of the Raritan River sediments performed by NL Industries.  NJDEP recognized NL Industries' conclusion that "[c]oncentrations of [arsenic, copper, lead, nickel, and zinc] are present at levels above their respective NJDEP Sediment Screening Criteria."  It also recognized NL

22

Industries' conclusion that "[t]he spatial distribution of the metals suggests overland flow from off-site locations," including the Garden State Parkway and State Route 35, and "on-site locations," including the North Ditch.

73.     NJDEP decided that "[w]hile N.L. Industries has contributed to the sediment contamination detected adjacent to the site," it would not require remediation or additional investigation of the sediments at that time.  NJDEP concluded that "any remedial actions conducted in this area of the river should be part of a regional approach."

74.     To date, no "regional approach" for remediation of the Raritan River sediments has been proposed, and no further actions have been taken towards remediation of the sediments in the vicinity of the NL site.

75.     Upon information and belief, a significant amount of the sediment contamination in the Raritan River in the vicinity of the NL site was and may be still caused by discharges from sources at the NL site and nearby roadways.  Remediation of the sediments and control of these sources would be effective in addressing the sediment contamination in the vicinity of the NL site to a significant extent.

76.     Subsequent to NJDEP's decision, USEPA issued a decision requiring remediation of sediments in the Raritan River upstream of the NL site.  The Horseshoe Road and Atlantic Resources Superfund sites are located on the Raritan River upstream of the NL site.  On June 22, 2009, USEPA issued a Record of Decision for Operable Unit 3 – Marsh and River Sediments of the Horseshoe Road and Atlantic Resources sites.  The selected remedy includes dredging of approximately 14,000 cubic yards of contaminated sediments from the Raritan River, off-site disposal of the dredged material, backfilling and grading of all excavated or dredged areas with

clean cover material, and institutional controls for the river sediments to prevent disruption of cover.

## THE RISK TO HUMAN HEALTH AND THE ENVIRONMENT
## FROM SEDIMENT CONTAMINATION

77.     Contaminated sediments present a risk to the aquatic environment.  Sediments are loose particles that settle at the bottom of a body of water.  Contaminants in sediments may kill organisms living in the benthic environment (the environment at the bottom of the body of water), reducing the variety of organisms and food supply to larger species.  If the benthic organisms do not die, they may still absorb the contaminants.  When larger species feed on these organisms, they also absorb the contaminants.  The contaminants accumulate in species at higher levels of the food chain. Species exposed to contaminants at any level in the food chain may die or develop health problems. Thus, the contaminated sediments may adversely affect the organisms living in the benthic environment as well as any species higher up in the same food chain.

78.     Contaminated sediments present a risk to human health because humans may eat fish and other animals in which contaminants have accumulated.

79.     Sediments may become resuspended in the water if they are disturbed, directly exposing all species in the water to the contaminants from the sediments.

80.     The sediments in the Raritan River in the vicinity of the NL site exceed screening standards that NJDEP has established for the purpose of assessing ecological risk.

## UNPERMITTED DISCHARGES FROM SOURCES AT NL SITE

81.     The North Ditch discharges arsenic, copper, lead, nickel, and zinc into the Raritan River.  No permit issued under the Clean Water Act authorizes the discharge of these pollutants.

82.     NJPDES Permit #NJ0000931 authorized discharge of certain pollutants from

24

Stormwater Outfall 002A on the NL site, but the permit does not authorize discharge from the North Ditch or discharge of arsenic, copper, lead, nickel, or zinc from any source.

83.     NJPDES Permit # NJ0000931 expired on April 30, 2009.  An application for renewal was submitted on April 20, 2009.  The application lists SSA as the applicant/operating entity and SERA as the property/land owner.  Stormwater Outfall 002A is the only discharge location listed in the application.  The application was required to list pollutants that the applicant knows or has reason to believe are present, but it did not list arsenic, copper, lead, nickel, or zinc.

84.     The prior application for renewal of NJPDES Permit # NJ0000931 was submitted on June 5, 2000.  It listed NL Industries, Inc. as both the applicant/operating entity and property/land owner.  It was required to list pollutants that the applicant knows or has reason to believe are present, but it did not list arsenic, copper, lead, nickel, or zinc.  It listed Stormwater Outfall 002A and two drainage areas not served by a stormwater outfall as the discharge locations.

