<u>FOR PUBLICATION</u>

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| RARITAN BAYKEEPER, INC. et al., | : |
| Plaintiffs, | : Civil Action No. 09-4117 (JAP) |
| v. | : |
| | : **OPINION** |
| NL INDUSTRIES, INC., et al., | : |
| Defendants. | : |

PISANO, District Judge:

Presently before the Court is defendant NL Industries, Inc.'s ("NL") Motion to Dismiss plaintiffs Raritan Baykeeper, Inc. d/b/a NY/NJ Baykeeper and Edison Wetlands Association, Inc.'s (collectively "Raritan Baykeeper") Complaint without prejudice on abstention grounds, or alternatively for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Procedure 12(b)(6).  For the reasons set forth below, NL's Motion to Dismiss is granted on abstention grounds and Raritan Baykeeper's Complaint is dismissed without prejudice.[1]

I.   Background

Raritan Baykeeper brought this citizen suit pursuant to section 7002(a)(1)(B) of the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6972(a)(1)(B), and section 505(a)(1) of the Federal Water Pollution Control Act (the "CWA"), 33 U.S.C. § 1365(a)(1), seeking remediation of contaminated sediments in the Raritan River located adjacent to a site formerly owned by NL (the "NL Site").  Amended Compl. at ¶¶ 1-2.  Raritan Baykeeper also

---

[1] There are several motions currently pending before this Court.  The Court's dismissal of this action on abstention grounds renders all pending motions in this case moot, and the motions are dismissed accordingly.

1

seeks a declaratory judgment, injunctive relief, imposition of civil penalties, and an award of costs, including attorneys' fees and expert witnesses' fees. *Id.* at ¶ 2.

The NL Site is located at 1000 Chevalier Avenue, Sayreville, New Jersey and consists of approximately 440 acres surrounded on three sides by the Raritan River. *Id.* at ¶ 52. The Garden State Parkway, U.S. Route 9, and State Highway 35 cross the NL Site. *Id.* NL acquired the site in the early 1930s. *Id.* at ¶ 53. From 1935 until 1982, NL manufactured titanium dioxide pigments on the site for use in various products. *Id.* In 1982, NL leased a portion of the property known as the "Marsulex Tract" and sold two sulfuric acid plants located on the Marsulex Tract to C-I-L Corporation of America ("C-I-L"). In 1989, Marsulex purchased the two sulfuric acid plants and took assignment of the lease from C-I-L. *Id.* Sulfuric acid was manufactured on the Marsulex Tract by both C-I-L and Marsulex. *Id.* NL assumed responsibility for environmental issues on the Marsulex Tract through a settlement agreement with Marsulex that was executed in 1997. *Id.*

The NL Site contains a lagoon system comprised of three lagoons covering 15 acres (the "Tertiary Lagoon"). Affidavit of Thomas T. Griffin, P.E. ("Griffin Affidavit") at Exhibit F, page 3.[2] The Tertiary Lagoon was used for the containment and settling of effluent from the plant and storm water runoff prior to discharge into the Raritan River pursuant to a New Jersey Department of Environmental Protection ("NJDEP") permit. *Id.* The NL Site also contains an area known as the North Ditch that is allegedly discharging contaminants into the Raritan River. Griffin Affidavit at Exhibit B, Part II, section 3. Raritan Baykeeper alleges that discharge from

---

[2] Plaintiffs argue that this Court may not look beyond the four corners of the complaint when deciding this Motion to Dismiss without first converting this motion to one for summary judgment and allowing Plaintiffs an opportunity for discovery. Pl. Br. at 9-10. Plaintiffs are mistaken. On a motion to dismiss, "[the] court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document." *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196-97 (3d Cir. 1993). Additionally, the Court may properly consider documents specifically referenced in the complaint, as well as documents that are part of the public record. *Heightened Indep. & Progress v. Port Auth. of N.Y. & N.J.*, 2008 WL 5427891 (D.N.J. 2008).

both the Tertiary Lagoon and the North Ditch are contributing to contamination of the Raritan River sediments adjacent to the NL Site.  Amended Compl. at ¶ 67.

