NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| RARITAN BAYKEEPER, INC., et al., | : | |
| | : | |
| Plaintiffs, | : | Civil Action No. 09-cv-4117 (JAP) |
| | : | |
| v. | : | **OPINION** |
| | : | |
| NL INDUSTRIES, INC., et al., | : | |
| | : | |
| Defendants. | : | |

PISANO, District Judge

This is an environmental remediation action brought pursuant to the citizen suit provisions of the Resource Conservation and Recovery Act ("RCRA") and the Clean Water Act ("CWA") involving a parcel of land (the "Site") located on the Raritan River. Plaintiffs seek the remediation of contaminated sediments in the Raritan River and the remediation of on-site sources of contamination that discharge into the river. Defendants are past and current owners or lessees of the Site and highway authorities that own highways which cross the land.

Presently before the Court are the following motions: Defendants Michael Davis and James S. Simpson[1] from the New Jersey Department of Transportation's Central Region (collectively "NJDOT Defendants")'s Motion to Dismiss pursuant to Rules 12(b)(1) and 12(b)(6) [docket # 183]; Defendants New Jersey Turnpike Authority and Veronique Hakim[2] (collectively "NJTA")'s Motion to Dismiss pursuant to 12(b)(6) [docket # 184]; Defendant Sayreville Seaport

---

[1] Michael Davis is the Regional Director of Operations for NJDOT's Central Region and James S. Simpson is the Commissioner of the NJDOT. Both individuals are sued in their official capacity.

[2] Veronique Hakim is the Executive Director of the NJTA and is being sued in her official capacity.

Associates, L.P. ("SSA")'s Motion to Dismiss the Amended Complaint, or in the alternative, for a Stay [docket # 185]; Defendant Sayreville Economic and Redevelopment Agency ("SERA")'s Motion to Dismiss the Amended Complaint, or in the alternative, for a Stay [docket # 186]; Defendant Middlesex County's Motion to Dismiss [docket # 187]; Defendants NL Industries, Inc. and NL Management Services, Inc. (collectively "NL")'s Motion for Summary Judgment or, in the alternative, for a Stay [docket # 188]; and Defendant NL's Motion to Dismiss the Amended Complaint [docket # 189].  Having reviewed the briefs associated with the motions above, this Court finds that NL has not met its burden under the summary judgment standard and Plaintiffs have alleged sufficient facts to establish a plausible claim for relief  under Federal Rule of Civil Procedure 12(b)(6); therefore, the Court denies the motions.  The Court reserves decision on the Motions for a Stay; it Ordered the parties to submit proposals regarding the parameters of a Stay within fourteen days of the date of the accompanying Order.  A decision on the Motion for a Stay will be rendered after this Court has reviewed the parties' proposals.

I.      **BACKGROUND**[3]

The Site, at issue here, consists of approximately 440 acres of land located at 1000 Chevalier Avenue, Sayreville, Middlesex County, New Jersey.  It is surrounded on three sides by the Raritan River, which is the largest river located entirely within New Jersey. The Garden State Parkway, Route 9, and Route 35 cross the Site.

---

[3] In addressing a motion to dismiss, the Court must accept as true the allegations contained in the Complaint.  *See Levkovsky v. New Jersey Advisory Comm. on Judicial Conduct*, 2012 WL 3715981, *1 n. 1 (D.N.J. Aug. 27, 2012). Thus, the facts below are taken from Plaintiffs' Second Amended Complaint, filed on December 14, 2012 [docket # 221] and any documents specifically referred to in the pleadings, unless otherwise indicated.  *See Interfaith Cmty. Org. v. AlliedSignal, Inc.*, 928 F. Supp. 1339, 1345 (D.N.J. 1996) (stating "[a] court may consider undisputedly authentic documents a defendant attaches to a motion to dismiss if the plaintiff's claims are based on those documents").  Because one party, NL, has moved for summary judgment, certain materials outside the pleadings and outside any authentic documents relied on in the pleadings, may be considered, with respect to that motion only. The facts in this "Background" section do not represent the Court's factual findings.

NL owned the Site from the early 1930's to 2005, and from approximately 1935 to 1982, it manufactured titanium dioxide pigments on the Site that were used in paints, paper, cosmetics, and other items.  In 1982, NL ceased operations at the Site.  It leased a portion of the Site, called the Marsulex Tract, and sold two sulfuric acid plants on that tract to C-I-L Corporation of America ("C-I-L").  In 1989, Marsulex took assignment of C-I-L's lease and purchased the two sulfuric acid plants.  Both C-I-L and Marsulex manufactured sulfuric acid on the Site.  In 1997, NL and Marsulex agreed that NL would assume responsibility for any environmental issues associated with the leased land.

In 1988, the New Jersey Department of Environmental Protection ("NJDEP") required NL to conduct an environmental investigation of the Site in compliance with New Jersey's Environmental Cleanup Responsibility Act, which is now known as the Industrial Site Recovery Act.  As a result, in June 2000 and July and August 2002, NL collected samples of river sediments taken from locations downstream, adjacent to, upstream, and across the river from the Site.  In October 2000, April 2001, November 2002, and July 2003, NL submitted reports containing the results of the sediment sampling to the NJDEP.  The results revealed that river sediments adjacent to and downstream from the Site were contaminated with arsenic, copper, lead, nickel, and zinc.  Previously, the NJDEP adopted the Marine/Estuarine Screening Guidelines, which are screening levels for sediment contamination.  Under these Guidelines, the Effects Range-Low ("ER-L") value is the concentration at which adverse benthic impacts are found in approximately 10% of studies, and the Effects Range-Medium ("ER-M") value is the concentration at which adverse benthic impacts exist in more than 50% of studies.  Applying these Guidelines to the results, nearly all of the samples taken from adjacent to the Site exceeded the ER-L standard and many exceeded the ER-M standard as well.  Additionally, the samples

taken from downstream of the Site exceeded the ER-L standard for arsenic, copper, lead, and nickel.  After reviewing these results, NL concluded that the sediment contamination was due, at least in part, to the North Ditch, which is a drainage ditch on the Site that discharges surface water runoff into the river, the Garden State Parkway, Route 35, and other overland sources instead of from groundwater.  Moreover, NL determined that the Tertiary Lagoon System, which is used "for containment and settling of plant process effluent prior to discharge into the" river, is not a "significant source of sediment contamination" (Second Amended Complaint ¶ 68).

On June 24, 2004, the NJDEP sent NL a letter containing its comments on the results of the river sediment studies.  The NJDEP acknowledged NL's conclusions that "[c]oncentrations of [arsenic, copper, lead, nickel, and zinc] are present at levels above their respective NJDEP Sediment Screening Criteria" and "[t]he spatial distribution of the metals suggests inputs to the river from overland flow from off-site locations," such as the Garden State Parkway, and "on-site locations," like the North Ditch.  *See* Letter from NJDEP to NL, Ex. 21 attached to Declaration of Patrick M. Flynn in Support of NL's Motion for Summary Judgment [docket # 188].  The NJDEP concluded, however, that "[w]hile N.L. Industries has contributed to the sediment contamination detected adjacent to the site," it would not require remediation of the river sediments at that time.  *Id.*  Instead, the NJDEP declared that "any remedial actions conducted in this area of the river should be part of a regional approach" because "any remedial efforts targeted adjacent to the . . . [Site] would be shortlived and of little ecological significance as recontamination" from upstream sources "would occur within a relatively short period of time."  *Id.*  Since this letter, no regional approach or remediation of river sediments has occurred.[4]

---

[4] On June 22 2009, the Environmental Protection Agency issued a Record of Decision for Operable Unit 3 – Marsh and River Sediments of the Horseshoe Road and Atlantic Resources sites, which are two sites located on the river upstream from the Site at issue here.  The decision required remediation of the river sediments near those sites,

In 2005, SERA acquired the Site through eminent domain for the purpose of redevelopment.  In 2007, SERA chose O'Neill Properties Group, L.P. to redevelop the Site, and O'Neill created SSA for that purpose.  On June 28, 2008, NL, SERA, SSA, and Middlesex County entered into the 2008 Agreement ("Agreement"), which transferred ownership of the Site from NL to SERA through three closings.  This Agreement also divided the Site into Parcels A, B, and C.   At the first closing, in September 2008, SSA assumed a 99 year ground lease for Parcel C, and Middlesex County purchased an easement across Parcel C along the waterfront and across Parcel B along the waterfront. ¶ 56.  At the second closing, in June 2009, Middlesex County purchased Parcel A, which it will hold as Open Space, subject to conservation easements.  The third closing took place in May 2012.

Moreover, the Agreement discussed the parties' environmental responsibilities at the Site. SSA assumed responsibility for all environmental investigation and remedial obligations at the first closing.  There were certain exceptions, however, to SSA's assumption of responsibility, including that NL would be responsible for the remediation and investigation of the river sediments.  SSA retained responsibility for on-site remediation, such as excavation, capping, and treatment of groundwater through an injection program.  The Agreement did not discuss a specific plan for remediating the river sediments.  Furthermore, the Agreement provided that in the event SSA defaulted on its environmental responsibilities, SERA would select a contractor to complete the remaining responsibilities.  If SERA defaulted on its obligations, the parties agreed that NL would be designated as lead remediator.

---

including dredging of approximately 14,000 cubic yards of contaminated sediments, off-site disposal of the dredged material, backfilling and grading of all excavated or dredged areas with clean cover material, and institutional controls to prevent disruption of the cover.  The remediation of the river sediments near these sites demonstrates that a regional approach is not necessary to remediate contaminated river sediments in the Raritan River.

Shortly after the parties' entered into the Agreement, SERA entered into a Memorandum of Understanding ("MOU") with the NJDEP, effective September 25, 2008.  In the MOU, SERA agreed to submit Remedial Action Work Plans ("RAWPs")  to the NJDEP and to implement them once approved.  In addition, SERA agreed to annually submit to the NJDEP a detailed review of all remediation costs it expended to comply with the MOU.

On August 11, 2009, Plaintiffs filed their initial Complaint [docket # 1].  On September 29, 2009, Defendants NJDOT, Stephen Dilts, and Bernard James[5] filed a Motion to Dismiss for Lack of Jurisdiction [docket # 11], and on October 8, 2009, the NJTA filed a Motion to Dismiss pursuant to Rules 12(b)(1) and 12(b)(6) [docket # 23].  Plaintiffs filed their Amended Complaint shortly thereafter, on October 13, 2009 [docket # 24].  On October 16, 2009, the Court ordered that the NJDOT be voluntarily dismissed from the action pursuant to Rule 41(a)(1)(A), but Dilts and James remained as defendants [docket # 32].  Subsequently, on December 15, 2009, Defendants O'Neill Properties Group and SSA, NL, and SERA filed Motions to Dismiss pursuant to 12(b)(6), and Middlesex County and the NJDEP filed answers to the Amended Complaint [docket # 56-60].  On January 8, 2010, Middlesex County filed a Cross-Motion to Dismiss the Complaint [docket # 64].  On February 22, 2010, the Court granted the voluntary dismissal of O'Neill Properties Group [docket # 86].

On May 27, 2010, the Court granted NL's Motion to Dismiss the Amended Complaint on abstention grounds and dismissed all of the other motions as moot [docket # 128].  In the accompanying Opinion, the Court applied the doctrines of primary jurisdiction and Burford abstention and found that the matter should be referred to the NJDEP for resolution [docket # 127].  Plaintiffs filed a notice of appeal on June 3, 2010 [docket # 129].