85.     Groundwater from the NL site containing arsenic, copper, lead, nickel, and zinc discharges into the Raritan River.  No permit issued under the Clean Water Act authorizes the discharge of these pollutants into the groundwater of the site or through the groundwater of the site into the Raritan River.

86.     The Tertiary Lagoon System discharges arsenic, copper, lead, nickel, and zinc into the Raritan River.  No permit issued under the Clean Water Act authorizes the discharge of these pollutants.

## VIOLATIONS OF HIGHWAY AGENCY STORMWATER GENERAL PERMIT

87.     On August 1, 2005, NJDEP issued the Highway Permit, pursuant to Section 402(p)(3)(B) of the Clean Water Act, 33 U.S.C. 1342(p)(3)(B).  On March 1, 2009, NJDEP renewed

the Highway Permit, with modifications.  The Highway Permit authorizes stormwater discharges from small MS4's at highways or other thoroughfares owned or operated by agencies authorized to discharge under the permit (hereafter "Highway Agencies").

88.     Under the Highway Permit, Highway Agencies must develop, implement, and enforce a stormwater program, which shall be designed to reduce the discharge of pollutants from the Highway Agency's small MS4 to the maximum extent practicable, to protect water quality, and to satisfy the appropriate water quality requirements by including the Statewide Basic Requirements (hereafter SBR's) set forth in the Highway Permit.  The Highway Permit requires Highway Agencies to prepare and implement a written Stormwater Pollution Prevention Plan (hereafter "SPPP") that describes the Highway Agency's stormwater program and serves as the mechanism for the implementation of the SBR's.  The Highway Permit requires Highway Agencies to compete Annual Reports summarizing the status of the Highway Agency's compliance with the Highway Permit, including a certification that Highway Agency is in compliance with its stormwater program, SPPP, and the Highway Permit.

89.     "NJDOT Region Central" and the Garden State Parkway are Highway Agencies authorized by the Highway Permit to discharge stormwater from small MS4's.  The portions of U.S. Route 9 and State Route 35 that cross the Raritan River are located in NJDOT's Central Region.

90.     According to NJDOT Region Central's annual report for the period from January 1, 2008, to December 31, 2008, during this period, NJDOT Region Central failed to sweep all required streets, as required by Section F.7.a of the Highway Permit, and failed to inspect all stormwater facilities to ensure proper functioning and maintenance, as required by Section F.7.c of the Highway Permit.

91.     According to previous annual reports, NJDOT Region Central also failed to sweep all required streets in 2006 and 2007, and failed to inspect all stormwater facilities to ensure proper functioning and maintenance in 2004, 2005, 2006, and 2007.  Because of this history of permit violations, plaintiffs believe and allege that NJDOT Region Central continues to violate the requirements to sweep all required streets and inspect all stormwater facilities to ensure proper functioning and maintenance.

## CLAIMS

### First Claim

92.     Section 7002(a)(1)(B) of RCRA, 42 U.S.C. 6972(a)(1)(B), provides that any person may commence a civil action on his own behalf:

> against any person, including the United States and any other governmental instrumentality or agency, to the extent permitted by the eleventh amendment to the Constitution, and including any past or present generator, past or present transporter, or past or present owner or operator of a treatment, storage, or disposal facility, who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may
>
> present an imminent and substantial endangerment to health or the environment * * *.

93.     Sediments in the Raritan River in the vicinity of the NL site are contaminated with arsenic, copper, lead, nickel, and zinc.  The contaminants in the sediments are solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment.

94.     NL Industries, NL Environmental Management Services, Inc., SERA, O'Neill, SSA, Middlesex, Stephen Dilts, in his official capacity, Bernard James, in his official capacity, NJTA, and/or Diane Gutierrez-Scaccetti, in her official capacity, have contributed to the past or present handling, storage, treatment, transportation, or disposal of the contaminants in the

27

Raritan River sediments.