In 1988, NL began an environmental investigation of the NL Site as required by New Jersey's Environmental Cleanup Responsibility Act ("ECRA"), now known as the Industrial Site Recovery Act ("ISRA").  *Id.* at ¶ 54.  The NJDEP issued an Administrative Consent Order ("ACO") on May 18, 1989, requiring NL to investigate environmental contamination on the NL Site, submit a clean-up plan to the NJDEP for approval, and implement the approved clean-up plan.  *Id.*; Griffin Affidavit at Exhibit A.  Investigation of environmental contamination and clean-up at the NL Site are ongoing under the ACO.  Amended Compl. at ¶ 54.

The Borough of Sayreville ("Sayreville") designated the NL Site as an area in need of redevelopment pursuant to the Local Redevelopment and Housing Law in 1996.  Affidavit of Christopher R. Gibson ("Gibson Affidavit") at Exhibit A, page 1.  In 2005, the Sayreville Economic and Redevelopment Agency ("SERA") acquired the NL Site through eminent domain for the purpose of redevelopment.  Amended Compl. at ¶ 55.  O'Neill Properties Group. L.P. ("O'Neill") was selected as redeveloper for the NL Site.  *Id.*  Subsequently, O'Neill created Sayreville Seaport Associates, L.P. ("SSA") in order to purchase and redevelop the NL Site.  *Id.* at ¶ 44.  In 2008, NL, SERA, SSA, and Middlesex County entered into an agreement governing the sale of the NL Site (the "2008 Agreement").  *Id.* at ¶ 56.  The 2008 Agreement calls for transfer of the NL Site through three separate closings.  *Id.* at ¶ 57.  At the first closing, which occurred in October 2008, SSA purchased a portion of the NL Site known as C Parcels, and Middlesex County purchased easements across the C Parcels and the B Parcel that run along the entire waterfront.  *Id.*  At the second closing, Middlesex County will purchase Parcel A to be held in the County's Open Space Inventory.  *Id.*  The purchase of Parcel A will be funded

through grants obtained by SERA from the NJDEP and Sayreville. *Id.* In exchange for the grants, NJDEP and Sayreville will hold conservation easements on Parcel A. *Id.* Also at the second closing, SSA will purchase an easement on Parcel A for the construction of an access road and turnaround, and for development rights on Parcel A which would then be transferred to Parcel B and the C Parcels. *Id.* At the third closing, SSA will purchase Parcel B. *Id.* Extensive redevelopment is planned for the NL Site consisting of commercial and light industrial uses. Griffin Affidavit at Exhibit D, page 2.

The 2008 Agreement also settled the parties' respective responsibilities for environmental liabilities on the NL Site. Amended Compl. at ¶ 58; Affidavit of Christopher R. Gibson ("Gibson Affidavit") at Exhibit A, page 7. Pursuant to the 2008 Agreement, SERA entered into a Memorandum of Understanding ("MOU") with the NJDEP in which SERA assumed responsibility for nearly all environmental investigation and remediation on the NL Site. Amended Compl. at ¶ 58; Gibson Affidavit at Exhibit B, pages 7-8. SSA assumed responsibility for spearheading the clean-up effort at the NL Site by performing SERA's obligations under the MOU. Gibson Affidavit at Exhibit A, pages 7-8. NL retained responsibility for remediation of the Raritan River sediments adjacent to the NL Site. Amended Compl. at ¶ 58; Griffin Affidavit at Exhibit A, page 8. SSA also entered into an agreement with the NJDEP to resolve its liability resulting from contamination of the NL Site and Raritan River. Gibson Affidavit at Exhibit D. The terms of the MOU and of the agreement between SSA and the NJDEP regarding contamination of the NL Site and the Raritan River were made available to the public. Gibson Affidavit at Exhibit B, ¶ 63; Exhibit D, page 2. No public comments were made indicating that the agreements were inadequate. Gibson Affidavit at ¶ 17.