---

[5] Dilts and James were later replaced by Michael Davis and James S. Simpson as defendants.

On October 3, 2011, the United States Court of Appeals for the Third Circuit issued its judgment vacating this Court's decision and remanding the case because "this case does not call for abstention" [#134]. *Raritan Baykeeper d/b/a/NY/NJ Baykeeper v. NL Industries, Inc.*, 660 F.3d 686, 689 (3d Cir. 2011). The Third Circuit noted that the "parties agree that none of the enumerated exceptions to the citizen suit provisions in the RCRA or the CWA applies here." *Id.* at 691. The Third Circuit explained that primary jurisdiction is not warranted for the following reasons: (1) "[w]hile NJDEP has expertise in environmental matters, federal courts are . . . competent to decide cases such as the one before" it; (2) the "matter is not *particularly* within the discretion of NJDEP" because "neither the RCRA nor the CWA charges NJDEP with enforcing those particular statutes"; (3) there is "minimal risk of inconsistent rulings" especially "[i]n light of agency inaction with respect to the river sediments over the last several years;" and (4) the "suit does not amount to a 'collateral attack' on an NJDEP decision . . . ." *Id.* at 691–92. Furthermore, the Burford abstention doctrine is not appropriate here because Plaintiffs "cannot obtain adequate and timely state court review of its claims" since federal statutes "establish the specific standards" Plaintiffs allege Defendants violated and a state statute does not authorize a state court to enforce rights under these federal statutes. *Id.* at 694. The Third Circuit issued its mandate on October 25, 2011 [docket # 135].

On December 1, 2011 and January 6, 2012, this Court held in-person status conferences regarding case management [docket # 151]. On March 20, 2012, the Court held a case management conference, and the following day it issued an Order, in which it outlined a briefing schedule for Defendants to file motions to dismiss, for summary judgment, and/or for a stay [docket # 179, 180].

Defendants filed the motions currently at issue here on May 21, 2012 [docket # 183, 184, 185, 186, 187, 189].  On October 10, 2012, Plaintiffs filed a Motion to Amend the Amended Complaint, which the Court granted on December 12, 2012 [docket # 209, 220].  Plaintiffs filed the Second Amended Complaint (hereinafter "Complaint") on December 14, 2012 [docket # 221].[6]

In the Second Amended Complaint, Plaintiffs allege several causes of action against Defendants.  In the first claim, Plaintiffs allege that NL, SERA, SSA, the NJDOT Defendants, and the NJTA have violated section 7002(a)(1)(B) of the RCRA, 42 U.S.C. § 6972(a)(1)(B), by having "contributed to the past or present handling, storage, treatment, transportation, or disposal of the contaminants" – arsenic, copper, lead, nickel, and zinc – in the river sediments.  Compl. ¶ 99.  In the second claim, Plaintiffs allege that NL, SERA, and SSA violated section 301(a) of the CWA, 33 U.S.C. § 1311(a), by discharging arsenic, copper, lead, nickel, and zinc from the North Ditch into the river without a permit authorizing the discharges.  In the third claim, Plaintiffs allege that the NJDOT Defendants have violated section 402(p)(3)(B) of the CWA, 33 U.S.C. § 1342(p)(3)(B), because they failed to comply with the NJDOT Region Central's Highway Permit since they failed to sweep all required streets and inspect all stormwater facilities to ensure proper functioning and maintenance.  For the fourth claim, Plaintiffs allege that NL, SERA, and SSA violated and continue to violate sections 301(a) and 402 of the CWA, 33 U.S.C §§ 1311(a), 1342, by discharging arsenic, copper, lead, nickel, and zinc through groundwater into the river without a permit allowing those discharges.  Finally, in the fifth claim, Plaintiffs allege that NL, SERA, and SSA violated and continue to violate sections 301(a) and 402 of the CWA by

---

[6] Although Defendants' motions are addressed to Plaintiffs' First Amended Complaint, "the court simply may consider the motion[s] as being addressed to the amended pleading," which in this case, is the Second Amended Complaint.  6 Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 1476 (3d ed. 2012).  *See Levkovsky*, 2012 WL 3715981, at *1 n. 2.  Indeed, the majority of the changes between the First and Second Amended Complaints are minor.

discharging arsenic, copper, lead, nickel, and zinc from the Tertiary Lagoon System into the river without a permit authorizing the discharges.

Plaintiffs allege that contamination of the river sediments near the Site "was and may be still caused by discharges from" on-site sources and nearby roadways. Compl. ¶ 77. The on-site sources allegedly contributing to the river sediments' contamination include the North Ditch, the Tertiary Lagoon System, and groundwater. The North Ditch discharges contaminants into the river in two ways: (1) through surface water runoff discharged into the river; and (2) into the groundwater via percolation that then discharges into the river. NL conducted sampling of the river sediments around the North Ditch, and the sampling revealed that the North Ditch contains arsenic, copper, lead, and zinc that exceed NJDEP standards. Additionally, at the point where the North Ditch discharges into the river, the river sediments contain elevated levels of arsenic, copper, lead, nickel, and zinc as compared to the levels of these metals immediately upstream of that point. Moreover, the Tertiary Lagoon System discharges pollutants into the river through stormwater which discharges into the river, and into groundwater via percolation which then discharges into the river. NL sampled the sediments of the Tertiary Lagoons, and the results of the sampling revealed elevated levels of arsenic, copper, lead, nickel, and zinc in the river sediments near where the lagoons discharge into the river. Although the discharge of certain pollutants from the Tertiary Lagoons is governed by NJPDES Permit #NJ0000931, this permit does not authorize the discharge of arsenic, copper, lead, nickel, and zinc or groundwater containing these metals. Furthermore, groundwater contributes to the contamination of the river sediments because contaminants from the North Ditch and Tertiary Lagoons enter the groundwater, and it discharges at many points into the river. The concentrations of arsenic,

copper, lead, nickel, and zinc are higher at the points where groundwater discharges into the river.

No CWA permit authorizes the discharge of these contaminants into groundwater and from the North Ditch, Tertiary Lagoon, and groundwater into the river. The Site is subject to NJPDES Permit #NJ0000931, which authorizes the discharge of certain pollutants from Stormwater Outfall 002A. This permit does not authorize any discharges from the North Ditch, and it does not authorize the discharge of arsenic, copper, lead nickel, or zinc from any sources. It does, however, authorize certain discharges from the Tertiary Lagoon. The permit expired on April 30, 2009. Prior to that, on April 20, 2009, an application for renewal was submitted. On the application, SSA is listed as the applicant/operating party, and SERA is listed as the landowner. The only discharge location listed on the permit is Stormwater Outfall 002A, and although the applicant was required to list all pollutants it knows or has reason to believe are present, the permit does not list arsenic, copper, lead, nickel, or zinc. The prior permit application, submitted on June 5, 2000, listed NL as the applicant/operating party and the property/landowner. That application lists Stormwater Outfall 002A and two drainage areas as discharge locations and does not list arsenic, copper, lead, nickel, and zinc on the application.

In addition to on-site sources of contaminants, Plaintiffs allege that stormwater runoff from the Garden State Parkway, Route 9, and Route 35 discharges into the river and contributes to the contamination of river sediments. The levels of arsenic, copper, lead, nickel, and zinc in the river sediments near these roadways are elevated in comparison to the levels of these sediments upstream. These roadways are subject to the Highway Permit, which the NJDEP issued on August 1, 2005 pursuant to the CWA, 33 U.S.C. § 1342(p)(3)(B). The Highway Permit allows stormwater discharges from small municipal separate stormwater sewer systems

("MS4s") at highways owned or operated by agencies authorized to discharge under the permit, like the NJDOT and NJTA. The Highway Permit requires agencies, like the NJDOT Region Central, which controls Routes 9 and 35, and the NJTA, which controls the Parkway, to "develop, implement, and enforce a stormwater program, which shall be designed to reduce the discharge of pollutants from the Highway Agency's small MS4 to the maximum extent practicable, to protect water quality, and to satisfy the appropriate water quality requirements by including the Statewide Basic Requirements (hereafter SBR's set forth in the Highway Permit" (Compl. ¶ 93). In addition, the NJDOT and NJTA must "prepare and implement a written Stormwater Pollution Prevention Plan (hereafter "SPPP") that describes the Highway Agency's stormwater program and serves as the mechanism for the implementation of the SBR's." *Id.* Moreover, the Permit requires the NJDOT and NJTA to complete Annual Reports summarizing whether the agency complied with the Highway Permit. According to NJDOT's annual report from January 1, 2008 to December 31, 2008, it failed to sweep all required streets and to inspect all stormwater facilities to ensure proper functioning and maintenance, meaning it failed to comply with Sections F.7.a. and F.7.c. of the Highway Permit. Previous annual reports reveal that the NJDOT failed to sweep all required streets in 2006 and 2007 and to inspect all stormwater facilities to ensure proper functioning and maintenance from 2004 through 2007. Because of the history of permit violations, Plaintiffs allege that the NJDOT Region Central continues to violate the Highway Permit. On March 1, 2009, the NJDEP renewed the Highway Permit, with some modifications.

Plaintiffs allege that remediation of the river sediments and control of the on-site sources and roadways would "be effective in addressing the sediment contamination in the vicinity of the" Site "to a significant extent." Compl. ¶ 77. The contaminated sediments allegedly cause a

risk to health and the environment because organisms may consume the contaminants and if these organisms do not die, the contaminants will be present at higher levels of the food chain; humans may eat the fish or other creatures that contain the contaminants.

Plaintiffs request the following forms of relief:  (1) declaratory judgment that NL SERA, SSA, the NJDOT Defendants, and the NJTA have violated section 7002(a)(1)(B) of the RCRA; (2) injunction requiring Defendants listed above to remediate contaminated river sediments and control any sources that may continue to contribute to sediment contamination; (3) declaratory judgment that NL, SERA, and SSA have violated and continue to violate sections 301(a) and 402 of the CWA; (4) injunction prohibiting Defendants above from discharging pollutants from the North Ditch, Tertiary Lagoon, or through groundwater except in compliance with a permit authorizing those discharges; (5) injunction requiring Defendants above to remediate unauthorized discharges of pollutants by removing the pollutants from the river sediments; (6) attorneys' fees and costs as authorized by the RCRA; (7) order SERA and SSA to pay civil penalties for unlawful discharges from the North Ditch, Tertiary Lagoon, and through groundwater; (8) declaratory judgment that the NJDOT Defendants violated sections 301 and 402 of the CWA by failing to comply with the Highway Permit; (9) order these defendants to comply with the Highway Permit; and (10) award Plaintiffs costs and attorneys fees as authorized by the CWA.[7]

---

[7] Refer to the Court's May 27, 2010 Opinion, the Third Circuit's Opinion, and other documents on the docket for more facts.

II.      DISCUSSION

   a.  NL'S MOTION FOR SUMMARY JUDGMENT [docket # 188]

NL argues that summary judgment should be granted because the RCRA & CWA citizen suit provisions were not intended to allow challenges to remedial decisions by federal and state environmental agencies, like the New Jersey Department of Environmental Protection ("NJDEP").  NL explains that citizen suits are permitted where governmental action is *lacking*, not where an agency is involved in remediation, as here.  NL asserts that Plaintiffs' lawsuit is really a collateral attack on DEP decisions.  Lastly, NL argues that Plaintiffs' suit violates the doctrine against pre-enforcement review.