## Second Claim

95.     Section 301(a) of the Clean Water Act, 33 U.S.C. 1311(a), prohibits the discharge of

pollutants from a point source into navigable waters of the United States, unless in compliance with

various enumerated sections of the Clean Water Act.  Section 301(a) prohibits, *inter alia*, such

discharges not authorized by, or in violation of, the terms and conditions of a NPDES permit issued

pursuant to Section 402 of the Act, 33 U.S.C. 1342.

96.     The discharges of arsenic, copper, lead, nickel, and zinc from the North Ditch on the

NL site into the Raritan River are discharges from a point source into navigable waters of the United

States within the meaning of Section 301(a) of the Clean Water Act, 33 U.S.C. 1311(a).

97.     NL Industries, SERA and/or SSA, have violated and continue to violate

Sections 301(a) and 402 of the Clean Water Act, 33 U.S.C. 1311(a) and 1342, by discharging

arsenic, copper, lead, nickel, and zinc from the North Ditch into the Raritan River without a permit

issued pursuant to Section 402 of the Clean Water Act, 33 U.S.C. 1342, authorizing such discharge.

## Third Claim

98.     Section 402(p)(3)(B) of the Clean Water Act, 33 U.S.C. 1342(p)(3)(B), requires a

permit to discharge from municipal storm sewers.  The permit must require controls to reduce the

discharge of pollutants to the maximum extent practicable, including management practices, control

techniques and system, design and engineering methods, and such other provisions as the

Administrator or State determines appropriate for the control of such pollutants.  33 U.S.C.

1342(p)(3)(B)(iii).

99. Discharges by "NJDOT Region Central" through small MS4's are authorized under, and are subject to, the terms of the Highway Permit.

100. Stephen Dilts, in his official capacity, and Bernard James, in his official capacity, have violated the Highway Permit in that they are responsible for NJDOT Region Central's compliance with the Highway Permit and NJDOT Region Central has violated the Highway Permit, *inter alia*, by failing and continuing to fail to sweep all required streets, as required by Section F.7.a of the Highway Permit, and to inspect all stormwater facilities to ensure proper functioning and maintenance, as required by Section F.7.c of the Highway Permit.

101. By violating terms of the Highway Permit, Stephen Dilts, in his official capacity, and Bernard James, in his official capacity, have violated and continue to violate Sections 301 and 402 of the Clean Water Act, 33 U.S.C. 1311 and 1342.

**Fourth Claim**

102. Section 301(a) of the Clean Water Act, 33 U.S.C. 1311(a), prohibits the discharge of pollutants from a point source into navigable waters of the United States, unless in compliance with various enumerated sections of the Clean Water Act. Section 301(a) prohibits, *inter alia*, such discharges not authorized by, or in violation of, the terms and conditions of a NPDES permit issued pursuant to Section 402 of the Act, 33 U.S.C. 1342.

103. The discharges of arsenic, copper, lead, nickel, and zinc through groundwater at the NL site into the Raritan River are discharges from a point source or point sources into navigable waters of the United States within the meaning of Section 301(a) of the Clean Water Act, 33 U.S.C. 1311(a).

29

104.    NL Industries, SERA, and/or SSA have violated and continue to violate Sections 301(a) and 402 of the Clean Water Act, 33 U.S.C. 1311(a) and 1342, by discharging arsenic, copper, lead, nickel, and zinc through groundwater at the NL site into the Raritan River without a permit issued pursuant to Section 402 of the Clean Water Act, 33 U.S.C. 1342, authorizing such discharge.

**Fifth Claim**

105.    Section 301(a) of the Clean Water Act, 33 U.S.C. 1311(a), prohibits the discharge of pollutants from a point source into navigable waters of the United States, unless in compliance with various enumerated sections of the Clean Water Act.  Section 301(a) prohibits, *inter alia*, such discharges not authorized by, or in violation of, the terms and conditions of a NPDES permit issued pursuant to Section 402 of the Act, 33 U.S.C. 1342.

106.    The discharges of arsenic, copper, lead, nickel, and zinc from the Tertiary Lagoon System into the Raritan River are discharges from a point source into navigable waters of the United States within the meaning of Section 301(a) of the Clean Water Act, 33 U.S.C. 1311(a).