Under the agreements, SSA would first remediate the environmental contamination on Parcel A, which is designated for open space. Gibson Affidavit at ¶ 19. Parcel A is currently being remediated in accordance with an NJDEP approved Remedial Action Workplan ("RAWP"). *Id.* Remediation of Parcel A should be completed in summer 2010. *Id.* Two additional RAWPs have been submitted to the NJDEP by SSA and SERA. *Id.* at ¶ 20. The first additional RAWP proposes that conventional contaminants in the soils on the NL Site be removed for off-site disposal, and remediation of the North Ditch, and other impacted swales and ditches, by capping them with clean fill material. *Id.* Consequently, the North Ditch would be eliminated entirely. *Id.* The second additional RAWP would remove radiologically-impacted soil from the NL Site for off-site disposal. *Id.*

In accordance with its obligations under the ACO, NL took and analyzed samples of river sediments in the vicinity of the NL Site in June 2000, and July and August 2002. Amended Compl. at ¶ 63; Griffin Affidavit at ¶¶ 10-14. NJDEP has adopted the Marine/Estuarine Screening Guidelines as screening levels for contaminants contained in the sediments in marine or estuarine waters. Amended Compl. at ¶ 64. Contamination in the Effects Range-Low ("ER-L") value has adverse benthic impacts in approximately 10% of studies. *Id.* Results of the June 2000 sampling were reported to the NJDEP in a report titled *Remedial Investigation Report, Raritan River Surface Water and Sediment Sample Results* (the "2000 Report"). Griffin Affidavit at ¶ 10. The June 2000 sampling revealed concentrations of arsenic, copper, lead, and zinc higher than ER-L values in nearly all samples taken. *Id.*; Amended Compl. at ¶ 65. Based upon the 2000 Report, NL observed that as a result of the geography of the Raritan River around the NL Site, sediments from contaminated upstream sources were deposited adjacent to the NL Site. Griffin Affidavit at Exhibit D, pages 107-108. NL identified several upstream sites,

including the Horseshoe Road Superfund Site, and the Black Ditch/ Red Root Creek, as possible sources of contamination.  *Id.* at page 108.  The North Ditch, groundwater, and Tertiary Lagoon system were identified as possible on-site sources of sediment contamination.  *Id.* at pages 107-108.

In July and August 2002, NL conducted additional sampling of the Raritan River sediments.  Amended Compl. at ¶ 63; Griffin Affidavit at ¶ 14.  NL reported the results of the July and August 2002 sampling to the NJDEP in a report titled *Remedial Investigation Report, Supplemental Raritan River Sediment Sampling Results* (the "2002 Report").  Griffin Affidavit at ¶ 14.  The sampling revealed concentrations of arsenic, copper, lead, nickel, and zinc above NJDEP screening levels.  *Id.* at Exhibit E, page 18.  The spatial distribution of the contaminants indicated that off-site sources, including the Horseshoe Road Superfund Site, Black Ditch/ Red Root Creek, Crow's Mill Creek, Honsell's Creek, the Garden State Parkway, and State Route 35, caused the contamination of river sediments along the NL Site.  *Id.*  NL concluded that the North Ditch may be an on-site source of sediment contaminants.  *Id.*  NL also analyzed the relationship between the Tertiary Lagoon and the Raritan River.  *Id.* at page 19.  NL concluded that the Tertiary Lagoon did not have a significant impact on the Raritan River or the Raritan River sediments.  *Id.*

On June 24, 2004, the NJDEP issued a comment letter in response to the 2002 Report.  Amended Compl. at ¶ 72; Griffin Affidavit at ¶ 16.  The NJDEP found that while elevated levels of contaminants were present in the river sediments adjacent to the NL Site, upstream sources, including the Horseshoe Road Superfund Site, contributed to the contamination, rendering any remediation of the sediments adjacent to the NL Site "short lived and of little ecological significance" because recontamination would occur "within a relatively short period of time."

Griffin Affidavit at Exhibit F, page 2.  In the June 24, 2004 letter, the NJDEP acknowledged that past industrial activity on the NL Site has contributed to the contamination of adjacent sediments but concluded that given the upstream sources of contamination remedial action was not required and that "any remedial actions conducted in this area of the river should be part of a regional approach."  *Id.* at pages 2-3.  The NJDEP also concluded that the Tertiary Lagoon is not impacting the Raritan River and that no further investigation is required regarding the Tertiary Lagoon's impact on river sediments.  *Id*. at page 3.  In a letter dated June 8, 2005, the NJDEP directed NL to conduct further investigation of the sediments with respect to radionuclides despite the current levels of radionuclides being "well below levels that may be considered of any significance with respect to the public health or potential impacts to the aquatic ecosystem."  Griffin Affidavit at Exhibit G, page 7.  The NJDEP did not direct NL to conduct further investigation of conventional contaminants in the Raritan River sediments.