Plaintiffs, however, argue that NL's Motion for Summary Judgment should be denied. Plaintiffs assert that NL is re-hashing the same argument it previously made to the Third Circuit that Plaintiffs are collaterally attacking NJDEP's decisions.  Notably, the Third Circuit rejected this argument and determined that the lawsuit is not a collateral attack.  Plaintiffs contend that NL's arguments that Congress did not intend for RCRA and CWA claims to exist where a state agency has regulatory involvement and that the claims violate the doctrine of pre-enforcement review are without merit.  Instead, Plaintiffs argue that there is no legal basis for summary judgment because the claims are expressly authorized by the statutes. Plaintiffs explain that the statutes only bar citizen suits when federal or state authorities have already commenced and are diligently prosecuting a civil or criminal action, but quite conspicuously, this has not happened in the present case.  Plaintiffs note that the NJDEP's regulatory, non-enforcement involvement in the remediation of the site does not bar the citizen suits.  Moreover, Plaintiffs argue that the state law doctrine of pre-enforcement review does not apply to Plaintiffs' federal claims.  Plaintiffs explain that the doctrine of pre-enforcement review is based on a state statute, the Spill Act,

which is not at issue here, and even if it was at issue, the citizen suit provisions expressly authorize Plaintiffs to sue in the absence of enforcement actions.  Furthermore, Plaintiffs' claim that NL relies on inadmissible statements such as legal memoranda and oral argument, which are not evidence for purposes of summary judgment.  Plaintiffs contend that even if the Court could consider the statements Plaintiffs' counsel made at oral argument on summary judgment, these statements are not material evidence because any evidence that could potentially demonstrate a collateral attack on the NJDEP's remedial decisions is irrelevant since Plaintiffs are entitled to sue under the statutes.

In its reply brief, NL again argues that the RCRA and CWA citizen suit provisions were not meant to challenge the NJDEP's remedial decisions.  NL asserts that because there is no dispute of material fact and the suit is not brought for a purpose intended by Congress, summary judgment should be granted in its favor.  NL claims that Plaintiffs incorrectly rely on express defenses contained in the statutes because legislative history intended citizen suits to plug holes where contaminated sites are not being addressed by agencies; instead, here the NJDEP site remediation is already underway.   In addition, Plaintiffs contend that the Third Circuit's statement that Plaintiff's suit is not a collateral attack on NJDEP decisions was made before it had a proper understanding of the relief sought and now must be reevaluated.  Furthermore, NL asserts that it cited the doctrine of pre-enforcement review merely to show the unfairness of permitting Plaintiffs to litigate the propriety of the NJDEP's remedial decisions when the parties charged with completing the cleanup did not challenge the decisions.  Finally, NL claims that because there is no factual dispute and it is entitled to judgment as a matter of law, summary judgment should be granted in its favor.

To prevail on a motion for summary judgment, the moving party must establish "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining whether a genuine dispute of material fact exists, the court must view the facts in the light most favorable to the non-moving party and extend all reasonable inferences to that party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Stephens v. Kerrigan*, 122 F.3d 171, 176–77 (3d Cir. 1997). The Court is not required to "weigh the evidence and determine the truth of the matter" but instead need only determine whether a genuine issue necessitates a trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A material fact raises a "genuine" issue "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.

On a summary judgment motion, the moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party makes this showing, the burden shifts to the non-moving party to present evidence that a genuine fact issue compels a trial. *Id.* at 324. The non-moving party must then offer admissible evidence that establishes a genuine issue of material fact, *id.*, not just "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S. at 586.

Here, NL's Motion for Summary Judgment is denied because NL has not established that there is no genuine dispute as to material fact, and it has not established that it is entitled to judgment as a matter of law. To the contrary, a reasonable jury could return a verdict for Plaintiffs because Plaintiffs' claims are expressly authorized by statute.

Plaintiffs' claims are expressly authorized by the RCRA and the CWA.  The RCRA and

the CWA include citizen suit provisions.  The citizen suit provision of the RCRA provides:

> any person may commence a civil action on his own behalf -- . . .
> against any person, including the United States and any other
> governmental instrumentality or agency, to the extent permitted by
> the eleventh amendment to the Constitution, and including any past
> or present generator, past or present transporter, or past or present
> owner or operator of a treatment, storage, or disposal facility who
> has contributed or who is contributing to the past or present
> handling, storage, treatment, transportation, or disposal of any
> solid or hazardous waste which may present an imminent and
> substantial endangerment to health or the environment . . . .

42 U.S.C. § 6972(a)(1)(B).  This "provision explicitly allows the consideration of environmental

or health effects arising from waste and authorizes suit any time there may be a present threat –

an imminent and substantial endangerment – to health or the environment."  *Interfaith Cmty.*

*Org. v. Honeywell Int'l, Inc.*, 399 F.3d 248, 258 (3d Cir. 2005), *cert. denied*, 545 U.S. 1129

(2005).  The citizen suit provision in the CWA states:

> any citizen may commence a civil action on his own behalf --
> against any person (including (i) the United States, and (ii) any
> other governmental instrumentality or agency to the extent
> permitted by the eleventh amendment to the Constitution) who is
> alleged to be in violation of (A) an effluent standard or limitation
> under this chapter or (B) an order issued by the Administrator or a
> State with respect to such a standard or limitation . . . .

 33 U.S.C. § 1365(a)(1).  The purpose of the CWA suit is "to supplement not supplant

government action," and it "represents the vindication of the plaintiffs' right to bring suit when

the Agency cannot or will not protect the environment."  *Public Interest Research Group of New*

*Jersey, Inc. v. Rice*, 774 F. Supp. 317, 326 (D.N.J. 1991).

Moreover, both statutes contain express prohibitions to citizen suits. The RCRA declares

that "[n]o action may be commenced" under the subsection above "if the Administrator . . . has

commenced and is diligently prosecuting an action under section 6973 of this title or under section 106 of the Comprehensive Environmental Response, Compensation and Liability Act" ("CERCLA").  42 U.S.C. § 6972(b)(2)(B)(i).  "Congress took no steps to bar a RCRA citizen suit for any other reason than that referred to [in the statute]."  *Interfaith Cmty. Org., Inc. v. PPG Indus., Inc.*, 702 F. Supp. 2d 295, 315 (D.N.J. 2010).  The "express terms of RCRA make clear, *inter alia*, that only an action by the Administrator of the United States Environmental Protection Agency (the 'EPA') or a diligently prosecuted remediation effort by a State under the Comprehensive Environmental Response, Compensation, and Liability Act ('CERCLA'), 42 U.S.C. §§ 9601, *et seq.,* may preclude a citizen suit."  *AlliedSignal, Inc.*, 928 F. Supp. at 1346. Likewise, the CWA provides that "[n]o action may be commenced" under the subsection above "if the Administrator or State has commenced and is diligently prosecuting a civil or criminal action in a court of the United States, or a State to require compliance with the standard, limitation, or order, but in any such action in a court of the United States any citizen may intervene as a matter of right."  33 U.S.C. § 1365(b)(1)(B).  Citizen suits "are proper only 'if the federal, state and local agencies fail to exercise their enforcement responsibility.'"  *Public Interest Research Group of New Jersey, Inc.*, 774 F. Supp. at 326 (omit internal quotation). "Therefore, citizen suits are barred only if the Administrator has commenced an action to require compliance."  *Id.* at 326-27 (internal quotation omitted).

After reviewing the plain language of these statutes, it is clear that NL has not established that it is entitled to judgment as a matter of law because the RCRA and the CWA expressly authorize Plaintiffs' citizen suit, and the express prohibitions contained in the statutes do not apply to this case because neither the EPA nor the State of New Jersey have commenced and

diligently prosecuted an enforcement action.[8]   In addition, certain material facts raise genuine issues because a reasonable jury could return a verdict for the nonmoving party – Plaintiffs.  To prevail on a RCRA citizen suit claim, "a plaintiff must prove:  (1) that the defendant is a person, including, but not limited to, one who was or is a generator or transporter of solid or hazardous waste or one who was or is an owner or operator of a solid or hazardous waste treatment, storage, or disposal facility; (2) that the defendant has contributed to or is contributing to the handling, storage, treatment, transportation, or disposal of solid or hazardous waste; and (3) that the solid or hazardous waste may present an imminent and substantial endangerment to health or environment."  *Honeywell Int'l, Inc.*, 399 F.3d at 258 (internal quotation omitted).  Here, NL has failed to establish that there is no genuine issue of material fact regarding whether NL has contributed or is contributing to the disposal of solid or hazardous waste and whether the waste may present an imminent and substantial endangerment to health or the environment.

Furthermore, Plaintiffs' citizen suit is not a collateral attack on the NJDEP's decisions.  In fact, the Third Circuit recognized that Plaintiffs' suit is not a collateral attack on the NJDEP's remedial decisions.  *See Raritan Baykeeper*, 660 F.3d at 693 (stating "Raritan Baykeeper's suit does not amount to a 'collateral attack' on an NJDEP decision, nor does it seek a remedy that necessarily conflicts with any agency order").  In addition, even though the NJDEP has taken certain remedial actions, like approving RAWPs, a "RCRA suit may exist in spite of other actions having been taken to resolve the same matter."  *PPG Indus., Inc.*, 702 F. Supp. 2d at 315.  Therefore, Plaintiffs' citizen suits are not improper collateral attacks on the NJDEP's decisions.

---

[8] "It is a cardinal rule of statutory construction that when 'the terms of a statute are unambiguous, judicial inquiry is complete.'"  *AlliedSignal, Inc.*, 928 F. Supp. at 1347 n. 5.  "In such a case, where the plain meaning of a statute is evident from the face of a statute, 'the sole function of the courts is to enforce it according to its terms.'"  *Id.*

Thus, NL's Motion for Summary Judgment is denied because NL has not met its burden to establish that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law.  Instead, the plain language of the RCRA and CWA demonstrates that Plaintiffs have properly brought citizen suits under those statutes.

### b.  MOTIONS TO DISMISS

### i.  Motion to Dismiss Standard

Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  This pleading standard does not require "detailed factual allegations," but it does require "more than labels and conclusions"; a "formulaic recitation of the elements of a cause of action" will not suffice.  *Bell Atlantic Corp. v. Twombley*, 550 U.S. 544, 555 (2007).  Therefore, in order to withstand a Motion to Dismiss pursuant to 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  The plausibility standard is satisfied "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  The plausibility standard is not a "probability requirement," but "it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Id.*  To decide if a complaint meets this plausibility standard and therefore, survives a motion to dismiss, the Third Circuit has required a three step analysis:  (1) the Court must "outline the elements a plaintiff must plead to . . . state a claim for relief"; (2) the Court must identify "those allegations that are no more than conclusions and thus not entitled to the assumption of truth"; and (3) "where there are well-pleaded factual allegations, [the Court] should assume their veracity and then determine whether they plausibly

give rise to an entitlement for relief."  *Bistrian v. Levi*, 696 F.3d 352, 365 (3d Cir. 2012);

*Santiago v. Warminster Twp.*, 629 F.3d 121, 130 (3d Cir. 2010).