107.    NL Industries, SERA, and/or SSA have violated and continue to violate Sections 301(a) and 402 of the Clean Water Act, 33 U.S.C. 1311(a) and 1342, by discharging arsenic, copper, lead, nickel, and zinc from the Tertiary Lagoon System into the Raritan River without a permit issued pursuant to Section 402 of the Clean Water Act, 33 U.S.C. 1342, authorizing such discharge.

**RELIEF**

Wherefore, plaintiffs respectfully request this Court to grant the following relief:

A.    Issue a declaratory judgment that defendants**,** NL Industries, NL Environmental Management Services, Inc., SERA, O'Neill, SSA, Middlesex, Stephen Dilts, in his official capacity, Bernard James, in his official capacity, NJTA, and/or Diane Gutierrez-Scaccetti, in her official

30

capacity, have contributed to the past or present handling, storage, treatment, transportation, or disposal of solid or hazardous waste in sediments of the Raritan River which may present an imminent and substantial endangerment to health or the environment within the meaning of Section 7002(a)(1)(B) of RCRA, 42 U.S.C. 6972(a)(1)(B);

B.      Enjoin defendants, NL Industries, NL Environmental Management Services, Inc., SERA, O'Neill, SSA, Middlesex, Stephen Dilts, in his official capacity, Bernard James, in his official capacity, NJTA, and/or Diane Gutierrez-Scaccetti, in her official capacity, to remediate contaminated sediments in the Raritan River and to control any sources that may continue to contribute to the sediment contamination;

C.      Award plaintiffs their costs, including reasonable attorneys' and expert witnesses' fees, as authorized by Section 7002(e) of RCRA, 42 U.S.C. 6972(e);

D.      Issue a declaratory judgment that NL Industries, SERA, and/or SSA, have violated and continue to violate Sections 301(a) and 402 of the Clean Water Act, 33 U.S.C. 1311(a) and 1342, by discharging arsenic, copper, lead, nickel, and zinc from the North Ditch, through groundwater at the NL site, and from the Tertiary Lagoon System, into the Raritan River without a permit issued pursuant to Section 402 of the Clean Water Act, 33 U.S.C. 1342, authorizing such discharge;

E.      Enjoin NL Industries, SERA and/or SSA from discharging arsenic, copper, lead, nickel, and zinc from the North Ditch, through groundwater at the NL site, and from the Tertiary Lagoon System, into the Raritan River, except in compliance with a permit issued pursuant to Section 402 of the Clean Water Act, 33 U.S.C. 1342, authorizing such discharge;

F.      Order SERA and/or SSA to pay appropriate civil penalties under Section 309(d)

of the Clean Water Act, 33 U.S.C. 1319(d), for the unlawful discharge of pollutants from the North Ditch, through groundwater at the NL site, and from the Tertiary Lagoon System, into the Raritan River;

G.     Issue a declaratory judgment that Stephen Dilts, in his official capacity, and Bernard James, in his official capacity, have violated Sections 301 and 402 of the Clean Water Act, 33 U.S.C. 1311 and 1342, by failing to comply with the Highway Permit;

H.     Order Stephen Dilts, in his official capacity, and Bernard James, in his official capacity, to comply with each specific term of the Highway Permit;

I.     Award  plaintiffs their costs, including reasonable attorneys' and expert witnesses'

fees, as authorized by Section 505(d) of the Clean Water Act, 33 U.S.C. 1365(d); and

J.     Award such other relief as this Court deems appropriate.

As NJDEP and Mark Mauriello, in his official capacity, are named as party defendants pursuant to Rule 19(a) of the Federal Rules of Civil Procedure, no specific relief is sought against these defendants.

Respectfully submitted,

s/ Edward Lloyd
Edward Lloyd
Columbia Law School
435 West 116th Street, Room 831
New York, NY 10027
(212) 854-4376/4291
Elloyd@tpmlaw.com

Bruce J. Terris
Carolyn Smith Pravlik
Terris, Pravlik & Millian, LLP
1121 12th Street, N.W.
Washington, DC  20005-4632
(202) 682-2100
TPMInfo@tpmlaw.com

October 13, 2009                                    *Counsel for Plaintiffs*