On June 22, 2009, the United States Environmental Protection Agency ("USEPA") issued a Record of Decision for Operable Unit 3 – Marsh & River Sediment Horseshoe Road and Atlantic Resources Sites, Sayreville, New Jersey (the "Record of Decision").  Amended Compl. at ¶ 76; Pl.'s Br. at Exhibit A.  The Record of Decision requires remediation of the Raritan River sediments at the Horseshoe Road and Atlantic Resources Superfund Sites, both of which are upriver from the NL Site.  *Id*.  The planned remediation includes dredging of approximately 14,000 cubic yards of contaminated river sediments to be disposed of off-site, as well as backfilling and grading with clean material.  Pl.'s Br, at Exhibit A.

II.  Discussion

Although federal courts have a "virtually unflagging obligation" to exercise the jurisdiction granted to them, circumstances exist in which it is appropriate for a federal court to

7

abstain from hearing a particular case despite having the power to do so. *HiTech Trans, LLC v. N.J.*, 382 F.3d 295, 303 (3d Cir. 2004) (quoting *Ky. W. Va. Gas Co. v. Pa. Pub. Util. Comm'n,* 791 F.2d 1111, 1114 (3d Cir.1986); *Chez Sez III Corp. v. Twp. of Union,* 945 F.2d 628, 630 (3d Cir.1991)). Here, NL argues that abstention is appropriate under two doctrines, primary jurisdiction and *Burford* abstention. Def. Br. at 14. Raritan Baykeeper argues that abstention is inappropriate because neither primary jurisdiction nor *Burford* abstention are applicable to actions brought pursuant to the RCRA or the CWA. Pl.'s Br. at 11, 21. The Court recognizes that a split in authority exists regarding when abstention is appropriate in RCRA and CWA cases, however, after carefully considering the facts in the present case, the Court finds that abstention is appropriate. *See Davies v. Nat'l Coop. Refinery Ass'n*, 963 F.Supp. 990, 997-99 (D. Kan. 1997) (acknowledging split in authority and abstaining on primary jurisdiction and *Burford* abstention grounds); *Friends of Santa Fe County v. LAC Minerals, Inc.*, 892 F.Supp. 1333, 1348 (D.N.M. 1995) (abstaining on primary jurisdiction and *Burford* abstention grounds); *Interfaith Comty. Org., Inc. v. PPG Indus., Inc.*, __ F.Supp. 2d __, 2010 WL 1371783, *7, *11, *13 (D.N.J. 2010) (holding that federal courts have exclusive jurisdiction over RCRA claims and that abstention is inappropriate under both the primary jurisdiction and *Burford* abstention doctrines); *Stewart-Sterling One LLC v. Tricon Global Rest., Inc.*, 2002 WL 1837844, *5 (E.D. La. 2002) (citing cases in which courts have declined to apply primary jurisdiction to RCRA claims); *LEAD v. Exide Corp.*, 1999 WL 124473, *21-22 (E.D. Pa. 1999) (finding primary jurisdiction inappropriately applied to CWA cases and that *Burford* abstention does not apply to citizen suits brought pursuant to the CWA).

    A. Primary Jurisdiction

"The doctrine of primary jurisdiction, like the rule requiring exhaustion of administrative remedies, is concerned with promoting proper relationships between the courts and administrative agencies charged with particular regulatory duties." *U.S. v. Western Pac. R. Co.*, 352 U.S. 59, 63 (1956). The doctrine applies "to claims properly cognizable in court that contain some issue within the special competence of an administrative agency." *Reiter v. Cooper,* 507 U.S. 258, 268 (1993). Abstention under the doctrine of primary jurisdiction is appropriate where "the matter involves technical or policy considerations which are beyond the court's ordinary competence and within the agency's field of expertise." *MCI Commc'n Corp. v. Am. Telephone & Telegraph Co.,* 496 F.2d 214, 220 (3d Cir.1974). "The Third Circuit has stated that the doctrine applies when decision-making 'is divided between courts and administrative agencies [and] calls for judicial abstention in cases where protection of the integrity of a regulatory scheme dictates primary resort to the agency which administers the scheme'" *Global Naps, Inc. v. Bell Atlantic-New Jersey, Inc.*, 287 F. Supp. 2d 532, 549 (D.N.J. 2003) (quoting *Cheyney State Coll. Faculty v. Hufstedler,* 703 F.2d 732, 736 (3d Cir.1983)).