### ii.   SSA's Motion to Dismiss Pursuant to 12(b)(6) [Docket # 185]

SSA argues that Plaintiffs' first claim should be dismissed because SSA cannot be liable

for the passive migration of contaminants under the RCRA.  SSA asserts that participation in the

active disposal of a pollutant is required for liability under RCRA, but the Complaint does not

allege any facts showing SSA was or is actively involved in the disposal of a pollutant.  In

addition, SSA contends that Plaintiffs' second, fourth, and fifth claims, which concern the CWA,

should be dismissed because they are barred by the NJDEP's enforcement action.  SSA explains

that it cannot be liable under the CWA because it has paid a penalty of $8 million pursuant to the

Settlement Agreement.  SSA claims that a portion of this sum was payment for SSA's alleged

liability resulting from discharges on the property.  Also, SSA argues that the CWA claims

should be dismissed because the NJDEP is diligently prosecuting an action under the New Jersey

Spill Act, which is comparable to the CWA.  Moreover, SSA asserts that the entire Complaint

should be dismissed because Plaintiffs have not shown a plausible claim for relief regarding

causation.  Plaintiffs explain that the allegations of contamination are based on sediment samples

taken before SSA became a lessee of the property, and the Complaint does not allege that

contamination has occurred since the date SSA first became a lessee.  Furthermore, SSA argues

that Plaintiff's fourth claim must be dismissed because groundwater is not a point source under

the CWA, and therefore, Plaintiffs cannot sue under the CWA for discharges caused by

groundwater.  Lastly, SSA contends that Plaintiffs' fifth claim must be dismissed because SSA

has a permit authorizing discharges from the Tertiary Lagoon System.  SSA states that it is

irrelevant that the permit does not refer specifically to arsenic, copper, lead, nickel, or zinc

because only discharges within the reasonable contemplation of a party are required to be disclosed to the permitting authority.

Plaintiffs, however, first argue that SSA is liable for contamination of river sediments caused by discharges from the Site.  Plaintiffs explain that SSA is not a passive landowner because pursuant to the 2008 Agreement, it is responsible for all environmental investigation and remediation at the Site.  Additionally, Plaintiffs observe that SSA is contributing to the present handling of solid and hazardous waste because it is responsible for on-site remediation, and therefore, it manages, operates, and controls contamination.  Plaintiffs point out that they alleged that the river was contaminated by on-site sources since SSA acquired an interest in the property when they alleged that contaminated groundwater, and discharges from the North Ditch and Tertiary Lagoon continue to contaminate or discharge into the river.  Moreover, Plaintiffs argue that SSA is responsible for the treatment of waste because its planned groundwater remediation program is designed to change the chemical composition of the polluted groundwater to neutralize waste and render it nonhazardous.  Furthermore, Plaintiffs assert that SSA disposed of waste because SSA is responsible for the continued discharge of pollutants from the North Ditch, Tertiary Lagoon, and groundwater into the river, and these discharges are disposal under the statute.  Plaintiffs also note that the definitions of leak and spill do not require active conduct. Second, Plaintiffs argue that their CWA claims are not barred because the preclusion provisions in the statute do not apply here since the NJDEP is not diligently prosecuting an action under a state law comparable to this section, and the NJDEP has not issued a final order.  Plaintiffs note that even if the preclusion provisions of the CWA applied to this case, those provisions would not bar Plaintiffs' request for injunctive and declaratory relief because those provisions discuss penalty actions.  Third, Plaintiffs assert that discharges continue to cause harm to the river.

Plaintiffs explain that the Complaint provides sufficient factual matter to state a claim because they allege that the North Ditch, Tertiary Lagoon, and groundwater, which are contaminated with arsenic, copper, lead, nickel, and zinc, continue to discharge into the river.  Because the river sediments have not been remediated, there is no reason to believe that ongoing discharges have stopped contributing to sediment contamination.  Therefore, Plaintiffs allege that the property has caused contamination of sediments since SSA became a lessee, and taking these allegations as true, Plaintiffs have satisfied the requirements of *Iqbal* and *Twombley*.  Fourth, Plaintiffs contend that their fourth claim is valid because groundwater discharged from the Site comes from point sources regulated by the CWA.  Plaintiffs allege that contaminants from the North Ditch and Tertiary Lagoon discharge into the groundwater via percolation, and groundwater is regulated by the CWA because it is hydrologically connected to the river.  Lastly, Plaintiffs argue that the permit for the Tertiary Lagoon does not permit discharges of arsenic, copper, lead, nickel, and zinc.  Plaintiffs explain that a permit holder violates the CWA if it discharges pollutants that it did not disclose, and Plaintiffs have not alleged that SSA listed in its permit applications these permits which it knew or had reason to believe were present in discharges from the Tertiary Lagoon.  As a result, Plaintiffs claim that they have properly pled the fifth claim.

SSA replied to Plaintiffs' opposition by reiterating the arguments it made in its initial brief:  (1) that it is not liable for passive migration under the RCR;  (2) that Plaintiffs' CWA claims should be dismissed because they are barred by the NJDEP's enforcement action;  (3) that the CWA does not authorize suit for wholly past violations; (4) groundwater is not a point source, meaning Plaintiffs' fourth claim must be dismissed; and (5) the fifth claim must be dismissed because it has a permit for the Tertiary Lagoon System.

Here, SSA's Motion to Dismiss must be denied for several reasons.  First, SSA is liable under the RCRA because it is not a passive landowner.  The RCRA imposes liability against "any person . . . who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment . . . ."  42 U.S.C. § 6972(a)(1)(B).  "[T]hese requirements are very broad and encompass practically any conduct relating to hazardous waste by practically any individual or entity."  *Interfaith Cmty. Org. v. Honeywell Int'l, Inc.*, 188 F. Supp. 2d 486, 502 (D.N.J. 2002).  In deciding if SSA violated the RCRA, we must analyze the definitions of the words in the statute.  "Disposal" is defined as "the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste . . . may enter the environment or be emitted into the air or discharged into any waters, including ground waters."  42 U.S.C. § 6903(3).  "Treatment" means "any method, technique, or process, including neutralization, designed to change the physical, chemical, or biological character or composition of any hazardous waste so as to neutralize such waste or so as to render such waste nonhazardous, safer for transport, amendable for recovery, amenable for storage, or reduced in volume.  Such term includes any activity or processing designed to change the physical form or chemical composition of hazardous waste so as to render it nonhazardous."  42 U.S.C. § 6903(34).  "Storage" is defined as "the containment of hazardous waste, either on a temporary basis or for a period of years, in such a matter as not to constitute disposal of such hazardous waste."  42 U.S.C. § 6903(33).  Finally, "handling," the "broadest of the statutory terms . . . is not defined in [the] RCRA" and therefore, should "be given the ordinary dictionary meaning of 'to manage, operate, or use with the hand or hands; . . . to manage, control, direct, train, etc.'"

23

*United States v. Union Corp.*, 259 F. Supp. 2d 356, 401 (E.D. Pa. 2003) (quoting *Webster's New World Dictionary* at 611 (3d Coll. Ed. 1988)); *see also Matter of Marin Motor Oil*, 740 F.2d 220, 228 n. 15 (3d Cir. 1984) (stating that if Congress uses a word that it does not define in a statute, the Court will "give the word its ordinary dictionary meaning").

The Complaint alleges sufficient facts to show that SSA's involvement at the Site is not passive. Plaintiffs allege that SSA contributes to the present handling of solid or hazardous waste because it is responsible for, meaning it manages and controls, on-site remediation. In the Complaint, Plaintiffs explain that SSA assumed responsibility for all on-site environmental investigation and remedial obligations pursuant to the 2008 Agreement. For example, SSA handles solid or hazardous waste by conducting "on-site remediation, including excavation" and "capping." Moreover, Plaintiffs allege that SSA contributes to the treatment of solid or hazardous waste by "conducting . . . treatment of groundwater through an injection program." Compl. ¶ 60. Furthermore, Plaintiffs allege that SSA has contributed or is contributing to the past or present disposal of solid or hazardous waste because they allege "a significant amount of the sediment contamination in the . . . river in the vicinity of the . . . [Site] was and may be still caused by discharges from sources at the" Site. Compl. ¶ 77. Plaintiffs explain that the North Ditch, Tertiary Lagoon, and groundwater "discharges arsenic, copper, lead, nickel, and zinc into the" river. Compl. ¶¶ 83, 84, 88. By using the present tense of the word "discharge," Plaintiffs allege that the disposal of these contaminants occurs in the present tense. Thus, the Complaint contains sufficient factual information to show that SSA is not merely a passive landowner and thus, is liable under the RCRA.

SSA cites one Third Circuit case for the proposition that to be liable under the RCRA, a party must be actively, as opposed to passively, involved in the discharge of solid or hazardous

wastes.  *See United States v. CDMG Realty Co.*, 96 F.3d 706 (3d Cir. 1996).  This case, however, discusses CERCLA as opposed to the RCRA, even though CERCLA defines "disposal" by incorporating the RCRA's definition of that word.  *Id.* at 713.  The Third Circuit narrowly held that "the passive migration of contamination . . . does not constitute disposal."  *Id.* at 711.  The Third Circuit explained that this holding was "based on an examination of CERCLA's text, is supported by the structure of the statute, and is consistent with CERCLA's purposes."  *Id.*  Yet, it did not address the question "of whether disposal always requires active human conduct."  *Id.* at 714.  This Court expanded the Third Circuit's views of the active/passive distinction in *Interfaith Cmty. Org. v. Honeywell Int'l, Inc.*, 263 F. Supp. 2d 796 (D.N.J. 2003), *aff'd*, 399 F.3d 248 (2005), *cert. denied*, 545 U.S. 1129 (2005).  There, it found that "a straightforward reading of RCRA compels a finding that only *active* human involvement with the waste is subject to liability under" the RCRA.  *Id.*  *See also Litgo N.J., Inc. v. Martin*, 2010 WL 2400388, *32 (D.N.J. June 10, 2010) (stating "RCRA liability is appropriate upon a showing that a defendant 'actively engaged in the management or disposal' of solid or hazardous waste at the site'").  Additionally, this Court declared that *CDMG* "specifically rejected the legal underpinning" of another case, *Price*.  *Honeywell*, 263 F. Supp. 2d at 846.  In *Price*, this Court determined that "disposal need not result from affirmative action by the defendants but may be the result of passive inaction" because the "RCRA's definition of 'disposal' . . . is quite broad," and "it includes within its purview leaking, which ordinarily occurs not through affirmative action but as a result of inaction or negligent past actions."  *United States v. Price*, 523 F. Supp. 1055, 1071 (D.N.J. 1981), *aff'd on other grounds*, 688 F.2d 204 (3d Cir. 1982); *accord United States v. Waste Indus., Inc.*, 734 F.2d 159, 164 (4th Cir. 1984).  Because the Complaint here contains

sufficient factual information to demonstrate that SSA engaged in active conduct, this Court does not need to weigh in on whether the RCRA always requires active conduct.