The Supreme Court has not articulated a formula for applying the doctrine. *See Western Pac. R. Co.*, *supra*, 352 U.S. at 63. In the absence of guidance from the Supreme Court, federal courts have examined slightly different, yet overlapping, factors when determining whether to abstain from hearing a case based upon the doctrine of primary jurisdiction. *See Global Naps, Inc.*, *supra*, 287 F. Supp. 2d at 549 (applying a four factor primary jurisdiction analysis); *Davies*, *supra*, 963 F. Supp. at 997-98 (applying a five factor primary jurisdiction analysis). Courts in this district have applied the four factor analysis articulated in *Global Naps* and this Court shall do so as well.

Under the *Global Naps* primary jurisdiction analysis courts should consider "(1) [w]hether the question at issue is within the conventional experience of judges or whether it involves technical or policy considerations within the agency's particular field of expertise; (2) [w]hether the question at issue is particularly within the agency's discretion; (3) [w]hether there exists a substantial danger of inconsistent rulings; and (4) [w]hether a prior application to the agency has been made." *Global Naps*, *supra*, 287 F. Supp. at 549.

While this Court is competent to decide the complex environmental issues presented in this case, the first factor asks whether "the question at issue is within the conventional experience of judges or *whether it involves technical or policy considerations within the agency's particular field of expertise*." *Id.* (emphasis added). Here, technical and policy considerations weigh in favor of the application of the doctrine of primary jurisdiction. Raritan Baykeeper's complaint asks this Court to enter an injunction requiring immediate remediation of the contaminated river sediments adjacent to the NL Site. The NJDEP, the agency charged with implementation of environmental protection policy in New Jersey pursuant to *N.J.S.A.* 13:1D-9, has technical expertise in interpreting sediment sampling reports to determine the source or sources of contamination and the need for remediation, as well as the best methods for remediation if remediation is deemed necessary and appropriate under the circumstances. Further, the NJDEP is privy to information about other contaminated sites located along the Raritan River, including contaminated sites located upstream from the NL Site that may be contributing to the contaminated sediment. Additionally, the NJDEP is in the best position to coordinate remediation of the sediments at the NL Site with the remediation of upstream sites that contribute to contamination of the NL Site sediments, thereby conserving the limited private and

public resources available for remediation of the NL Site generally and the contaminated Raritan River sediments specifically.

The second factor the Court must address is whether the issues raised in this case are particularly within the NJDEP's discretion. *Global Naps*, *supra*, 287 F. Supp. at 549. The Court finds that this factor also weighs in favor of application of the doctrine of primary jurisdiction. While the NJDEP does not have authority to interpret the RCRA or the CWA, it does have discretion to formulate and implement a remediation plan that addresses not only the NL Site sediments, but also addresses remediation of contaminants at upstream locations that are contributing to contamination of river sediments adjacent to the NL Site. Several upstream sites have been identified as sources of contamination for the NL Site sediments. Griffin Affidavit at Exhibit D, pages 107-108. The NJDEP has found after extensive sampling that any remediation of the sediments adjacent to the NL Site would be "short lived and of little ecological significance" because recontamination would occur "within a relatively short period of time." Griffin Affidavit at Exhibit F, page 2. As a result, the NJDEP has concluded that "any remedial actions conducted in this area of the river should be part of a regional approach" and has halted investigation and remediation of the NL Site sediments so that they may be addressed as part of a regional plan. *Id.*

Third, the Court must consider "[w]hether there exists a substantial danger of inconsistent rulings" if the Court exercises jurisdiction over the case. *Global Naps*, *supra*, 287 F. Supp. at 549. This factor also weighs in favor of application of the doctrine of primary jurisdiction. Here, the danger of inconsistent rulings is a significant concern. Raritan Baykeeper seeks immediate remediation of the river sediments. The NJDEP has recognized that the river sediments adjacent to the NL Site are contaminated but has ruled that remediation of the