Second, Plaintiff's CWA claims should not be dismissed because its claims are not barred by the statute. The CWA provides that "any violation . . . shall not be the subject of a civil penalty action" under the CWA if "(i) the Administrator or the Secretary has commenced and is diligently prosecuting an action under this subsection, (ii) . . . a State has commenced and is diligently prosecuting an action under a State law comparable to this subsection, or (iii) for which the Administrator, the Secretary, or the State has issued a final order not subject to further judicial review and the violator has paid a penalty assessed under this subsection, or such comparable State law . . . ." 33 U.S.C. § 1319(g)(6). SSA argues that it cannot be liable under the CWA because it has already paid a penalty, and the NJDEP is diligently prosecuting an action under the New Jersey Spill Act, which is comparable to the CWA. These arguments, however, are improper on a motion to dismiss because they reference alleged facts outside of the pleadings. Nevertheless, the CWA claims will not be dismissed because none of the subsections of § 1319 apply to this case. There is no evidence that NJDEP has commenced and is diligently prosecuting an enforcement action. In addition, the State is not diligently prosecuting an action that is comparable to the CWA. SSA claims that the State is diligently prosecuting an action under New Jersey's Spill Act; however, discovery is needed to determine whether the state action exists. If the action exists, it is not comparable to the CWA. For example, the CWA provides for "reasonable opportunity to comment on the proposed issuance of" an order assessing a civil penalty, while a search of New Jersey's Spill Act did not provide a comparable provision. 33 U.S.C. § 1319(g)(4); *see Public Interest Research Group of New Jersey, Inc. v. New Jersey Expressway Auth.*, 822 F. Supp. 174, 184 n. 14 (D.N.J. 1992) (stating while the

CWA "requires notice to the public of enforcement actions along with the opportunity to comment on any proposed order and to participate in a hearing, . . . no such provisions for public involvement exist in the state statute or regulations").  Lastly, neither the NJDEP nor the State has issued a final order, and SSA has not paid a penalty under this subsection or a comparable State law.

Third, the Complaint should not be dismissed because it shows a plausible claim for relief regarding causation since Plaintiffs allege that discharges have occurred since SSA became a lessee.  Plaintiffs have pled "sufficient factual matter," which accepted as true, states "a claim to relief that is plausible on its face."  *Iqbal*, 556 U.S. at 678.  The CWA requires "citizen-plaintiffs [to] allege a state of either continuous or intermittent violation – that is, a reasonable likelihood that a past polluter will continue to pollute in the future."  *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 57 (1987).  The Complaint contains sufficient facts to show that discharges continue to cause harm.  For example, Plaintiffs allege that "sources located on the NL site, including the North Ditch, groundwater at the site, and the Tertiary Lagoon System, contribute to the contamination of sediments in the" river "in the vicinity of the" Site.  Compl. ¶ 69.  Plaintiffs allege that the North Ditch discharges stormwater into the river, sampling of sediments in the North Ditch revels levels of arsenic, copper, lead, and zinc that exceed NJDEP standards, and river sediments, "at the point where the North Ditch discharges into the river," contain "concentrations of arsenic, copper, lead, nickel, and zinc" that are "elevated and higher than concentrations of these metals in sediments immediately upstream of that point."  Compl. ¶ 70.  Additionally, Plaintiffs allege that contaminants enters groundwater via percolation from the North Ditch and the Tertiary Lagoon System, this groundwater contains elevated levels of arsenic, copper, lead, nickel, and zinc, the groundwater discharges into the

river, and the concentrations of metals in the river sediments where the groundwater discharges are higher than elsewhere.  Moreover, the Tertiary Lagoon System discharges stormwater into the river and sampling of sediments revealed elevated levels of arsenic, copper, lead, nickel, and zinc.  Concentrations of these metals are elevated where the Tertiary Lagoon System discharges into the river.  Plaintiffs do not allege that any remediation of on-site sources has taken place; instead, they allege that "a significant amount of the sediment contamination in the . . . River in the vicinity of the NL site was and may be still caused by discharges" from on-site sources." Compl. ¶ 77.  Thus, taking as true the factual allegations concerning the North Ditch, groundwater, and Tertiary Lagoon, Plaintiffs have alleged that discharges continue to occur while SSA has been a lessee of the Site and consequently, have stated a plausible claim for relief regarding causation.

Fourth, Plaintiffs' fourth claim will not be dismissed because they have alleged that groundwater is a point source, meaning groundwater is regulated by the CWA.  The "discharge of any pollutant by any person shall be unlawful" except as in compliance with a permit.  33 U.S.C. § 1311(a), § 1342(k).  The "discharge of any pollutant" is defined as "any addition of any pollutant to navigable waters from any point source."  33 U.S.C. § 1362(12).  "Point source" means "any discernible, confined, and discrete conveyance . . . ."  33 U.S.C. § 1362(14). Examples of point sources include the North Ditch and the Tertiary Lagoon System because they are "confined, and discrete conveyance[s]."  Courts disagree regarding whether groundwater is a point source.  Some courts hold that "if the ground water is hydrologically connected to surface water," it is subject to the CWA.  *Greater Yellowstone Coal. v. Larson*, 641 F. Supp. 2d 1120, 1138 (D. Idaho 2009), *aff'd*, 403 Fed. App'x. 275 (9th Cir. 2010); *see also Washington Wilderness Coal. v. Hecla Mining Co.*, 870 F. Supp. 983, 990 (E.D. Wash. 1994) (stating

"pollutants must be traced from their source to surface waters, in order to come within the purview of the CWA" since "the goal of the CWA is to protect the quality of surface waters, any pollutant which enters such waters, whether directly or through groundwater, is subject to regulation by NPDES permit"). Other courts, however, hold that the CWA does not apply to groundwater, even if hydrologically connected to surface water. *Allegheny Environmental Action v. Westinghouse Electric Corp.*, 1998 U.S. Dist. LEXIS 1838, *6-9 (W.D. Pa. Jan. 30, 1998). Because applying a motion to dismiss standard, a plaintiff must plead sufficient facts to establish a plausible claim and a Court is supposed to take as true the facts pleaded, here, Plaintiffs have sufficiently pleaded that groundwater is a point source because it is hydrologically connected to the river. Specifically, Plaintiffs alleged that water discharges from the North Ditch and Tertiary Lagoon into groundwater "via percolation," and then the groundwater discharges into the river. Compl. ¶¶ 62-63. Plaintiffs allege that this groundwater contains elevated levels of arsenic, copper, lead, nickel, and zinc, and concentrations of these metals are higher in the river sediments where groundwater discharges into the river. Therefore, because Plaintiffs have alleged that groundwater is hydrologically connected to surface water, the discharges from groundwater into the river are regulated by the CWA. As a result, Plaintiffs' fourth claim will not be dismissed.

Lastly, Plaintiffs' fifth claim will not be dismissed because although there is a permit covering the Tertiary Lagoon System, Plaintiffs allege that the permit does not authorize the discharge of certain contaminants and SSA did not disclose discharges of arsenic, copper, lead, nickel, and zinc. The CWA prohibits "the discharge of any pollutant by any person" unless in compliance with a permit issued pursuant to 33 U.S.C. § 1342(k). 33 U.S.C. § 1311(a). A "permit holder is in compliance with the CWA even if it discharges pollutants that are not listed

on its permit, as long as it only discharges pollutants that have been adequately disclosed to the permitting authority." *Piney Run Pres. Ass'n v. County Commissioners of Carroll County, MD*, 268 F.3d 255, 268 (4th Cir. 2001), *cert. denied*, 535 U.S. 1077 (2002). These discharges "must be reasonably anticipated by, or within the reasonable contemplation of, the permitting authority." *Id.* If, however, "a permit holder discharges a pollutant that it did not disclose, it violates the . . . permit and the CWA." *Id.* Here, Plaintiffs allege that the Tertiary Lagoon is covered by NJPDES Permit # NJ0000931, but this permit does not authorize the discharge of arsenic, copper, lead, nickel, or zinc. Plaintiffs further allege that SSA submitted an application for renewal of the permit on April 20, 2009, and although the applicant was required to list all pollutants it knows or has reason to believe are present, the application does not disclose arsenic, copper, lead, nickel, or zinc. Therefore, Plaintiffs properly pled a violation of the CWA.

For these reasons, this Court will deny SSA's Motion to Dismiss.

### iii.    SERA's Motion to Dismiss Pursuant to 12(b)(6) [Docket # 186]

There is substantial overlap between this Motion to Dismiss and SSA's Motion to Dismiss, which is discussed above. SERA argues that Plaintiffs' RCRA claim must be dismissed because it is not liable for passive migration under the statute; SERA adopts SSA's argument here. *See supra* 20. SERA explains that it obtained legal title to the property in 2005, and at this point, contaminants had been long deposited into the river. Next, SERA asserts that Plaintiffs' claims must be dismissed because they have not shown plausible relief regarding causation by not specifying any actions by SERA after it acquired title to the property to demonstrate liability under the CWA. SERA adopts SSA's argument here too. *See supra* 20. Moreover, SERA contends that Plaintiffs' fourth claim must be dismissed because groundwater is not a point

source; it adopts SSA's argument here as well.  *See supra* 20.  Furthermore, SERA claims that Plaintiffs' fifth claim must be dismissed because there is a permit authorizing discharges from the Tertiary Lagoon; again, SERA adopts SSA's argument.  *See supra* 20-21.  SERA further argues that it is not liable under the CWA because that statute does not allow recovery for wholly past violations.  Lastly, SERA argues that summary judgment should be granted because the RCRA and CWA citizen suit provisions were not intended to permit challenges to remedial decisions by federal or state agencies; here, SERA adopts NL's argument.  *See supra* 13.

Plaintiffs argue that SERA is liable under the CWA because the Amended Complaint alleges active and ongoing discharges from the North Ditch, Tertiary Lagoon System, and groundwater that is hydrologically connected to surface water into the river.  Plaintiffs note that they alleged that these discharges continue to present day, and they incorporate their opposition to SSA's brief here.  *See supra*  21.  In addition, Plaintiffs argue that SERA is liable under the RCRA because the 2008 Agreement made SERA responsible for remediation and required SERA to ensure that SSA performed the remedial obligations, meaning SERA is not just a passive landowner.  Plaintiffs incorporated their opposition to SSA's brief here too.  *See supra* 21. Moreover, Plaintiffs incorporated their opposition to SSA's brief and contend that discharges from the Tertiary Lagoon and groundwater are subject to CWA liability.  *See supra* 22.  Lastly, Plaintiffs claim that Plaintiffs' RCRA and CWA claims are not barred because of actions by federal or state agencies and refer to their opposition to NL's motion.  *See supra* 13.

SERA replies by again arguing that it is not liable under the CWA because it did not actively engage in the discharge of pollutants and the Complaint contains conclusory statements, instead of sufficient facts to show it did.  Additionally, SERA again argues that it is not liable under the RCRA because it did not actively engage in the disposal of pollutants.

Because SERA's Motion to Dismiss repeats arguments already addressed and analyzed in response to SSA's Motion to Dismiss and NL's Motion for Summary Judgment, this Court incorporates its analysis of those motions here and denies SERA's motion.  *See supra* 15-19 and 23-30.  In addition, Plaintiffs allege sufficient facts to show that SERA is liable under the RCRA and CWA.  Plaintiffs allege that SERA has legal title to the property.  Plaintiffs further allege that contamination of the river sediments "were and still may be caused" by discharges from on-site sources, such as the North Ditch, the Tertiary Lagoon System, and groundwater.  Plaintiffs claim that these discharges are not covered by a permit.  Furthermore, Plaintiffs allege that the MOU between SERA and NJDEP provides that SERA agreed to submit RAWPs and keep NJDEP apprised of remediation costs.  Thus, Plaintiffs allege that SERA is liable under the CWA and RCRA because SERA is not merely a passive landowner — it has responsibility on-site, it contributed to the past or present handling, storage, treatment, or disposal of solid or hazardous waste, and it does not have a permit authorizing discharges into the river.