11

sediments adjacent to the NL Site should be addressed as part of a larger regional approach and should be coordinated with remediation of upstream sources of contamination. Griffin Affidavit at Exhibit F, page 2. Absent such coordination, any remediation effort would be short lived because sediments adjacent to the NL Site would quickly be recontaminated by pollution from upstream sources. *Id.* Raritan Baykeeper also seeks a determination that the NL Site sediments are being contaminated by the North Ditch and the Tertiary Lagoon. The NJDEP has determined that the Tertiary Lagoon is not contributing to contamination of the sediments. Griffin Affidavit at Exhibit F, page 3. Further, the redevelopment plan approved by the NJDEP calls for remediation of the North Ditch. Gibson Affidavit at ¶ 20. In fact, Raritan Baykeeper acknowledges that there is a NJDEP approved plan in place for remediation of the North Ditch and states in its opposition brief that "[t]o the extent that the current on-site remediation efforts eliminate the ongoing discharge of contaminants into the river from the North Ditch, the groundwater, and the Tertiary Lagoon System, this will satisfy the portion of this case seeking to remedy the sources of continued pollution of sediments in the river. *Plaintiffs have no intention of disrupting this remediation at the NL site which may satisfy one of the objectives of this litigation*." Pl. Br. at 16 (emphasis added). If this Court were to find that the Tertiary Lagoon was a source of the contamination, or order the immediate remediation of the sediments adjacent to the NL Site, the order would be in direct conflict with the rulings and policy determinations already made by the NJDEP. When faced with a significant danger of inconsistent rulings other courts have declined to exercise jurisdiction and have applied the doctrine of primary jurisdiction. *See Davies*, *supra*, 963 F. Supp. at 998; *Friends of Santa Fe County*, *supra*, 892 F. Supp. at 1350. Further, courts that have declined to apply the doctrine have indicated that it may be appropriate under circumstances in which there is a substantial danger of inconsistent rulings.

*See Interfaith Comty. Org., Inc.*, *supra*, __ F. Supp. 2d at __, 2010 WL 1371783, *14. Here, the Court finds that there is a significant danger of inconsistent rulings and finds that this factor weighs heavily in favor of applying the doctrine of primary jurisdiction.

Finally, the Court must address "[w]hether a prior application to the agency has been made." *Global Naps*, *supra*, 287 F. Supp. at 549. Although Raritan Baykeeper has not initiated an action before the NJDEP, proceedings before the NJDEP have begun. It is not necessary that the plaintiff in the federal action have initiated proceedings before the agency. *See MCI Commc'n Corp.*, *surpa*, 496 F.2d at 223. It is sufficient that the issue in dispute is before the agency. *Miss. Power & Light Co. v. United Gas Pipeline Co.*, 532 F.2d 412, 419-20 (5th Cir. 1976). NL is obligated to investigate and remediate contamination on the NL Site pursuant to the ISRA under an ACO entered into with the NJDEP in 1988. Amended Compl. at ¶ 54. Investigation and remediation of the NL Site has continued under the direction of the NJDEP since that time. *Id.* Further, as part of the redevelopment of the NL Site undertaken by SERA and SSA, SERA has entered into a MOU with the NJDEP governing remediation efforts at the NL Site. Given the NJDEP's long-term involvement with the issues raised in this case, the Court finds that this factor weighs in favor of applying the doctrine of primary jurisdiction.

Applying the factors discussed above to the instant case, the Court concludes that this matter should be referred to the NJDEP for resolution.