### iv.    NL's Motion to Dismiss Pursuant to 12(b)(1) and 12(b)(6) [docket # 189]

NL argues that Plaintiffs' Complaint should be dismissed under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). NL asserts that the Complaint should be dismissed under 12(b)(1) because the relief requested does not redress Plaintiffs' alleged injuries.  NL explains that an injunction seeking to enjoin NL from discharging pollutants from on-site sources does not redress Plaintiffs' injuries because NL does not own or control the site and did not at the time the Complaint was filed.  Furthermore, NL points out that an injunction requiring NL to remediate river sediments would not redress Plaintiffs' injuries because it would be futile since a regional approach is needed and this depends on third parties. NL claims that declaratory relief would not redress Plaintiffs' injuries because declaratory relief would only make sense in conjunction with

injunctive relief, and NL has shown that injunctive relief would not redress Plaintiffs' injuries. In addition, NL argues that Plaintiffs' claims should be dismissed for failure to state a claim upon which relief can be granted, pursuant to 12(b)(6). Specifically, NL contends that Plaintiffs' CWA claims should be dismissed for the following reasons: (1) the CWA does not authorize suits for wholly past violations of the statute; (2) the fourth claim does not allege a cause of action because groundwater is not a point source under the statute; and (3) the fifth claim should be dismissed because there is a valid permit authorizing discharges from the Tertiary Lagoon System. Moreover, NL asserts that the RCRA claims should be dismissed because the statute authorizes mandatory injunctive relief only where necessary, and mandatory injunctive relief is not necessary here since the NJDEP is involved at the Site and remediation of river sediments is not necessary because of recontamination.

Plaintiffs, however, argue that the requested relief redresses their injuries. They remind the Court that they just have to show that their injuries will be partially redressed to satisfy the requirements of standing. Plaintiffs explain that their injuries will be partially redressed by injunctive relief requiring the remediation of sediments and preventing further discharges from on-site sources because this is the first step in restoring the river's ecological health, allowing Plaintiffs' members to crab, swim, fish, and allowing Plaintiffs to make more money by holding more activities on or near the river that the public would be more likely to participate in. Plaintiffs note that the remediation or river sediments adjacent to the Site is not futile. Moreover, Plaintiffs explain that the declaratory relief requested will redress Plaintiffs' injuries, and because Plaintiffs have standing to seek injunctive relief, they have standing to seek declaratory relief. Also, Plaintiffs point out that NL retains responsibility for all remediation "relating to sediment" in the river. In addition, Plaintiffs assert that their CWA claims should not be

dismissed pursuant to 12(b)(6) because NL's CWA violations are ongoing since NL's discharges, made without a permit, remain in the river sediments and continue to cause harm. Plaintiffs cite their response in Opposition to SSA's brief to argue that the discharge of pollution through groundwater and into surface water violates the CWA and the Tertiary Lagoon permit did not authorize the discharge of metals at issue here. Furthermore, Plaintiffs argue that the RCRA claims should not be dismissed because a mandatory injunction is necessary.

NL responds in its reply brief by again arguing that Plaintiffs claims should be dismissed pursuant to 12(b)(1) for lack of standing. First, NL asserts that Plaintiffs have not established that their RCRA claim seeking the remediation of river sediments will redress their injuries since remediation of river sediments will have a fleeting effect and therefore, is not even a first step toward redressing their injury. Second, NL contends that Plaintiffs have not satisfied the redressability requirement for their CWA claims, which seek relief regarding the on-site source areas, because NL is not responsible for on-site source control. Instead, NL points out that SSA and SERA are responsible for on-site source control. Moreover, NL asserts that Plaintiffs' CWA claims should be dismissed pursuant to 12(b)(6) because the CWA does not authorize suit for wholly past violations, groundwater is not a point source under the statute, and a permit authorizes discharges from the tertiary lagoon. Lastly, NL again argues that Plaintiff's RCRA claim should be dismissed because a mandatory injunction is not necessary.

Under Federal Rule of Civil Procedure 12(b)(1), a defendant may seek to dismiss a case for "lack of subject-matter jurisdiction." "A motion to dismiss for want of standing is . . . properly brought pursuant to Rule 12(b)(1), because standing is a jurisdictional matter." *Ballentine v. United States*, 486 F.3d 806, 810 (3d Cir. 2007).

To satisfy standing, Plaintiffs must show: "(1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 180-81 (2000). Redressability "focuses on whether the plaintiff will benefit in a tangible way from the court's intervention." *Honeywell Int'l, Inc.*, 188 F.Supp.2d at 496 (internal quotation omitted). "Said differently," it "focuses on the connection between the plaintiff's injury and the judicial relief sought." *Id.* (internal quotation omitted). The redressability requirement is satisfied when Plaintiffs "show[] that a favorable decision will relieve a discrete injury to himself. He need not show that a favorable decision will relieve his *every* injury." *Massachusetts v. E.P.A.*, 549 U.S. 497, 525 (2007) (quoting *Larson v. Valente*, 456 U.S. 228, 244 n. 15 (1982)). Plaintiffs "bear[] the burden of establishing the elements of standing, and each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation." *Ballentine*, 486 F.3d at 810 (internal quotation omitted).

Here, NL's Motion to Dismiss pursuant to 12(b)(1) is denied because the relief Plaintiffs requested redresses their injuries.[9] Plaintiffs' alleged injuries include, among other things, expending resources to patrol the river to monitor the river's health, the inability to obtain a certain amount of funds from public boat tours because "pollution and sediment contamination . . . . lessen the public's interest in taking boat tours" (Compl. ¶ 17), the inability to restore fish

---

[9] Although the parties do not discuss the first two elements of standing, Plaintiffs have established that they suffered an injury in fact and that their injuries are fairly traceable to the contamination of the river, which NL allegedly contributed to or is contributing to. *See* Complaint, ¶¶ 15-38.

migrations because of the contaminated sediments, expending limited resources on alerting the public about health advisories since fish and crabs are contaminated, difficulty in obtaining oyster restoration approvals because of concerns that humans will consume the contaminated oysters, the inability to fish and crab or consume fish and crab from the river, and the inability to swim and scuba dive in the river.  It is likely that these injuries will be redressed by a favorable decision granting injunctive relief because the injunction will require NL to remediate the river sediments, thereby removing contamination and paving the way for Plaintiffs to enjoy the river to a greater extent and increasing their profits by removing the stigma associated with the river. Plaintiffs "need not show that [an area] will be returned to pristine condition" where the area is "polluted by multiple sources," as here.  *Honeywell Int'l, Inc.*, 399 F.3d at 257 (internal quotation omitted). Instead, Plaintiffs must show that "at a minimum, the relief will materially reduce their reasonable concerns about [the] . . . endangerments."  *Id.*  Thus, an injunction requiring NL to remediate river sediments will not be futile, even if some recontamination occurs, because it will "materially reduce their concerns about" the contamination in the river by reducing the contaminated sediments.  In addition, NL's argument that the requested relief does not redress Plaintiffs' injuries because NL does not own or control the Site is wrong since pursuant to the 2008 Agreement, NL is responsible for the remediation of sediments.  Thus, an injunction requiring NL to remediate the river sediments will redress Plaintiffs' injuries.  As a result, declaratory relief stating that NL has violated the RCRA and CWA will redress Plaintiffs' injuries because NL concedes that "declaratory relief . . . would have relevance only in conjunction with companion relief in the form of an injunction requiring . . . NL . . . to undertake remediation of the adjacent River sediments," and because, as explained above, injunctive relief would redress Plaintiffs' injuries, declaratory relief would have the same effect.  As a result,

Plaintiffs' requested relief will redress their injuries, and NL's Motion to Dismiss pursuant to 12(b)(1) is denied.

NL's Motion to Dismiss pursuant to 12(b)(6) is denied because Plaintiffs pleaded "sufficient factual matter," which accepted as true, states "a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678. First, NL argues that Plaintiffs' CWA claims should be dismissed because the CWA claims discuss wholly past violations, which are not a basis for suit under the statute. "The most natural reading of 'to be in violation'" in the CWA "is a requirement that citizen-plaintiffs allege a state of either continuous or intermittent violation – that is, a reasonable likelihood that a past polluter will continue to pollute in the future." *Gwaltney of Smithfield, Ltd.*, 484 U.S. at 57. Thus, while it is true that the CWA does not authorize suit for wholly past violations, Plaintiffs have not alleged wholly past violations. Instead, Plaintiffs allege that NL has "violated and continue[s] to violate" the CWA "by discharging arsenic, copper, lead, nickel, and zinc from the" North Ditch, through groundwater, and from the Tertiary Lagoon System into the river without a permit authorizing such discharge. Compl. ¶¶ 102, 109, 112. Plaintiffs allege that NL owned the Site from the early 1930's to 2005 and manufactured titanium dioxide pigments on the Site from 1935 to 1982. Compl. ¶ 52. In 1997, NL assumed responsibility for environmental issues associated with a portion of the Site that it leased to Marsulex and upon which Marsulex manufactured sulfuric acid. Moreover, Plaintiffs allege that pursuant to the 2008 Agreement with SERA, SSA, and Middlesex County, NL retained responsibility for liabilities related to river sediments. Furthermore, Plaintiffs allege that NL conducted sampling of the river sediments and the results revealed that the levels of arsenic, copper, lead, nickel, and zinc in the river adjacent to and downstream from the Site were elevated. River sediments near where the North Ditch, groundwater, and Tertiary Lagoon System discharge into the river

contain high levels of these contaminants.  Plaintiffs allege that "a significant amount of the sediment contamination in the . . .river . . . in the vicinity of the NL site was and may be still caused by discharges from sources at the NL site . . . ."  Compl. ¶ 77.  Plaintiffs point out that no permit issued under the CWA authorizes the discharge of arsenic, copper, lead, nickel, and zinc from the North Ditch and Tertiary Lagoon into the river or into the groundwater and subsequently into the river.  Assuming the veracity of these factual allegations, it is plausible that NL has violated and continues to violate the CWA.  "When a company has violated an effluent standard or limitation, it remains, . . . 'in violation' of that standard or limitation so long as it has not put in place remedial measures that clearly eliminate the cause of the violation."  *Gwaltney of Smithfield, Ltd.*, 484 U.S. at 69 (Scalia, J., concurring).  Thus, if NL discharged these pollutants into the river without a permit, it is still in violation of the CWA because remedial measures have not been taken that clearly eliminate the cause of the violation.  The contaminants from NL's discharges constitute a continuing violation because they remain in the river and the river sediments have not been remediated.

Lastly, Plaintiffs' RCRA claims should not be dismissed because the injunctive relief sought is necessary.  The RCRA authorizes the Court to "restrain any person who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste . . . to order such person to take such other action as may be necessary, or both . . . ."  42 U.S.C. § 6972(a).  "Under a plain reading of this remedial scheme, a private citizen suing under § 6972(a)(1)(B) could seek a mandatory injunction, *i.e.,* one that orders a responsible party to 'take action' by attending to the cleanup and proper disposal of toxic waste, or a prohibitory injunction, *i.e.,* one that 'restrains' a responsible party from further violating RCRA." *Meghrig v. KFC W., Inc.*, 516 U.S. 479, 484

(1996).  If a defendant "no longer conducts activity at the Site, only a mandatory injunction would be possible."  *Trinity Indus., Inc. v. Chicago Bridge & Iron Co.*, 867 F. Supp. 2d 754, 763–64 (W.D. Pa. 2012).  Because NL no longer operates on-site, Plaintiffs may obtain a mandatory injunction.  "[I]n order to obtain injunctive relief, plaintiff would have to identify some action that defendant could be ordered to take that is not already in place thanks to the action of the state agency and that would improve the situation in some way."  *87th St. Owners Corp. v. Carnegie Hill-87th St. Corp.*, 251 F. Supp. 2d 1215, 1220 (S.D.N.Y. 2002).  In their Complaint, Plaintiffs request that NL remediate contaminated river sediments.  This action is not already in place because although the NJDEP said, in 2004, that remediation of contaminated river sediments should be subject to a regional approach, "no action has been taken since." *Raritan Baykeeper*, 660 F.3d at 692.  Moreover, remediating river sediments would improve the situation because it would clean up the river, causing Plaintiffs to be able to fish, crab, conduct educational boat tours about river ecology, etc.  As a result, the mandatory injunction sought by Plaintiffs is necessary, and Plaintiffs' RCRA claim should not be dismissed.