### B. *Burford* Abstention

"*Burford* abstention is appropriate when 'federal adjudication would disrupt an important and complex state regulatory scheme.'" *Interfaith Comty. Org., Inc.*, *supra*, __ F. Supp. 2d at __, 2010 WL 1371783, *11 (quoting *Lac D'Amiante Du Quebec, Ltd. v. Am. Home Assurance Co.*, 864 F.2d 1033, 1043 (3d Cir. 1998)). A federal court sitting in equity must decline jurisdiction

"where the exercise of federal review of the question in the case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern" provided "timely and adequate state-court review is available." *New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 491 U.S. 350, 361 (1989) (quoting *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 814 (1976)). There are two steps in the *Burford* abstention analysis. *Riley v. Simmons*, 45 F.3d 764, 771 (3d Cir. 1995). First, the Court must determine if "timely and adequate state-court review is available." *Id.* Once the Court is satisfied that the issues raised are subject to review in state court, only then may the Court "turn to the other issues and determine . . . whether the district court's exercise of jurisdiction would have a disruptive effect on the state's efforts to establish a coherent public policy on a matter of important state concern." *Id.*

   Timely and adequate state-court review of an issue may be available even where the statute a plaintiff has sued under vests exclusive jurisdiction in the federal courts. *Id.* at 775. To conclude otherwise "would preclude abstention no matter how important the state interest or how severe the federal interference with the state's scheme for resolution of problems Congress has seen fit to entrust to the states." *Id.* The question for this Court to decide is not whether Raritan Baykeeper may proceed with its RCRA and CWA claims in state court but whether timely and adequate state-court review of the issues raised is those claims is available. *See id.* Here, Raritan Baykeeper's claims are reviewable in state court under New Jersey's Environmental Rights Act ("ERA"), *N.J.S.A.* 2A:35A-1, *et seq*. In enacting the ERA, the New Jersey Legislature determined that "the integrity of the State's environment is continually threatened by pollution, impairment and destruction, that every person has a substantial interest in minimizing this condition, and that it is therefore in the public interest to *enable ready access to the courts*

for the remedy of such abuses." *N.J.S.A.* 2A:35A-2 (emphasis added). To that end, the ERA contains a citizen suit provision which provides:

> Any person may commence a civil action in a court of competent jurisdiction against any other person alleged to be in violation of any statute, regulation or ordinance which is designed to prevent or minimize pollution, impairment or destruction of the environment. The action may be for injunctive or other equitable relief to compel compliance with a statute, regulation or ordinance, or to assess civil penalties for the violation as provided by law. The action may be commenced upon an allegation that a person is in violation, either continuously or intermittently, of a statute, regulation or ordinance, and that there is a likelihood that the violation will recur in the future.
>
> *N.J.S.A.* 2A:35A-4(a).

The ERA creates a broad cause of action which allows a party to seek "declaratory and equitable relief against any other person for the protection of the environment, or the interest of the public therein, from pollution, impairment or destruction." *N.J.S.A.* 2A:35A-4(b). Further, the definition of "person" in the ERA is broad enough to encompass citizen groups such as Plaintiffs in this case, and is also broad enough to encompass all Defendants named in Plaintiffs' suit. *See N.J.S.A.* 2A:35A-3(a).

Once a court is satisfied that timely and adequate state-court review is available it must determine "whether the district court's exercise of jurisdiction would have a disruptive effect on the state's efforts to establish a coherent public policy on a matter of important state concern." *Riley*, *supra*, 45 F.3d at 775. Here, by retaining jurisdiction, the Court risks interfering with NJDEP efforts to implement state policy regarding remediation and redevelopment of contaminated sites pursuant to the Brownfield and Contaminated Site Remediation Act, *N.J.S.A.* 58:10A-1, *et seq.* The NL Site is currently being remediated and redeveloped pursuant to the Brownfield and Contaminated Site Remediation Act, remediation efforts are ongoing and are being completed along with redevelopment of the NL Site property. Further, by retaining

jurisdiction, this Court risks entering rulings that are inconsistent with, and thereby disruptive to, rulings made by the NJDEP in the course of its investigation and oversight of the ongoing remediation efforts at the NL Site, including the NJDEP's decision to take a regional approach to the remediation of contaminated sediments in the Raritan River.

Given the availability of timely and adequate state-court review of the issues raised in this case, and the danger of interference with the important state policies of Brownfield rehabilitation and regional remediation of river sediments, this Court concludes that abstention under the *Burford* abstention doctrine is appropriate and shall abstain.

III.   Conclusion

For the reasons set forth above, NL's Motion to Dismiss on abstention grounds is granted, all pending motions are dismissed as moot, and the case is closed.  An appropriate Order accompanies this Opinion.


                                                  /s/ JOEL A. PISANO
                                                  United States District Judge

Dated: May 26, 2010