For all the reasons listed in this section of the Opinion, NL's Motion to Dismiss is denied.

### v.      Middlesex County's Motion to Dismiss [Docket # 187]

Middlesex County moved to dismiss for the following reasons:  (1) there was no basis for Plaintiffs' RCRA claim against the County; (2) it cannot be held liable for passive migration of contamination caused by previous landowners; (3) the Complaint does not allege that any contamination was caused by the County since it acquired an easement across Parcel C or joint ownership of Parcel A; and (4) the County did not participate in the active disposal of pollutants (Db3–4).  In its Opposition, Plaintiffs withdrew their claim against the County but did not release

the County from the lawsuit since the County is a necessary party because it owns property on the Site, which will likely need to be accessed during remediation.  *See* Federal Rule of Civil Procedure 19 (stating "[a] person who is subject to service of process and whose joinder will not deprive the court of subject-matter jurisdiction must be joined as a party if:  (A) in the person's absence, the court cannot accord complete relief among existing parties; or (B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may:  (i) as a practical matter impair or impede the person's ability to protect the interest; or (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest"); *Steel Valley Authority v. Union Switch and Signal Division*, 809 F.2d 1006, 1013–14 (3d Cir. 1987) (a property owner is a party to be joined to an action if injunctive relief would interfere with its rights).   Therefore, because Plaintiffs withdrew their claim against Middlesex County, the County's Motion to Dismiss is denied as moot.

### vi.     NJDOT Defendants' Motion to Dismiss [Docket # 183]

The NJDOT Defendants argue that the Eleventh Amendment bars Plaintiffs' claims against them because both the RCRA and CWA allow suit only to the extent permitted by the Eleventh Amendment. The NJDOT Defendants explain that the State has not waived its sovereign immunity or consented to be sued, Congress has not abrogated the state's immunity, and *Ex Parte Young* does not apply because there is no ongoing violation, so Plaintiffs are not seeking prospective injunctive relief.   In addition, the NJDOT Defendants assert that the Complaint should be dismissed because Plaintiffs have not stated a plausible claim against them under either the RCRA or CWA.  The NJDOT Defendants contend that Plaintiffs have failed to state a claim under the RCRA because they have not alleged any action by the NJDOT; instead,

the allegation is that sediments near Routes 9 and 35 have higher concentrations of contaminants than sediments upstream from the roadways, which is a conclusion NL initially made in its report to the NJDEP.  The NJDOT Defendants claim that Plaintiffs have failed to state a claim under the CWA because they allege that Defendants have violated a CWA permit by not sweeping streets and inspecting stormwater facilities to ensure proper function and maintenance, but this allegation is based on the NJDOT Defendants' previous violation of the highway permit.  The NJDOT Defendants point out that because the NJDEP renewed their highway permit, there is no basis to allege that they continue to violate the CWA.  Lastly, the NJDOT Defendants argue that the Court should abstain from hearing Plaintiffs' CWA claim against the NJDOT Defendants because the claim may be mooted by the NJDEP's issuance of a new stormwater permit.  The NJDOT Defendants note that they already must submit quarterly progress reports to the NJDEP with stipulated penalties for failure to comply with an administrative consent order, and this means there is "heightened state involvement," making abstention appropriate.

Plaintiffs, however, argue that their claims are not barred by the Eleventh Amendment. Plaintiffs explain that they seek only prospective declaratory and injunctive relief for ongoing violations of the RCRA and CWA, and this relief is allowed by the Eleventh Amendment.  They point out that any money that must be spent to accomplish the prospective declaratory and injunctive relief is ancillary and therefore, allowed.   Moreover, Plaintiffs assert that the Administrative Consent Order between the NJDOT and NJDEP does not implicate the Eleventh Amendment.  Plaintiffs explain that the possibility that the NJDEP will issue a new stormwater permit has nothing to do with the Eleventh Amendment, and they are seeking prospective and injunctive relief to ensure future compliance with the permit and remedy the current danger associated with the sediment contamination.   Furthermore, Plaintiffs claim that they have

adequately pleaded their RCRA and CWA claims.  Plaintiffs note that the plausibility of its CWA claim is not undercut by the NJDEP renewing the highway permit because the NJDOT Defendants need a permit to authorize stormwater discharges whether or not they complied with the terms of their first permit.  Lastly, Plaintiffs argue that it is improper to abstain from the CWA claim because a future stormwater permit may render the claim moot.  Plaintiffs assert that the permit is still in effect and the NJDOT Defendants have not shown any evidence they are in compliance with it, so there is still a need for injunctive relief.  Additionally, the possibility that a party may come into compliance with a permit does not make a case moot.

In their reply brief, the NJDOT Defendants again argue that the RCRA claim against them should be dismissed because the claim does not allege any action by them, it does not allege that they discharged any material, meaning it does not allege that stormwater is solid waste, and the risk of harm from stormwater runoff from a bridge is speculative and de minimis. Moreover, the NJDOT Defendants again argue that the CWA claim against them should be dismissed and that the Administrative Consent Order warrants abstention on a stay pending resolution of a permit issue between them and the NJDEP.

The Eleventh Amendment provides:  "[t]he judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by citizens of another state, or by citizens or subjects of any foreign state."  "There are three narrow exceptions to Eleventh Amendment immunity: (1) abrogation by Act of Congress, (2) waiver by state consent to suit, and (3) suits against individual state officials for prospective relief to remedy an ongoing violation of federal law."  *Litgo New Jersey Inc. v. Jackson*, 2008 WL 656027, *2 (D.N.J. Mar. 6, 2008) (internal quotation omitted).  For our purposes here, the third exception, first announced in *Ex Parte Young*, applies.  *See Ex Parte*

*Young*, 209 U.S. 123 (1908).  The  *Ex Parte Young* exception "does not bar certain actions against state officers for injunctive or declaratory relief."  *Alden v. Maine*, 527 U.S. 706, 757 (1999).  It does, however, bar actions seeking retrospective monetary relief against state officers, but if monetary damages are necessary in conjunction with prospective declaratory or injunctive relief, then "[s]uch an ancillary effect on the state treasury is a permissible and often an inevitable consequence of the principle announced in Ex parte Young."  *Edelman v. Jordan*, 415 U.S. 651, 668 (1974); *see also Papasan v. Allain*, 478 U.S. 265, 278 (1986).  Courts  have permitted suits against state officials in actions seeking injunctive and declaratory relief pursuant to the RCRA and CWA.  *See Natural Res. Def. Council v. California Dept. of Transportation*, 96 F.3d 420, 423 (9th Cir. 1996) (CWA); *Litgo New Jersey, Inc.*, 2008 WLL 656027, at *2.

Here, the Eleventh Amendment does not bar this suit against the NJDOT Defendants. The NJDOT Defendants are both state officials being sued in their official capacity.  Plaintiffs seek prospective declaratory and injunctive relief ordering the NJDOT Defendants to comply with the highway permit and to control any sources that contribute to sediment contamination. Any money required to comply with this prospective relief is ancillary and will not bar the suit against the NJDOT Defendants.  Consequently, the suit is not barred due to the Eleventh Amendment.

Moreover, Plaintiffs have alleged sufficient facts to state a plausible claim for relief under the RCRA and CWA.  In order to demonstrate a violation of the RCRA, Plaintiffs need to allege sufficient facts to plausibly show that the NJDOT Defendants have contributed or are contributing "to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment . . . ."  42 U.S.C. § 6972(a)(1)(B).  Plaintiffs allege that "the Garden

State Parkway, U.S. Route 9, and State Route 35 are sources that contribute to the contamination of" river sediments near the Site. Compl, ¶ 73. Plaintiffs explain by alleging that "[s]tormwater runoff[10] from these roadways discharges into the" river, and river sediments near these roadways contain elevated concentrations of arsenic, copper, lead, nickel, and zinc as compared to concentrations of metals in sediments upstream of the roadways. *Id.* Plaintiffs further allege that sediments may present an imminent and substantial endangerment to health or the environment because contaminated sediments may kill organisms or accumulate in species at higher levels of the food chain; humans may eat fish and other animals in which contaminants have accumulated. Because "handling" is defined as "manage, control, [or] direct," Plaintiffs have alleged sufficient facts to demonstrate a plausible claim for relief against the NJDOT Defendants since by stormwater runoff entering the MS4 system and going into the river, the NJDOT Defendants are contributing to the management of solid or hazardous waste. Other courts have found liability for stormwater runoff. *See United States v. California Dep't of Transportation*, 767 F. Supp. 2d 1012, 1027 (N.D. Cal. 2011) (finding Defendant liable for damage to a lake caused by "discharges of lead, copper, and zinc" from runoff from a boulevard).

In addition, Plaintiffs have alleged sufficient facts to demonstrate a CWA claim against the NJDOT Defendants. A person who violates an "effluent standard or limitation" violates the CWA. 33 U.S.C. § 1365(a). Plaintiffs allege that the NJDEP issued the Highway Permit on August 1, 2005; this permit authorizes "stormwater discharges from small MS4's at highways or other thoroughfares owned or operated by agencies authorized to discharge under the permit . . . ." Compl. ¶ 92. Plaintiffs allege that the NJDOT Region Central, which encompasses Routes 9

---

[10] Stormwater runoff is "surface water generated by precipitation events, such as rainstorms, which flows over streets, parking lots, commercial sites, and other developed parcels of land." *Natural Res. Def. Council, Inc. v. County of Los Angeles*, 673 F.3d 880, 883-84 (9th Cir. 2011), *cert. granted in part*, 133 S. Ct. 23 (2012). "When stormwater flows over urban environs, it collects 'suspended metals, sediments, algae-promoting nutrients (nitrogen and phosphorus), floatable trash, used motor oil, raw sewage, pesticides, and other toxic contaminants[.]'" *Id.* at 884. Stormwater runoff "is a major contributor to water pollution . . . ." *Id.*]

and 35, and the Garden State Parkway are Highway Agencies authorized by the permit to discharge stormwater from small MS4's.   Moreover, Plaintiffs allege that NJDOT Region Central's annual report for 2008 indicates that it failed to sweep all required streets and failed to inspect all stormwater facilities to ensure proper functioning and maintenance.   Furthermore, NJDOT Region Central's annual reports for 2006 and 2007 show that it failed to sweep all required streets, and the reports for 2004 through 2007 indicate that it failed to inspect all stormwater facilities to ensure proper functioning and maintenance.   Plaintiffs allege that because of these permit violations, NJDOT Region Central continues to violate these permit requirements.   Accepting these allegations as true, Plaintiffs have stated "a claim to relief that is plausible on its face" against the NJDOT Defendants under the CWA.   *See Iqbal*, 556 U.S. 678. At this Motion to Dismiss stage, the Court examines the sufficiency of the pleading, meaning it does not matter whether the NJDOT Defendants are no longer actually violating the permit. Additionally, the fact that the NJDEP renewed the Highway Permit does not change the fact that Plaintiffs have pleaded sufficient facts, taken as true, to show a plausible claim for relief against the NJDOT Defendants.

        Lastly, it is improper to abstain from the CWA claim because the claim may be mooted by a new permit.   "A case becomes moot only when it is impossible for a court to grant any effectual relief whatever to the prevailing party."   *Knox v. Serv. Employees Int'l Union, Local 1000*, 132 S. Ct. 2277, 2287 (2012) (internal quotation omitted).   "As long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot."   *Id.* (internal quotation omitted).   Here, the case is not moot because there is still a "live controversy."   *Id.*   At the Motion to Dismiss stage, a Court may consider the pleadings and any documents relied on in the pleadings.   Plaintiffs have alleged that the NJDOT Defendants have

previously violated the Highway Permit for several years in a row and because of this history of noncompliance, the NJDOT Defendants continue to violate said permit.  There is nothing in the pleadings to show that the NJDOT Defendants are in compliance with the permit which is currently in effect.  Moreover, there is no information in the pleadings about the new permit.  Thus, the case is not moot because the parties have a concrete interest in the outcome of the litigation, and the court can grant effectual relief to the moving party by requiring compliance with the permit if it is shown that the NJDOT Defendants are not in compliance with it.

For the reasons above, this Court will deny the NJDOT Defendants' Motion to Dismiss.

### vii.     NJTA's Motion to Dismiss [Docket # 184]

The NJTA argues that Plaintiffs' Complaint fails to state a RCRA claim against them as a matter of law for three reasons.  First, the NJTA asserts that the RCRA exempts discharges subject to permitting under the CWA from suit.  The NJTA explains that Plaintiff has not sufficiently alleged that stormwater is a solid waste, and there is a express exemption in the RCRA for point sources that are subject to permit under the CWA.  Second, the NJTA contends that the RCRA's anti-duplication provision bars Plaintiffs' suit.  Third, the NJTA claims that it is not engaging in the active disposal of a pollutant.  The NJTA notes that the only affirmative act it performed was constructing the highway infrastructure; other than that, the contamination deposited into the river from stormwater runoff is the work of third parties, such as passing cars. Furthermore, the NJTA argues that Plaintiffs have failed to plead their claims against it with sufficient particularity.  The NJTA states that the Complaint does not put it on notice of what it did wrong because the factual allegations in the Complaint are based on one sentence in a 354 page report NL submitted to the NJDEP.

Plaintiffs, however, argue that their RCRA claim against the Highway Defendants – both the NJTA and the NJDOT Defendants – is valid as a matter of law for the following reasons. First, the Highway Defendants are disposing of solid waste as defined by the statute because stormwater collects suspended metals and other toxic contaminants before it discharges into the river, these discharges are not industrial discharges subject to the industrial discharge exception, and even if they were industrial discharges, the Highway Defendants would be liable for pre-2004 discharges under the RCRA.  Second, Plaintiffs RCRA claim is not barred by the RCRA's anti-duplication provision because it is "not inconsistent" with the CWA.  Additionally, Plaintiffs' RCRA claim should not be dismissed because the question of whether it is "inconsistent" with the Highway Defendants' permits is a factual question and discovery is needed.  Third, the Highway Defendants are contributing to the disposal of a solid waste. Plaintiffs explain that the Highway Defendants would not need a permit to discharge if they did not exercise control over the discharge of stormwater into the river.  Plaintiffs point out that they contribute to the contamination by discharging contaminants through sewer systems dedicated to stormwater, and they are responsible for the operation and maintenance of these municipal sewer systems, meaning they exercise complete control over the disposal of stormwater.  Plaintiffs also incorporated their opposition to SSA's Motion to Dismiss here.  Lastly, Plaintiffs argue that they have sufficiently pled their claim and incorporate their opposition to NJDOT Defendants' motion.

In its reply brief, the NJTA again argues that the Complaint fails to state a RCRA violation against the NJTA as a matter of law because NJTA's activities are subject to the industrial discharge exception and the anti-duplication provision applies because the RCRA and CWA  are inconsistent.

Any person "who has contributed or is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment" is liable under the RCRA.  Here, the RCRA cause of action against the Highway Defendants is valid as a matter of law because the discharge of stormwater from the Garden State Parkway, Route 9, and Route 35 into the river fits within the language of the statute.  First, these discharges constitute solid waste. "Solid waste" is defined as "any garbage, refuse, sludge from a waste treatment plant, water supply treatment plant, or air pollution control facility and other discarded material, including solid, liquid, semisolid, or contained gaseous material resulting from industrial, commercial, mining, and agricultural operations, and from community activities . . . ."  42 U.S.C. § 6903(27). Stormwater runoff is "surface water generated by a precipitation of events, such as rainstorms, which flows over streets, parking lots, commercial sites, and other developed parcels of land." *Natural Res. Def. Council, Inc.*, 673 F.3d at 883-84.  When it "flows over urban environments, it collects suspended metals, sediments, algae-promoting nutrients (nitrogen and phosphorus), floatable trash, used motor oil, raw sewage, pesticides, and other toxic contaminants."  *Id.* at 884 (internal quotation omitted).  Consequently, stormwater runoff is "solid waste" because it includes solid and liquid materials that result from community activities.

Second, the industrial discharge exception does not apply.  The definition of "solid waste" exempts "industrial discharges which are point sources subject to permits under section 1342 of Title 33 . . . ."  42 U.S.C. § 6903(27).  Stormwater discharges may be industrial or municipal.  33 U.S.C. § 1342(p).  Industrial stormwater discharge is defined as "the discharge from any conveyance that is used for collecting and conveying storm water and that is directly related to manufacturing, processing or raw materials storage areas at an industrial plant."  40

C.F.R. § 122.26(14).   The stormwater discharges at issue here are municipal and not industrial, meaning the industrial discharge exception does not apply.

Third, the Highway Defendants are actively contributing to the handling and disposal of stormwater runoff.  This Court has discussed the need for active involvement to find RCRA liability in response to SSA's Motion to Dismiss.  *See supra* 23-26.  That being said, this Court will examine the RCRA's language in terms of the Highway Defendants' actions.  "Disposal" means "the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste . . . may enter the environment or be emitted into the air or discharged into any waters, including ground waters."  42 U.S.C. § 6903(3).  "Handling," the "broadest of the statutory terms . . . is not defined in [the] RCRA" and therefore, should "be given the ordinary dictionary meaning of 'to manage, operate, or use with the hand or hands; . . . to manage, control, direct, train, etc.'" *Union Corp.*, 259 F. Supp. 2d at 401 (quoting *Webster's New World Dictionary* at 611 (3d Coll. Ed. 1988)).  Moreover, "contribute" is not defined in the RCRA, and thus, its ordinary dictionary meaning is "to play a significant part in bringing about an end or result."  *Merriam-Webster Online Dictionary*, *available at:* <http://www.merriam-webster.com/dictionary/contribute>.  The Highway Defendants contribute to the disposal of stormwater because they managed the MS4s, and stormwater enters the MS4s and discharges into the river.  Thus, the NJTA's argument that the Highway Defendants are passive actors and have done nothing besides construct the highway infrastructure is incorrect.

Lastly, Plaintiffs' RCRA claim against the Highway Defendants is not barred by the anti-duplication provision.  The anti-duplication provision states "[n]othing in this chapter shall be construed to apply to . . . any activity or substance which is subject to the . . . [CWA] . . . except

to the extent that such application (or regulation) is not inconsistent with the requirements of such Acts."  42 U.S.C. § 6905.  "[W]hen two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective.  When there are two acts upon the same subject, the rule is to give effect to both if possible . . . ."  *Morton v. Mancari*, 417 U.S. 535, 551 (1974) (internal quotation omitted).  Defendants have the burden "to show that . . . an inconsistency would result."  *Legal Environmental Assistance Foundation, Inc. v. Hodel*, 586 F. Supp. 1163, 1167 (E.D. Tenn. 1984).  Here, Plaintiffs' RCRA claim cannot be dismissed on this basis because discovery is needed to determine if the RCRA and CWA are inconsistent in this case.

Not only is Plaintiffs' RCRA claim against the NJTA valid as a matter of law but Plaintiffs pled sufficiently facts to show a plausible claim for relief.  Plaintiffs allege that the NJTA is "responsible for operation of the Garden State Parkway," and discharges from the Parkway through small MS4s are authorized under the Highway Permit.  Compl. ¶ 47.  Plaintiffs allege that stormwater runoff from these discharges contributes to sediment contamination because sediments near the roadways contain higher levels of arsenic, copper, lead, nickel, and zinc than concentrations of these sediments upstream from the roadways.  Thus, Plaintiffs have sufficiently pled a violation of RCRA.  *See also supra* 43-44.

For these reasons, NJTA's Motion to Dismiss is denied.

### c.   MOTION FOR A STAY

NL, SSA, and SERA argue, in the alternative, for a stay of the litigation.  NL asserts that this case should be stayed pending completion of on-site source area remediation because the NJDEP has approved RAWPs and work under the RAWPs has already begun.  NL explains that staying this case pending completion of on-site remediation will simplify the issues for trial.

Additionally, NL contends that the stay should extend to Plaintiffs' claims for injunctive relief regarding the remediation of river sediments because to avoid recontamination, the on-site source areas should be remediated and upstream sources of contamination should be addressed as well.  Plaintiffs, however, only agree to a stay of the on-site source claims.  Plaintiffs assert that the claims involving river sediments should not be stayed because the claims will not be resolved by on-site work.

"A United States district court has broad power to stay proceedings."  *Bechtel Corp. v. Local 215, Laborers' Int'l Union of N. Am., AFL-CIO*, 544 F.2d 1207, 1215 (3d Cir. 1976).  This "power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants."  *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936).  "How this can be done calls for the exercise of judgment, which must weigh competing interests and maintain an even balance."  *Id.* at 254-255.

Having denied the Defendants' various motions, the Court will permit this litigation to go forward.  However, the Court questions the sense of the case, at this time, in that, the NJDEP-approved on-site remediation project will be managed and coordinated with the development of the Site, which has already resulted in the expenditure of large sums of public and private funds, the remediation method that is in place may very well satisfy the parties' obligations; and, it is obvious that the treatment of river sediments near the Site, without a broad regional approach to the project, will be futile.[11]

Furthermore, regarding the Highway Defendants, it is unclear what the requested declaratory relief achieves in an environmental sense.  Although this Opinion demonstrates that further discovery is needed concerning all parties, the claims against the Highway Defendants

---

[11] The NJDEP has previously concluded that a regional project is required.  *See supra* 4.

may be severed from the claims concerning the other Defendants because the claims against the Highway Defendants concern a different set of circumstances.

Therefore, the parties are required to submit proposals for further case management, including the potential severance of the claims regarding the Highway Defendants and the appropriate parameters for a Stay.

### III.     CONCLUSION

For the foregoing reasons, the NJDOT Defendants' Motion to Dismiss [docket # 183], the NJTA's Motion to Dismiss [docket # 184], SSA's Motion to Dismiss [docket # 185], SERA's Motion to Dismiss [docket # 186], NL's Motion for Summary Judgment [docket # 188], and NL's Motion to Dismiss [docket # 189] are denied.  Middlesex County's Motion to Dismiss [docket # 187] is denied as moot.  An Order accompanies this Opinion.

/s/ Joel A. Pisano
JOEL A. PISANO
United States District Judge

Dated: January 8, 2013